## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UFCW LOCAL 1500 WELFARE FUND, UNIFORMED FIRE OFFICERS ASSOCIATION FAMILY PROTECTION PLAN LOCAL 854, and UNIFORMED FIRE OFFICERS ASSOCIATION FOR RETIRED FIRE OFFICERS FAMILY PROTECTION PLAN.<br><br>          Plaintiffs,<br><br>v.<br><br>TAKEDA PHARMACEUTICALS U.S.A., INC., WATSON LABORATORIES, INC., TEVA PHARMACEUTICAL INDUSTRIES LTD., TEVA PHARMACEUTICALS USA, INC., and  AMNEAL PHARMACEUTICALS LLC,<br><br>          Defendants. | Case No.<br><br><br>Jury Trial Demanded |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   PARTIES AND RELEVANT NONPARTIES.......................................................... 3

    A.    Plaintiffs ...................................................................................................... 3

    B.    Defendants ................................................................................................... 5

    C.    Nonparty ..................................................................................................... 6

III.  JURISDICTION AND VENUE .............................................................................. 6

IV.  FACTS ................................................................................................................. 13

    A.    Colcrys ...................................................................................................... 13

    B.    Generic Versions of Brand-Name Drugs Are Significantly Less Expensive Than, and Take Significant Sales Directly from, the Corresponding Brand-Name Versions ........................................................................................................ 18

    C.    FDA's Generic Drug Approval Process ................................................... 21

        1.    Tentative Approval ........................................................................22

        2.    How a Company with Tentative Approval Gets Final Approval ..............23

    D.    Timeline of Key Events Regarding Efforts to Market Generic Colcrys ............. 24

    E.    Applications to Market Generic Colcrys ................................................. 27

        1.    Par's ANDA Approval ..................................................................28

        2.    Watson and Amneal's ANDA Approvals .....................................28

        3.    Third Wave ANDA Approvals ......................................................29

    F.    Takeda's Litigation Against Par, Watson, and Amneal Had No Realistic Chance of Success ................................................................................................... 29

        1.    Takeda's Loses the Mitigare Litigation........................................31

        2.    When the Par Litigation Settled in December 2015, Takeda Had Little Chance of Prevailing..................................................................33

        3.    Watson and Amneal Were Also Highly Likely to Prevail on Non-Infringement Grounds................................................................35

        4.    Takeda Would Also Have Lost Due to the Patents' Invalidity..................35

    G.    Facing Entry by Multiple Generics, Defendants Conspire to Restrain Competition ................................................................................................................... 39

        1.    Takeda Enters Into Settlement, License, and Distribution Agreements With Par, Watson, and Amneal .................................................41

        2.    Economic Benefits Flowing from the Conspiracy to Takeda, Par, Watson, and Amneal ..................................................................47

3.    Defendants' Written Agreements Contain Direct Evidence of
      Conspiracy to Restrain Trade ..................................................................51

4.    Additional Evidence of Conspiracy .........................................................52

5.    Anticompetitive Effects of the Market Allocation ...................................54

H.    Teva Acquired Watson and Joined the Conspiracy .................................. 55

I.     The Market Allocation Comes to an Abrupt End.................................... 57

V.     CLASS ACTION ALLEGATIONS ................................................................. 60

VI.    ANTICOMPETITIVE EFFECTS.................................................................... 63

VII.   ANTITRUST IMPACT.................................................................................... 67

VIII.  EFFECT ON INTERSTATE AND INTRASTATE COMMERCE................... 68

IX.    MONOPOLY POWER AND RELEVANT MARKET..................................... 70

X.     CLAIM ACCRUAL AND/OR TOLLING........................................................ 71

XI.    CLAIMS FOR RELIEF ................................................................................... 74

XII.   DEMAND FOR JUDGMENT........................................................................ 107

XIII.  JURY DEMAND ............................................................................................ 107

Plaintiffs UFCW Local 1500 Welfare Fund ("UFCW Local 1500"), Uniformed Fire

Officers Association Family Protection Plan Local 854 ("UFOAFPP"), and Uniformed Fire

Officers Association for Retired Fire Officers Family Protection Plan ("RFOFPP") bring this

Complaint against Takeda Pharmaceuticals U.S.A., Inc. ("Takeda"), Teva Pharmaceutical

Industries Ltd. ("Teva Ltd."), Teva Pharmaceuticals USA, Inc. ("Teva USA"), Watson

Laboratories, Inc. (later acquired by and integrated into Teva Ltd. and its holdings) ("Watson"),

and Amneal Pharmaceuticals LLC ("Amneal" and all defendants collectively, "Defendants") and

allege as follows based on: (a) personal knowledge, (b) the investigation of its counsel, and (c)

information and belief.

## I.    <u>INTRODUCTION</u>

1.      Colcrys is a drug whose active ingredient, colchicine, is derived from a plant that

has been used to treat gout since at least 1500 B.C. As part of an FDA program called the

Unapproved Drugs Initiative, Takeda, the seller of brand Colcrys, obtained a regulatory

exclusivity that allowed Takeda to sell the only version of Colcrys from 2009 to 2016. But, even

after enjoying those seven years of exclusivity, Takeda sought out and obtained patents that

ostensibly protected this ancient drug until 2029. Three generic drug companies—Par, Amneal,

and Watson—challenged Takeda's patents, and in late 2015, on the eve of a trial that Takeda was

almost certain to lose, Takeda proposed to allocate the market with the generic challengers rather

than open the market to full generic competition, which in turn would cause Takeda's profits to

decline precipitously. The generics agreed to the conspiracy.

2.      Before Takeda's exclusivity, there were as many as 21 sellers of colchicine

medications. Because market share and generic prices decline as more competitors come on the

market, the conspirators sought to avoid a similarly competitive market and agreed to limit the

number of generic competitors for several years. Under the settlements, Par would sell the only

Colcrys generic from July 2018 to October 2020. Then Watson and Amneal would come on the market as the second and third generics for 135 days. Then, and only then, would full generic competition begin.

3.      The scheme initially succeeded, keeping Colcrys prices high for years after they would otherwise have been reduced to competitive levels. But when Hikma (another drug manufacturer), defeated the Colcrys patents in a different case about a separate drug Mitigare, an "acceleration clause" under the settlements was triggered, leading to generic colchicine entry on November 25, 2019. But by then, the damage had been done. Prices for brand and generic Colcrys remained high during the period of delayed competition, particularly when compared to the pennies that colchicine sold for before Takeda launched Colcrys.

4.      Defendants' scheme allowed them to reap hundreds of millions of dollars in additional revenues at the expense of those responsible for paying for brand and generic Colcrys prescriptions. In the United States, the vast majority of prescriptions are covered by and paid for in large part by a consumer's prescription drug benefit plan. In an insured prescription drug purchase, the consumer pays a portion of the cost at the pharmacy (a "co-payment" or "co-insurance" amount). The entity that is financially responsible for the prescription drug plan, known as a third-party payer or TPP, is then billed for the remaining cost of the drug. A variety of entities can be TPPs. For example, a TPP can be: (1) a commercial insurer, (2) a union health and welfare benefit fund like UFCW Local 1500, UFOAFPP, and RFOFPP, (3) a municipality, or (4) a private company that provides prescription drug benefits to its employees. The defining characteristic of a TPP (for purposes of this litigation) is that it bears ultimate responsibility for the cost of drugs. Plaintiffs and members of the proposed class are TPPs.

5.      TPPs are not direct purchasers;[1] they do not buy drugs from manufacturers. Nor are they resellers of prescription drugs (in fact, they never take possession of a drug that is dispensed to their members). Instead, TPPs are the last entity in the chain of payment for prescription drugs (and are often called "end-payers" as a result) and are responsible for providing prescription drug coverage to consumers and paying the vast majority of the costs of drugs that doctors prescribe for their members. Because they are not resellers, when the prices of prescription drugs are inflated, TPPs are ultimately the ones left holding the bag. That is exactly what happened as a result of Defendants' conduct concerning the brand and generic Colcrys.[2]

6.      Defendants' conduct forced TPPs to provide reimbursements for prescriptions of brand and generic Colcrys at inflated prices for several years longer than they would have without the conspiracy. Absent Defendants' conduct (1) more of those prescriptions would have been filled with a lower-cost generic instead of the brand, (2) the prices paid for generic prescriptions would have been lower than what Plaintiffs and other TPPs paid, and (3) the prices paid for branded prescriptions would have been lower than what Plaintiffs and other TPPs paid. Plaintiffs bring this action under state law and Federal Rule of Civil Procedure 23 to recover the overcharges paid by it and other TPPs.

## II.    **PARTIES AND RELEVANT NONPARTIES**

### A.    **Plaintiffs**

7.      Plaintiff UFCW Local 1500 Welfare Fund is a multi-employer welfare benefits fund with its principal place of business in Westbury, New York. Local 1500 provides nearly

---

[1] They are, therefore, distinct from the direct purchaser entities that previously litigated antitrust claims against the Defendants. Case No. 2:21-cv-3500-MAK (E.D. Pa.).

[2] References to Colcrys, generic Colcrys, or colchicine do not, unless otherwise specified, refer to a colchicine product marketed by Hikma Pharmaceuticals (f/k/a West-Ward).

23,000 plan participants with health and welfare benefits and, with more than 17,000 members, is the largest grocery union in New York. Between October 2017 and December 2020, UFCW Local 1500 paid for some or all of its members' purchases of brand and/or generic Colcrys in Connecticut, Georgia, New Jersey, New York, and North Carolina.

8.      Plaintiff Uniformed Fire Officers Association Family Protection Plan Local 854 is a health and welfare benefits plan headquartered and with a principal place of business in New York, New York. UFOAFPP is a non-profit entity. UFOAFPP is a joint labor-management sponsored trust fund authorized by Sections 302(c)(5) and (8) of the Labor Relations Management Act, established to provide health and welfare benefits to employees and their families, commonly known as a Taft-Hartley Fund, as well as an employee welfare benefit fund within the meaning of Section 3(1) of the Employee Retirement Income Security Act, that provides a program of health, welfare, legal, and related benefits for its participants and beneficiaries. It administers the assets of defined contribution plans formed to provide certain benefits including prescription drug benefits. UFOAFPP provides health and welfare benefits to members and participants who reside in numerous locations in the United States. Between at least October 2017 and December 2020, UFOAFPP paid for some or all of its members' purchases of brand and/or generic Colcrys in at least California, Delaware, Florida, New Jersey, New York, and Virginia.

9.      Plaintiff Uniformed Fire Officers Association for Retired Fire Officers Family Protection Plan is a health and welfare benefits plan headquartered and with a principal place of business in New York, New York. RFOFPP is a non-profit entity. RFOFPP is a joint labor-management sponsored trust fund authorized by Sections 302(c)(5) and (8) of the Labor Relations Management Act, established to provide health and welfare benefits to employees and

their families, commonly known as a Taft-Hartley Fund, as well as an employee welfare benefit fund within the meaning of Section 3(1) of the Employee Retirement Income Security Act, that provides a program of health, welfare, legal, and related benefits for its participants and beneficiaries. It administers the assets of defined contribution plans formed to provide certain benefits including prescription drug benefits. RFOFPP provides health and welfare benefits to members and participants who reside in numerous locations in the United States. Between at least October 2017 and December 2020, RFOFPP paid for some or all of its members' purchases of brand and/or generic Colcrys in at least New York, North Carolina, Pennsylvania, Wyoming, and Utah.

### B.    Defendants

10.    Defendant Takeda is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located in Lexington, Massachusetts.

11.    Defendant Teva Ltd. is an Israeli corporation with its principal place of business at 124 Dvora HaNevi'a Street, Tel Aviv 6944020, Israel. Teva Ltd. is the successor-in-interest to Watson. On July 26, 2015, Teva Ltd. agreed, through a Master Purchase Agreement ("MPA"), to purchase Watson and, as part of that purchase (which closed in August 2016), assumed all of Watson's liabilities. Moreover, Teva Ltd. ratified Watson's conduct challenged herein.

12.    Defendant Teva USA is a Delaware corporation with its principal place of business located in North Wales, Pennsylvania through at least February 2019, after which its principal place of business relocated to 400 Interpace Parkway, Parsippany, NJ 07054. Teva USA is a wholly owned subsidiary of Teva Ltd.

13.    Defendant Watson is a Nevada corporation that appears to exist as a going concern in name only. Watson's "active" Nevada corporate registration has, for the last few years, identified both its Principal Office address and mailing address as "N/A." In August 2016,

Teva Ltd. wholly acquired Watson as a result of the 2015 transaction. Teva Ltd. then assigned the Watson generic Colcrys Abbreviated New Drug Application ("ANDA") to Teva USA and other wholly-owned Teva Ltd. subsidiaries for manufacture, labelling, and marketing for U.S. sales.

14.     Watson, Teva Ltd. and Teva USA are hereinafter referred to collectively as "Watson," except when referring to personal jurisdiction.

15.     Defendant Amneal is a Delaware corporation with its principal place of business at 400 Crossing Boulevard, Third Floor, Bridgewater, NJ, 08807-2863.

**C.      Nonparty**

16.     Relevant Nonparty Par Pharmaceutical, Inc. ("Par") is a Delaware corporation with its principal place of business and corporate headquarters at One Ram Ridge Road, Chestnut Ridge, New York 10977.

## III.    <u>JURISDICTION AND VENUE</u>

17.     This action arises under states antitrust and consumer protection laws and seeks damages (including multiple damages as permitted by law), costs of suit, and reasonable attorneys' fees for the overcharges paid by Plaintiffs and those similarly situated resulting from Defendants' conspiracy or conspiracies in restraint of trade and monopolization of the market for Colcrys and its AB-rated generic equivalents. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 and at least one member of the putative class is a citizen of a state different from that of one of the Defendants.

18.     Defendants transact business within this district, and they carry out interstate trade and commerce in substantial part in this district and/or have an agent and/or can be found in this district. Venue is therefore appropriate within this district under 28 U.S.C. §1391(b) and (c).

19.     The Court has personal jurisdiction over each defendant. Each defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district.

20.     During the relevant period, each of Teva USA, Watson, and Amneal also has either been domiciled or registered to conduct business in New York.

21.     Though not domiciled in the United States, Teva Ltd. has, during the relevant period, itself maintained continuous and systematic direct contacts with the United States and Pennsylvania. Teva Ltd. trades on the New York Stock Exchange under "TEVA" and has directly solicited and obtained roughly $12 billion in U.S. investor capital. Teva Ltd. routinely describes itself in its SEC filings, year-to-year, as a "worldwide" operation with a "significant presence in the United States." For FY 2015, Teva reported roughly the same total number of employees working in the United States as in Israel; by 2020, Teva Ltd. reported nearly twice as many employees working in the United States than in Israel. Throughout the relevant period, Teva Ltd. has consistently touted in its SEC filings that it is the "leading generic pharmaceutical company in the United States," with sales of its "entire product portfolio" in the United States ranging from $4 billion to over $8 billion per year. Teva Ltd. is the express assignee on over 450 U.S. patents, each of which, per 35 U.S.C. § 293, requires submission to U.S. federal court jurisdiction. Teva Ltd. has also routinely appeared in U.S. federal courts, including this Court, to enforce its U.S. intellectual property and to defend against similar antitrust actions involving generic delay claims. Teva Ltd. acquired the at-issue Watson generic Colcrys ANDA through a

transaction with Allergan plc in which it purchased the generics business formerly run by Watson (described more fully below). By its terms, the Master Purchase Agreement ("MPA") between Teva Ltd. and Allergan plc requires litigation in U.S. courts with U.S. law applied. Teva Ltd. assigned its acquired Watson generic Colcrys ANDA to Teva USA and others of its wholly-owned subsidiaries for manufacture, labelling, and marketing for U.S. sale, consistent with the conspiracy alleged. U.S. sales of the Watson generic Colcrys ANDA product did not start until *after* Mylan's unexpected disruption of the conspiracy in November 2019, when, in the absence of the alleged output restriction conspiracy, such sales would have commenced as close in time to January 26, 2017, as possible.

22.    The post-January 26, 2017, delay in the marketing of the Watson generic Colcrys ANDA product in the United States constitutes ratification of the Watson conspiracy agreements and accordingly also confers personal jurisdiction on Teva Ltd. in this Court.

23.    Per the MPA, liability pertaining to the Watson generic Colcrys ANDA product and Watson's actions and agreements thereto were expressly transferred. Teva Ltd. is accordingly also subject to personal jurisdiction in this Court as Watson's successor-in-interest.

24.    Teva Ltd. also acts as the alter ego for its wholly-owned subsidiary Teva USA, which it dominates and controls as a mere U.S. sales department. Teva Ltd. is accordingly also subject to personal jurisdiction in this Court by virtue of the imputed domiciliary contacts of Teva USA. The facts establishing such personal jurisdiction include the following:

25.    Teva Ltd. holds itself and its subsidiaries out to the public as "One global brand, One story, One Teva." It manages "One Teva" as a single product portfolio and "one commercial organization," departmentalized among three regional segments: North America, Europe, and

International Markets. All "One Teva" entities, including Teva USA, use Teva Ltd.'s common branding and single corporate logo, uniform across would-be corporate boundaries.

26.     Teva Ltd. controls its subsidiaries to ensure that all act as the single "One Teva" commercial organization. For instance, while Teva Ltd. has three regional operating segments, "Teva manages its assets on a total company basis . . . as many of its assets are shared or commingled [among subsidiaries]." Teva Ltd. Segment Reporting Memorandum Q1 2018 at 4. Moreover, Teva Ltd.'s Chief Executive Officer, Kare Schultz, "manage[s] and orchestrate[s]" Teva's singular economic unit and "is directly involved in assessing performance and making decisions on resource allocation." *Id.* at 3. Schultz regularly reviews the discrete financial operating results of the component parts of "One Teva" to inform his decisions on how to allocate resources. *Id.* Schultz controls Teva Ltd.'s subsidiaries on a day-to-day basis by reviewing "flash reports," containing key financial data such as "daily revenues" and "sales information based on product line," as well as presentations comparing results to forecasts and budgets for all Teva entities. *Id.* at 6-7. These regular reports inform Schultz's decisions regarding allocation of resources among subsidiaries. *Id.* at 7.

27.     Teva Ltd. is managed by an Executive Committee ("Executive Management"), which consists of its CEO (Schultz), and 11 high-ranking Teva Ltd. corporate officers. All of these Executive Management officers are paid by Teva Ltd., whether employed in Israel, the United States, or Europe. All Teva USA employees report up a chain through Teva Ltd.'s Executive Management and ultimately to Teva Ltd.'s CEO. The head of tax for Teva USA, for instance, reports to the head of tax for Teva Ltd.

28.     Not only do all subsidiaries report directly to Teva Ltd., but Teva Ltd. also shares several officers and employees with its subsidiaries, including Teva USA. For instance, Deborah

Griffin is based in Pennsylvania and holds the position of Chief Accounting Officer and Senior Vice President at both Teva Ltd. and Teva USA. Until July 2021, Brendan O'Grady, based in Kansas, served as Executive Vice President and Head of North America Commercial at Teva Ltd. As of April 2021, he was simultaneously the Director, President, and CEO of Teva USA. Pennsylvania-based Brian Shanahan is the Vice President and Deputy General Counsel-Transactions for Teva Ltd. and simultaneously holds the title of Vice President and Secretary for Teva USA.

29.    Teva Ltd. dominates its subsidiaries by controlling their boards. Teva Ltd.'s Guidelines for Composition and Governance of Subsidiary Boards require that Teva Ltd.'s Secretary approve the nomination of any and all board members for Teva Ltd.'s "First Tier Subsidiaries," such as Teva USA.

30.    Teva Ltd. has implemented numerous policies that apply with equal force to all Teva employees, including all employees of Teva Ltd.'s subsidiaries. This includes, among other things, annual bonus policies, conflict of interest policies, and financial and accounting policies. Teva Ltd. also has the ultimate control to fire the employees of its subsidiaries, which, in 2017, Teva Ltd. exercised and fired thousands of employees in the United States.

31.    Teva Ltd. exerts further control over its subsidiaries, including Teva USA, through various global "divisions" and groups, which are managed by Teva Ltd.'s officers and are responsible for significant aspects of Teva Ltd.'s subsidiaries' businesses, such as design, manufacturing, marketing, sales, supply, reporting, policy, compliance, and administration, and provide for vertical integration within "One Teva." For instance:

a.    Teva Ltd. has a "Global Generic Medicines group" responsible globally for all of its subsidiary's generic commercial activities, including Teva's "generic R&D

10

portfolio management and selection, product launch and commercial execution." Teva Ltd., 2016 Annual Report (Form 10-K) at 46 (Feb. 15, 2017).

b.    Teva Ltd. maintains a separate Global R&D Division which, in development centers around the world, carries out product formulation, clinical studies, and various other testing on behalf of "One Teva." Because Global R&D "incurs expenses" but "does not have any revenues," its "expenses are allocated to other units within Teva." Teva Ltd. Segment Reporting Memorandum Q1 2018 at 9.

c.    Another global division, Teva Global Operations, is responsible for "development, manufacturing and commercialization of APIs, manufacturing of pharmaceuticals, quality assurance, procurement and supply chain." Teva Ltd., 2016 Annual Report (Form 10-K) at 46 (Feb. 15, 2017). It also must ensure the "reliable supply of quality, cost-effective medicines from our global network of sites in compliance with all relevant standards." *Id.*

d.    The Global Marketing & Portfolio division is "responsible for overseeing the interface between regions, R&D and operations." Teva Ltd. Segment Reporting Memorandum Q1 2018 at 4-5.

e.    Other functions that Teva Ltd. performs globally for all its subsidiaries, including Teva USA, "includ[e], Finance, Legal, Information Technology, the Business Development Strategy and Innovation Group, Human Resources and the Corporate Marketing and Communications Group." Teva Ltd., 2016 Annual Report (Form 10- K) at 46 (Feb. 15, 2017).

32.    Teva Ltd. thus operates as a single vertically integrated sales and distribution system, operating among and across all "One Teva" entities, including Teva USA. Teva Ltd.'s

business unit, Teva API, manufactures and distributes active pharmaceutical ingredients to Teva Ltd.'s subsidiaries. Furthermore, Teva Ltd. orchestrates the manufacture and distribution of generic drugs across Teva entities. For instance, the "Teva" generic colchicine (*i.e.*, generic Colcrys) product launched and sold in the United States is: (i) the Watson ANDA formulation Teva Ltd. acquired in 2016 as a result of the 2015 MPA transaction; (ii) manufactured in the Czech Republic by Teva Ltd. subsidiary Teva Czech Industries, s.r.o.; (iii) labelled for U.S. sales by Teva Ltd. subsidiary Actavis Pharma, Inc.; and (iv) marketed in the United States by Teva Ltd.'s U.S. sales department, Teva USA.

33.     Teva Ltd.'s unity of interest with Teva USA and its other subsidiaries is evidenced also by their shared legal representation. Teva Ltd. and Teva USA commonly share the same outside legal counsel. Moreover, all Teva USA lawyers and paralegals report to U.S.-based David Stark, who is both the Executive Vice President and Chief Legal Officer of Teva Ltd. and an employee of Teva USA. Teva Ltd. has also implemented, for all its subsidiaries, various standard operating procedures and policies for contracting with third parties.

34.     Teva Ltd., through its Global Insurance Department, buys and manages insurance policies for the entire group of affiliated companies worldwide as a single economic entity, and allocates the costs among its subsidiaries. A Teva Ltd. officer manages the Global Insurance Department.

35.     Teva Ltd. maintains extensive control over its subsidiaries' finances, including Teva USA. Teva Ltd. files its consolidated financial results for all affiliated entities with the U.S. Securities & Exchange Commission. Its inter-company general ledger transactions shows that Teva Ltd. has integrated billions of dollars of its subsidiaries' cash resources into its single "One Teva" business enterprise. Teva Ltd. formed a Special Purpose Entity ("SPE") that takes control

12

of, and comingles, its subsidiaries' trade receivables. Teva Ltd. is the primary beneficiary of the SPE. Moreover, Teva Ltd. treats Teva USA's earnings as its own, using Teva USA's cash flows to, among other things, pay dividends, repurchase shares, and pay advances on receivables.

36.    Teva Ltd. is also involved in the approval of its subsidiaries' capital expenditures and procurements. In Teva's Capital Expenditure Corporate Policy, applicable to "all Teva entities" and governed by Teva Ltd.'s Executive Management: "Every project above $100K in total [for] Teva's Global Operation, Global IT and above $50K for all other Business Unit/Global Function requires a standardized Capital Expenditure Request." Depending on the amount of the requested expenditure, expenditures require approval by Teva Ltd.'s business units, Global Functions, CEO, or Board of Directors. Moreover, Teva Ltd. also directs its subsidiaries' procurement of goods and services from third parties. Under Teva Ltd.'s Global Procurement Policy, all Teva companies and employees are required to "engage" Teva Global Procurement where the estimated value of an agreement, change order, or anticipated annual spend of a third party supplier "is equal to or greater than the Competitive Bidding Threshold," $100,000 in the United States.

37.    Consistent with Teva Ltd.'s control over its subsidiary's financing and related decision-making, Teva Ltd. arranged for all financing related to the MPA transaction and the integration of the acquired Watson assets into the "One Teva" organization, including into Teva USA.

## IV.    FACTS

### A.    Colcrys

38.    Colchicine is a naturally occurring substance found in the autumn crocus plant (*colchicum autumnale*) and was used by the Ancient Greeks approximately two thousand years ago to treat and prevent symptoms of gout, a type of severe arthritis often characterized by

painful "flares" (severe and sudden attacks of pain, redness, inflammation, and tenderness in joints) resulting from the build-up of uric acid. More recently, in 1972, Dr. Stephen Goldfinger reported the successful use of colchicine in treating Familial Mediterranean Fever ("FMF"), a rare, autosomal recessive, auto-inflammatory disease characterized by recurrent and/or chronic inflammation that is concentrated in populations of Mediterranean origin. Thus, no later than 1972, the uses of colchicine in the treatment and prevention of gout flares and the treatment of FMF were well known and unpatentable.

39.     Before 2009, there were at least 21 companies, including Watson,[3] that marketed single ingredient colchicine. As a result, a dose of colchicine was available for pennies. Before 2006, a colchicine pill cost just $0.09.

40.     The Food, Drug & Cosmetics Act—the federal law that regulates prescription drugs—applies only to "any new drug," and therefore not to old drugs like colchicine. Accordingly, companies marketing colchicine as of 2006 were not doing so pursuant to the operative regulatory framework that required any company wanting to market and sell a new prescription drug to submit and get FDA approval of a New Drug Application ("NDA"). In 2006, however, FDA announced its Unapproved Drugs Initiative under which it planned "to remove unapproved drugs from the market" and bring "all such drugs" —including colchicine—"into the approval process."

41.     In 2008, Takeda's predecessor Mutual Pharmaceutical Co., Inc., a subsidiary of United Research Laboratories, Inc. (all referred to collectively as "Takeda" herein) filed three NDAs (*i.e.*, NDA Nos. 22-351, 22-352, and 22-353) for colchicine tablets for the treatment of FMF and the treatment and prophylaxis (*i.e.*, prevention) of gout flares. In July of 2009, the FDA

---

[3] *See Mut. Pharm. Co. v. Watson Pharm., Inc.*, 2009 WL 3401117 (C.D. Cal. Oct. 19, 2009).

approved these NDAs and granted Takeda's branded colchicine tablet product, called Colcrys, a three-year exclusivity for the treatment of acute gout flares and a seven-year exclusivity for the treatment of FMF. Takeda's final exclusivity expired on July 29, 2016.

42.     As a result, the 21 existing colchicine treatments were removed from the market after 2009 and replaced with Takeda's Colcrys tablets. Takeda, now with a monopoly, realized annual sales of Colcrys as high as $629 million.[4] By May 2014, Takeda was charging over $5.25 per tablet of Colcrys, an increase of 5,733.33% over the price in 2006. Takeda raised the price of colchicine to a peak of $6.73 per Colcrys tablet in January 2019, up from the pennies a pill the drug cost a little over a decade earlier. As a result, both expenditures to fill Colcrys prescriptions and Takeda's revenues skyrocketed after Takeda took advantage of the FDA's Unapproved Drug Initiative.[5]



Growth in Colcrys Sales Following the FDA's UDI

---

[4] *See* https://www.fiercepharma.com/pharma/actavis-confirms-generic-colcrys®-patent-challenge, *last accessed* November 9, 2023.

[5] Expert Merits Report of Dr. Russell Lamb, Case No. 2:21-cv-3500-MAK, ECF 742-3, at 68 (Jan. 13, 2023).

43.    Though the drug dates back literally centuries, Takeda sought and obtained seventeen U.S. patents that it listed in the FDA Orange Book under the Colcrys NDA No. 22-352—*i.e.*, United States Patent Nos. 7,906,519 ("the '519 Patent"); 7,935,731 ("the '731 Patent"); 8,093,298 ("the '298 Patent"); 7,964,648 ("the '648 Patent"); 8,093,297 ("the '297 Patent"); 7,619,004 ("the '004 Patent"); 7,601,758 ("the '758 Patent"); 7,820,681 ("the '681 Patent"); 7,915,269 ("the '269 Patent"); 7,964,647 ("the '647 Patent"); 7,981,938 ("the '938 Patent"); 8,093,296 ("the '296 Patent"); 8,097,655 ("the '655 Patent"); 8,415,395 ("the '395 Patent"); 8,415,396 ("the '396 Patent"); 8,440,721 ("the '721 Patent"); and 8,440,722 ("the '722 Patent") (collectively, the "Colcrys Patents").

44.    Instead of claiming colchicine itself, Takeda's patents cover several methods of administering colchicine products to treat gout. *See Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 627 (Fed. Cir. 2015) (the "Mitigare Litigation"). Takeda's Colcrys Patents fall into two categories: "Acute Gout Flare Patents," which are directed to methods of treating acute gout flares and the "Drug-Drug-Interaction (DDI) Patents," which are directed to methods for administering colchicine for prophylaxis of gout in patients who are concomitantly taking certain drug inhibitors known as "CYP3A4" and "P-gp" inhibitors. *Id.* These latter patents claim the unapproved use of co-administering colchicine with other drugs (*e.g.*, ketoconazole, ritonavir, and clarithromycin) and are sometimes called "the Co-Administration Patents." The following table illustrates the patents:

| Patent | Expiration Date | Type |
|---|---|---|
| 7,601,758 | October 15, 2028 | Co-Administration |
| 7,619,004 | December 3, 2028 | Co-Administration |
| 7,820,681 | February 17, 2029 | Co-Administration |
| 7,906,519 | February 17, 2029 | Co-Administration |
| 7,915,269 | February 17, 2029 | Co-Administration |
| 7,935,731 | December 3, 2028 | Co-Administration |
| 7,964,647 | October 6, 2028 | Acute Gout Flare*[6] |
| 7,981,938 | October 6, 2028 | Acute Gout Flare* |
| 7,964,648 | February 17, 2029 | Co-Administration * |
| 8,093,296 | December 3, 2028 | Co-Administration |
| 8,093,297 | February 17, 2029 | Co-Administration * |
| 8,093,298 | December 3, 2028 | Co-Administration * |
| 8,097,655 | December 3, 2028 | Co-Administration * |
| 8,415,395 | October 6, 2028 | Acute Gout Flare* |
| 8,415,396 | October 6, 2028 | Acute Gout Flare |
| 8,440,721 | February 17, 2029 | Co-Administration |
| 8,440,722 | February 17, 2029 | Co-Administration |

45.     None of Takeda's patents covered the FDA-approved methods of prophylaxis of gout or the treatment of FMF using colchicine as a single-active ingredient. *See id.* at 627, 629 (identifying only the Acute Gout Flare Patents and DDI Patents and observing that "[a]s Takeda concedes, '[a]dministering colchicine for prophylaxis of gout flares is not covered by Takeda's asserted patents, except when it involves concomitant administration with certain other drugs'").

46.     Thus, none of Takeda's patents claims the FDA-approved uses of colchicine as a monotherapy for the treatment of FMF or prophylaxis of gout.

---

[6] At a status conference on June 16, 2015 in the Mitigare Litigation, Takeda agreed to limit the number of patents asserted at trial to eight patents. The eight patents that Takeda chose are those asterisked in the table, plus the '296 patent. On October 8, 2015, Takeda provided all three generic defendants with a covenant not to sue with respect to the '296 patent.

**B.    Generic Versions of Brand-Name Drugs Are Significantly Less Expensive Than, and Take Significant Sales Directly from, the Corresponding Brand-Name Versions**

47.    Takeda obtained approval of Colcrys as a brand name prescription drug product. Federal law also provides for the approval and sale of generic versions of branded drug products. A generic drug is a less expensive, but substantively identical (*i.e.*, bioequivalent), version of a brand name drug. Where a generic drug is shown to be bioequivalent to its branded counterpart, the generic drug is given an "AB" rating.

48.    Competition from lower-priced generic drugs saves American consumers billions of dollars a year. These consumer savings mean lower profits for brand drug companies. When robust AB-rated generic entry occurs, the brand company suffers a rapid and steep decline in sales and profits on its corresponding brand drug. On average, when generic drugs enter the market they take 97% of the total sales.[7] This is precisely what happened when, after the delays in competition caused by Defendants' conduct, full generic competition for Colcrys commenced.

49.    When there are many generic competitors, AB-rated generic versions of brand-name drugs are priced significantly below their brand-name counterparts. Because of those lower prices, and aided by institutional features of the pharmaceutical market, AB-rated generic drugs are rapidly and substantially substituted for their more expensive brand-name counterparts.

50.    When multiple generic manufacturers enter the market, prices for generic versions of a drug predictably decrease significantly because of competition among the generic manufacturers. Moreover, the entry of new competitors requires the existing competitors to split the available market, further reducing each competitor's overall revenue.

---

[7] IQVIA Institute for Human Data Science, "The Use of Medicines in the U.S.: Spending and Usage Trends and Outlook to 2025," 2021.

51.    As each incremental generic competitor enters the market as AB-rated to the reference-listed brand drug, it splits the available "pie" of generic sales with the existing competitors. And each such incremental competitor causes an incremental decline in price as it competes for a piece of that "pie," as shown in the FDA's analysis of generic competition and drug prices:



52.    As the FDA's analysis above shows, each additional generic competitor that launches for a given reference-listed brand drug causes prices to fall an incremental amount lower. That incrementally lower price can be expressed as a percentage of the brand price. The largest price drop occurs when a second generic competitor enters the market, but a substantial drop also occurs as each additional generic enters the market. There is thus a significant incentive for companies already on the market to delay the onset of competition from multiple generic manufacturers.

53.    Par's own expert, Walter H.A. Vandaele, Ph.D., whom Par proffered in seeking to enjoin Mylan's entry into the market, offered a similar analysis (based on a later FDA study),[8] which found that each additional generic competitor caused an increment of price drop for each new generic entrant:



54.    An AB-rating means that the generic drug is pharmaceutically equivalent and bioequivalent to the corresponding reference-listed brand drug. An AB-rating is particularly significant to a generic manufacturer because, under the Drug Price Competition and Patent

---

[8] See Takeda Pharm. *USA, Inc. v. Mylan Pharm., Inc.*, No. 19-2216-RGA, ECF No. 53 at Ex. 7, Page I.D. 3022 (D. Del. filed Jan. 6, 2020).

Term Restoration Act of 1984 (referred to as the "Hatch-Waxman Act"), and all state Drug

Product Selection laws, pharmacists may (and in many states, must) substitute an AB-rated

generic version of a drug for the brand-name drug automatically at the pharmacy counter,

without seeking or obtaining permission from the prescribing physician. Generic drugs that are

not AB-rated, either because they are not pharmaceutically equivalent or not bioequivalent,

cannot be automatically substituted by the pharmacist.

55.    Robust AB-rated generic competition, facilitated by automatic pharmacy

substitution, enables purchasers, patients, and insurers to (a) purchase generic versions of brand-

name drugs at substantially lower prices, and/or (b) purchase the brand-name drug at reduced

prices. However, until generic manufacturers enter the market with their AB-rated generic

products, there are no bioequivalent and substitutable generic drugs which compete with the

brand-name drug, and therefore the brand-name manufacturer can charge supracompetitive

prices profitably without losing all or a substantial portion of its brand-name sales.

56.    The threat of AB-rated generic competition thus creates a powerful incentive for

brand companies to protect their revenue streams.

**C.    FDA's Generic Drug Approval Process**

57.    The framework for the approval of generic drugs is governed by the Hatch-

Waxman Act. The Hatch-Waxman Act created an Abbreviated New Drug Application ("ANDA")

process that permitted generic applicants to reference the safety and efficacy evidence previously

submitted in support of a corresponding brand drug's NDA approval (the "Reference Listed

Drug" or "RLD") and then submit evidence to show that the generic drug is "bioequivalent" to

the RLD (*i.e.*, that it conveys its active ingredient to the part of the body where the drug works in

the same amount of time and in the same amount as the RLD).

58.    As an incentive to spur generic companies to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an ANDA containing a Paragraph IV certification that the generic version does not infringe any valid patent listed in FDA Orange Book against the reference-listed brand drug gets 180 days of protection from competition from other generic versions of the drug (except the brand's authorized generic ("AG") version) once it launches under its ANDA or as an AG ("180-day exclusivity").

### 1.    Tentative Approval

59.    One requirement a generic applicant must meet to obtain final FDA marketing approval before expiry of a patent listed in the FDA "Orange Book" under the NDA corresponding to the RLD is that it must submit either a Paragraph IV certification that the patent is invalid or will not be infringed by the manufacture, use, or sale of the generic applicant's product or a statement pursuant to § 355(j)(2)(A)(viii) for method-of-use patents. Under the Hatch-Waxman Act, the filing of a Paragraph IV certification is a technical act of infringement that provides standing for a brand company to initiate a patent infringement action even absent any actual infringement (assuming the patentee otherwise has a Rule 11 basis to file suit). If the patent's owner responds by suing the generic applicant for alleged patent infringement within 45 days, the Act requires the FDA to implement a stay of up to 30 months (the "30-month stay") on approving the contested ANDA to allow time for the parties to litigate the patent claims, after which the generic applicant can obtain final FDA marketing approval and launch its product even if the litigation has not been resolved by that time. The ANDA can be approved immediately if the litigation is concluded in the generic applicant's favor before the 30-month stay expires,

assuming the application fulfills the other requirements for approval. During the 30-month stay, the FDA can grant "tentative approval" to the ANDA, but not "final approval."[9]

60.    The high profit margins on brand name drugs, and the profit lowering effects of AB-rated generic entry, create powerful financial incentives for brand name manufacturers to list patents in the Orange Book even if such patents are not eligible for listing, and sue any generic competitor that files an ANDA with a Paragraph IV certification even if the competitor's product does not actually infringe the listed patents or the patent is invalid and unenforceable. Brand drug manufacturers do this simply to delay final FDA approval of an ANDA for up to 30 months.

### 2.    How a Company with Tentative Approval Gets Final Approval

61.    Tentative approval means that an ANDA meets the technical and substantive requirements for final approval, but final approval cannot be granted because of the existence of, for example, a patent against which a Paragraph III certification has been filed (meaning that the ANDA filer intends to wait until patent expiry before marketing its own product) or that has been judicially determined to be infringed by the ANDA filer, or regulatory exclusivity such as a 30-month stay.[10] Absent such exclusivity or stay, tentative approval is unnecessary and the FDA simply grants final approval when the ANDA meets all regulatory requirements.

62.    According to FDA guidance, "FDA does not automatically grant final approval upon the expiration of any periods of exclusivity or patent protection that served as the basis of the TA . . . . Accordingly, an applicant with an ANDA in [tentative approval] status generally

---

[9] 21 C.F.R.§§ 314.107(b)(3)(i); (b)(4).

[10] FDA, ANDA Submissions – Amendments and Requests for Final Approval to Tentatively Approved ANDAs, Guidance for Industry, Sept. 2020 at 4, *available at* https://www.fda.gov/media/119718/download.

submits an amendment to its ANDA explicitly requesting final approval to market its drug product."[11]

63.    According to FDA guidance, "[a] request for final approval with no new data, information, or other changes to the ANDA generally requires 90 days for FDA assessment."[12]

### D.    Timeline of Key Events Regarding Efforts to Market Generic Colcrys

64.    Numerous companies sought to market generic versions of Colcrys. But due to Defendants' anticompetitive conduct, consumers were for years denied the benefits of competition from those generic products. A timeline of key events, set forth in more detail below, is summarized in the following chart:

| Date | Event | Paragraph |
|------|-------|-----------|
| 2006 | FDA's Unapproved Drug Initiative | 40 |
| 2008 | Takeda's predecessor files NDAs for Colcrys | 41 |
| before 2009 | At least 21 sellers' market colchicine products for pennies per dose | 39-39 |
| 2009 | FDA approves Takeda's NDAs | 41 |
| 2011 | Par files an ANDA for a generic version of Colcrys | 66 |
| Apr. 4, 2012 | Takeda's predecessor sues Par for alleged patent infringement as to Par's Colcrys ANDA | 67 |
| Oct. 2012 | Hikma Pharmaceuticals submits a 505(b)(2) NDA to market a single-ingredient colchicine product under the trade name Mitigare | 79 |
| 2013 | Amneal files an ANDA for a generic version of Colcrys | 68 |
| February 9, 2013 | Watson's ANDA for a generic version of Colcrys received for review by FDA | 70 |
| Mar. 28, 2013 | Takeda sues Amneal for alleged patent infringement as to Amneal's Colcrys ANDA | 69 |
| Feb. 27, 2014 | Takeda sues Watson for alleged patent infringement as to Watson's Colcrys ANDA | 71 |

---

[11] *Id*. at 6-7.

[12] FDA, ANDA Submissions – Amendments to Abbreviated New Drug Applications Under GDUFA, Guidance for Industry, July 2018 at 14, available at https://www.fda.gov/media/89258/download.

| Date | Event | Paragraph |
|------|-------|-----------|
| Sept. 2014 | FDA approves Hikma's Mitigare NDA | 81 |
| Oct. 2014 | Takeda sues Hikma for alleged patent infringement | 82 |
| Nov. 4, 2014 | Judge Sue Robinson denies Takeda's motion for a preliminary injunction against Hikma, finding that Takeda was unlikely to succeed on the merits | 86 |
| Jan. 11, 2015 | Takeda launches authorized generic Colcrys through Prasco | 107 |
| Feb. 12, 2015 | FDA tentatively approves Par's Colcrys ANDA | 73 |
| May 6, 2015 | Federal Circuit affirms Judge Robinson's denial of a preliminary injunction in Mitigare litigation | 87 |
| July 26, 2015 | Teva Ltd. executes MPA and acquires Watson's generic Colcrys ANDA; related due diligence begins. | 154 |
| Oct. 6, 2015 | FDA tentatively approves Watson's Colcrys ANDA | 159 |
| Nov. 24, 2015 | Takeda-Par executed settlement | 113 |
| Dec. 9, 2015 | Takeda-Watson settlement term sheet | 120 |
| Dec. 10, 2015 | Takeda-Amneal settlement term sheet | 121 |
| Jan. 7, 2016 | Takeda-Watson executed settlement | 122 |
| Mar. 3, 2016 | Takeda-Amneal executed settlement | 123 |
| May 18, 2016 | Judge Sue Robinson grants Hikma's motion to dismiss in litigation concerning Mitigare. | 88 |
| July 29, 2016 | Takeda's regulatory exclusivity for Colcrys expires | 41 |
| Aug. 2, 2016 | MPA transaction closes and Teva Ltd. acquires Watson's generic Colcrys ANDA | 154 |
| Sept. 2016 | FDA approves Amneal's Colcrys ANDA | 75 |
| Fall 2016 | Mylan files an ANDA for a generic version of Colcrys | 138 |
| Dec. 14, 2016 | Judge Sue Robinson grants Takeda's motion to file an amended complaint in the Mitigare litigation | 88 |
| Summer 2017 | Generic manufacturer Granules files an ANDA for a generic version of Colcrys | 138 |
| Summer 2017 | Generic manufacturer Hetero files an ANDA for a generic version of Colcrys | 138 |
| Fall 2017 | Generic manufacturer Macleods files an ANDA for a generic version of Colcrys | 138 |
| Fall 2017 | Generic manufacturer Strides files an ANDA for a generic version of Colcrys | 138 |

| Date | Event | Paragraph |
|---|---|---|
| Nov. 7, 2017 | Mylan and Takeda settle Colcrys patent litigation with a license that requires Mylan to wait 135 days after Watson and Amneal's launches except under certain circumstances that Takeda and Par argued did not apply | 131 |
| Nov. 7, 2017 | Granules and Takeda settle Colcrys patent litigation with a license that requires Granules to wait 135 days after Watson and Amneal's launches except under certain circumstances that Takeda and Par argued did not apply | 131 |
| Nov. 28, 2017 | Hetero and Takeda settle Colcrys patent litigation with a license that requires Hetero to wait 135 days after Watson and Amneal's launches except under certain circumstances that Takeda and Par argued did not apply | 131 |
| Dec. 11, 2017 | Macleods and Takeda settle Colcrys patent litigation with a license that requires Macleods to wait 135 days after Watson and Amneal's launches except under certain circumstances that Takeda and Par argued did not apply | 131 |
| Late 2017/ Early 2018 | DRL files an ANDA for a generic version of Colcrys | 138 |
| Late 2017/ Early 2018 | Alkem files an ANDA for a generic version of Colcrys | 138 |
| Early 2018 | Zydus files an ANDA for a generic version of Colcrys | 138 |
| Apr. 7, 2018 | DRL and Takeda settle Colcrys patent litigation with a license that requires DRL to wait 135 days after Watson and Amneal's launches except under certain circumstances that Takeda and Par argued did not apply | 131 |
| May 11, 2018 | Strides and Takeda settle Colcrys patent litigation with a license that requires Strides to wait 135 days after Watson and Amneal's launches except under certain circumstances that Takeda and Par argued did not apply | 131 |
| May 23, 2018 | Alkem and Takeda settle Colcrys patent litigation with a license that requires Alkem to wait 135 days after Watson and Amneal's launches except under certain circumstances that Takeda and Par argued did not apply | 131 |

| Date | Event | Paragraph |
|------|-------|-----------|
| July 1, 2018 | Par launches authorized generic Colcrys as part of the challenged agreement with Takeda, replacing Prasco | 114 |
| Aug. 20, 2018 | Zydus and Takeda settle Colcrys patent litigation with a license that requires Zydus to wait 135 days after Watson and Amneal's launches except under certain circumstances that Takeda and Par argued did not apply | 131 |
| Dec. 12, 2018 | Judge Richard G. Andrews grants summary judgment in Hikma's favor in litigation concerning Mitigare. Takeda does not appeal. | 88, 162 |
| Nov. 25, 2019 | Mylan launches its generic version of Colcrys | 162 |
| After Nov. 25, 2019 | Additional generics launch; prices fall to $.1475 per 0.6mg colchicine tablet from a peak of $6.73 per tablet for Takeda's branded Colcrys | 172 |

### E.   Applications to Market Generic Colcrys

65.   By 2011, Takeda's fatally weak patents started to attract challenges from Par, Watson and Amneal, each of whom filed an ANDA with a Paragraph IV certification that Takeda's patents were invalid, unenforceable, or not infringed.

66.   In December 2011, Par filed ANDA No. 203976, the first ANDA to seek FDA approval for a generic version of Colcrys. Par certified that all pertinent patents that Takeda listed in the Orange Book under the Colcrys NDA were either invalid or not infringed. As the first generic filer making such a Paragraph IV certification, Par was eligible for 180-day exclusivity during which the FDA would not approve other generic manufacturers to sell a generic version of Colcrys.

67.   Takeda sued Par for alleged patent infringement in April 2012, within 45 days of notice of Par's Paragraph IV certification, and thereby triggered the automatic 30-month stay of FDA approval of Par's ANDA.

68.     In 2013, Amneal submitted ANDA No. 204711 to the FDA seeking approval to market a generic version of Colcrys. Amneal certified that all pertinent patents that Takeda listed in the Orange Book under the Colcrys NDA were either invalid or not infringed.

69.     Takeda sued Amneal for alleged patent infringement in March 2013, within 45 days of notice of Amneal's Paragraph IV certification, and thereby triggered the automatic 30 month stay of FDA approval of Amneal's ANDA.

70.     In 2013, Watson submitted ANDA No. 204461 to the FDA seeking approval to market a generic version of Colcrys. Watson certified that all pertinent patents that Takeda listed in the Orange Book under the Colcrys NDA were either invalid or not infringed.

71.     Takeda sued Watson for alleged patent infringement in February 2014, within 45 days of notice of Watson's Paragraph IV certification, and thereby triggered the automatic 30-month stay of FDA approval of Watson's ANDA.

72.     The 30-month stays of Par, Amneal, and Watson's ANDA approvals were to elapse on September 15, 2014, August 22, 2015, and July 31, 2016, respectively.

### 1.     Par's ANDA Approval

73.     The FDA tentatively approved Par's ANDA on February 12, 2015. Accordingly, the FDA determined that Par's ANDA met all the technical and substantive requirements for final approval, but that it could not be granted final approval because of the regulatory exclusivities still attached to Takeda's NDA until July 29, 2016. In advance of those exclusivities expiring, Par could have requested final approval as early as 90 days before July 29, 2016.

### 2.     Watson and Amneal's ANDA Approvals

74.     Watson obtained tentative FDA approval to launch its true generic product in October of 2015. This meant that FDA found Watson was ready and able to market its generic Colcrys product once Par, as the first ANDA filer, had been on the market for 180 days.

75.    Amneal obtained final FDA approval to launch its true generic product in September of 2016.

### 3.    Third Wave ANDA Approvals

76.    The FDA would approve multiple other ANDA applications from 2019 through 2021, but none of these "Third Wave ANDA filers" had filed its ANDA until late 2016, well after the Par, Watson, and Amneal settlements discussed below. The earliest any 30-month stay of a Third Wave ANDA filer was set to expire was 2019.

### F.    Takeda's Litigation Against Par, Watson, and Amneal Had No Realistic Chance of Success

77.    As stated above, in December 2011, Par filed ANDA No. 203976 with the FDA seeking approval to engage in the commercial marketing of 0.6 mg oral colchicine tablets prior to the expiration of the Colcrys Patents. As originally filed, pursuant to 21 U.S.C. § 355(j)(2)(A)(viii), Par's ANDA "carved out" the *patented* FDA-approved use for the treatment of acute gout flares and the ***unpatented*** FDA-approved use for treatment of FMF, and the Par ANDA instead sought approval only for the ***unpatented*** FDA-approved use of prophylaxis of gout. Subsequently, however, Par submitted a labeling amendment to the FDA carving out the gout indications altogether and seeking approval only for the ***unpatented*** FDA-approved use for treatment of FMF. Thus, at no time did Par ever seek approval for the patented FDA-approved use of treating acute gout flares.

78.    On or about July 22, 2013, Takeda received a letter from Par dated July 19, 2013, notifying Takeda of Par's filing of ANDA No. 203976 and that it contained a Paragraph IV certification. The letter notified Takeda that Par had filed a certification under 21 C.F.R. § 314.95 in conjunction with its ANDA to seek approval to engage in the commercial use, manufacture, sale, offer to sell or importing of Par's proposed product for the treatment of FMF and asserted

that the Colcrys Patents listed in the Orange Book as purportedly covering the use of Colcrys to treat FMF were invalid and/or would not be infringed by the sale or use of Par's generic version of Colcrys. Thereafter, Takeda filed the suit against Par in the District of Delaware alleging that Par's submission of its ANDA infringed all seventeen of its Colcrys Patents (the "Par Litigation"). The Par Litigation was docketed as Civil Action No. 13-cv-1524 and was assigned to Judge Sue Robinson for a bench trial.

79.     On or about October 5, 2012, pharmaceutical company West-Ward Pharmaceutical Corp., later acquired by Hikma International Pharmaceuticals LLC ("Hikma"), challenged the very same Takeda patents as did Par in the Par Litigation. Hikma's objective, however, was to bring to market colchicine *capsules* (as opposed to Takeda's *tablets*), to be marketed as a brand name drug under the name Mitigare. Rather than filing an ANDA, Hikma filed an NDA under § 505(b)(2) of the Food, Drug and Cosmetics Act concerning Mitigare.

80.     Capsules (like Mitigare) are not pharmaceutically equivalent to tablets (like Colcrys), and so are not able to be automatically substituted at the pharmacy when the reference listed drug (in this case Colcrys) is in the form of a tablet. Par has admitted that Mitigare does not compete with Colcrys.[13]

81.     Hikma's NDA for Mitigare did not seek approval for the ***patented*** FDA approved use of treatment of acute gout flares; instead, Hikma's NDA "carved out" that indication as well as the indication for FMF, and pursued FDA approval only for the ***unpatented*** FDA-approved use of prophylaxis of gout. The FDA approved Hikma's Mitigare brand colchicine capsule in September 2014, and Hikma launched Mitigare capsules on October 1, 2014.

---

[13] *See* Proposed Intervenor Par Pharm. Inc.'s Br. in Supp. of Pl. Takeda's Mot. for Prelim. Injunction, *Takeda Pharm. USA, Inc. v. Mylan Pharm., Inc*., No. 19-2216-RGA, at 4-5 (Jan. 6, 2020) (ECF No. 52).

82. On October 3, 2014, Takeda filed the Mitigare Litigation as a declaratory judgment action in the District of Delaware asserting that Hikma's Mitigare product would infringe five of the Colcrys Patents. The Mitigare Litigation was docketed as Civil Action No. 14-cv-1268 and, like the Par Litigation, was also assigned to Judge Sue Robinson for a bench trial.

83. Both the Par Litigation and Mitigare Litigation raised the same patent law issue, namely, whether colchicine labeling seeking FDA approval for one of the unpatented FDA-approved uses of colchicine would induce infringement of either the Acute Gout Flare Patents or the Co-Administration Patents. Both the Par Litigation and the Mitigare Litigation were bench trials before the same judge: Judge Robinson.

84. Both Par and Hikma adopted the same approach for avoiding infringement of Takeda's patents; both companies "carved out" of their labels the only *patented* FDA-approved use for colchicine (*i.e.*, the treatment of acute gout flares) and pursued only an **_unpatented_** FDA-approved use for colchicine (*i.e.*, FMF and prophylaxis of gout, respectively).

85. Because the issues involved in Takeda's "induced infringement" theory against Par mirrored its induced infringement theory against Hikma—namely, whether a competitor's request to market a drug solely for an unpatented FDA-approved use could induce infringement of a different, patented use for which the applicant was not seeking FDA approval—and both were before the same judge for a bench trial, both theories would likely meet the same fate.

### 1. Takeda's Loses the Mitigare Litigation

86. As the Supreme Court has noted, "[t]he [Hatch-Waxman] scheme . . . contemplates that one patented use will not foreclose marketing a generic drug for other unpatented ones." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 415 (2012) (emphasis added). That was precisely the issue in the Mitigare Litigation because Hikma was not

31

seeking approval for the ***patented*** FDA-approved use of treating acute gout flares, but rather was only seeking approval for the ***<u>unpatented</u>*** FDA-approved use of prophylaxis of gout. Although Judge Robinson initially granted Takeda a temporary restraining order ("TRO") in the Mitigare Litigation based on Takeda's *ex parte* submission, *Takeda Pharms. USA, Inc. v. W.- Ward Pharm. Corp.*, Civ. No. 14-cv-1268, 2014 WL 5088690, *3 (D. Del. Oct. 9, 2014), she later determined in the context of a preliminary injunction proceeding that the TRO was improvidently granted and that Takeda did not have a likelihood of prevailing in the litigation on its induced infringement theory, *Takeda Pharms. USA, Inc. v. West-Ward Pharm. Corp.*, 72 F. Supp. 3d 539, 549 (D. Del. 2014) ("Takeda has failed to demonstrate that it will likely prove induced infringement at trial. . . .").

87.     On May 6, 2015, the Federal Circuit affirmed Judge Robinson's denial of a preliminary injunction. *Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 627 (Fed. Cir. 2015). With respect to the asserted Acute Gout Flare Patents, the Federal Circuit explained that, because Hikma had carved out of its label the patented FDA-approved use of treating acute flares, "there is no evidence that the label would necessarily lead doctors who are consulted by patients taking Mitigare to prescribe an off-label use of it to treat acute gout flares." *Id.* at 632. The Federal Circuit concluded that Takeda faced "an evidentiary deficit" that not even its experts' declarations could overcome. *Id.* at 633. With respect to the asserted Co-Administration Patents, the Federal Circuit found Takeda's infringement theory was "similarly insufficient to support a finding of inducement." *Id.* at 634. Thus, the Federal Circuit affirmed Judge Robinson's finding that "Takeda had failed to meet its burden to show a likelihood of success on the merits." *Id.* at 635.

88.     Several months later, on September 10, 2015, Takeda filed an amended complaint seeking to skirt the deficiencies identified by the Federal Circuit. *Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 188 F. Supp. 3d 367, 369-70 (D. Del. 2016). In response, Hikma filed a motion to dismiss, which Judge Robinson granted on May 18, 2016. *Id.* at 370, 378. Takeda nonetheless later moved to amend the judgment and to file a second amended complaint, which the court granted. *Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 2016 WL 7230504, *1-*2 (D. Del. Dec. 14, 2016). Ultimately, although Hikma was forced to litigate Takeda's induced infringement theory through discovery, the court granted summary judgment against Takeda. *Takeda Pharms., U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 2018 WL 6521922, *7 (D. Del. Dec. 12, 2018). Because Hikma had been wrongfully enjoined, the court awarded Hikma $31,871,072.09 against Takeda in wrongful injunction damages. *Takeda Pharms., U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 2018 WL 6529289, *1-*2 (D. Del. Nov. 12, 2018).

**2.      When the Par Litigation Settled in December 2015, Takeda Had Little Chance of Prevailing**

89.     As the Par Litigation approached a bench trial in December 2015, the squarely on-point reasoning of the district court and the Federal Circuit in the Mitigare Litigation left no doubt as to the likely outcome. Takeda pursued the same defective legal theory against both Hikma and Par. Both Par and Hikma had "carved out" of their labels the only ***patented*** FDA-approved use of colchicine for the treatment of gout flares. Although Par and Hikma were pursuing different ***unpatented*** FDA-approved uses—*i.e.*, treatment of FMF and prophylaxis of gout, respectively—Takeda's induced infringement theory raised essentially the same question in both cases. That the district court and Federal Circuit rejected Takeda's induced infringement theory against Hikma all but confirmed that the Par litigation would reach the same outcome.

90.     Against that backdrop, Takeda also pursued a "contributory infringement" theory against Par based on the Acute Gout Flare Patents. This theory was even weaker than Takeda's induced infringement theory. "To establish contributory infringement, the patent owner must show the following elements . . . : 1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial non-infringing uses, and 4) that the component is a material part of the invention." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010). To prevail on its contributory infringement theory, Takeda was required to prove, among other things, that if Par's product were approved by the FDA and marketed, there would be direct infringement by others and that colchicine has no substantial non-infringing uses other than for the treatment of acute gout flares.

91.     Takeda could not have anticipated success on the contributory infringement theory. As Judge Robinson and the Federal Circuit recognized in the Mitigare Litigation, the patented treatment of acute gout flares and unpatented prophylaxis of gout flares are two entirely different uses for colchicine, and the Acute Gout Flare Patents do not claim the latter unpatented uses. Colchicine's use for the unpatented prophylaxis of gout flares is very common, and a substantial non-infringing use. Takeda itself has previously concluded that 66% of Colcrys patients were chronic patients, and that nearly 85% of prescriptions of colchicine and 88% of Colcrys prescriptions were for chronic (prophylactic) use rather than acute treatment use. In addition, prescription data from the IMS Health National Disease and Therapeutic Index demonstrate that, between April 2009 and March 2015, 72% of total colchicine prescriptions (both unapproved colchicine and Colcrys prescriptions) were for prophylaxis of gout flares, and only 19% of all colchicine prescriptions in this timeframe were for treatment of acute gout flares.

92.     Moreover, aside from prophylaxis of gout flares, 0.6 mg oral colchicine is used for a number of other medical conditions that also constitute substantial non-infringing uses, such as treatment of primary biliary cirrhosis, recurrent pericarditis, Behçet's disease, and Sweet syndrome, among others. In addition, treatment of FMF using colchicine monotherapy is also a substantial non-infringing use for purposes of Takeda's contributory infringement allegations. In addition, treatment of gout flares according to any prior art low-dose colchicine regimens, or several non-infringing colchicine regimens described in published scientific literature, are further substantial non-infringing uses that precluded contributory infringement of the Acute Gout Flare Patents. The substantial non-infringing uses of colchicine doomed Takeda's contributory infringement theory against Par.

### 3.    Watson and Amneal Were Also Highly Likely to Prevail on Non-Infringement Grounds

93.     Takeda had no reasonable chance of success in its infringement claims against Watson and Amneal for the same reasons applicable to Takeda's claims against Par and Hikma. The statement of admitted facts in the pretrial order in the Par Litigation said that Par, Watson and Amneal all had essentially the same labels limiting them to the unpatented FDA-approved use of treating FMF: "The labels for Defendants' ANDA Products state that Defendants' ANDA Products are indicated for the treatment of FMF. . . . Defendants are not permitted to promote their products for the prophylaxis or treatment of acute gout flares." Accordingly, Takeda's likelihood of success against Watson and Amneal in the Par Litigation was no greater than its likelihood of success against Par.

### 4.    Takeda Would Also Have Lost Due to the Patents' Invalidity

94.     Even if Takeda had some prospect of prevailing on infringement in its litigation against Par, Watson, or Amneal—and it did not—Takeda was poised to suffer a finding of

invalidity. The use of colchicine for the treatment and prophylaxis of gout flares, and for the treatment of FMF, was very well known at the time that Takeda filed the patent applications leading to the Colcrys Patents. This substantial body of knowledge relating to colchicine was prior art to the Colcrys Patents. The Acute Gout Flare Patents contain a common dosing regimen requiring 1.2 mg of colchicine at the onset of a gout flare and an additional 0.6 mg of colchicine one hour later. This claimed regimen was only trivially different from, and invalid as obvious in light of, the prior art, which taught administering 0.6 mg every hour for up to 3 doses (*i.e.*, a total dose of 1.8 mg over 1 hour) and which also taught a dose or 0.5 or 0.6 mg three times a day (*i.e.*, a total dose of 1.5 or 1.8 mg over a 24-hour period).

95.     Regarding the Co-Administration Patents, the prior art disclosed the drug-drug interactions between colchicine and ketoconazole, ritonavir, or clarithromycin, among other CYP3A4 inhibitors. Although this prior art teaches that co-administration should be avoided because of dangerous toxicity, the prior art also teaches that lower doses would be required if one were to make the medically unsound decision to co-administer the drugs. Accordingly, the prior art anticipates or renders obvious the inventions disclosed in the Co-Administration Patents.

96.     To the extent the claims in the Colcrys Patents were anticipated by the prior art, Takeda's alleged secondary evidence of nonobviousness was irrelevant. To the extent the claims in the Colcrys Patents were obvious in view of the prior art, Takeda's secondary evidence of nonobviousness was insufficient to overcome the very strong evidence of *prima facie* obviousness.

97.     The claimed inventions in the Co-Administration Patents are also invalid because they were not invented by the named inventor(s) but rather were derived from others, including the FDA and Dr. Bill Barr. *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292, 1301 (Fed. Cir.

2002) ("A patent is invalid if more or less than the true inventors are named."). On August 31, 2006, the FDA sent minutes of a July 31, 2006, meeting between Takeda representatives and FDA, to discuss the path to FDA approval for colchicine to treat acute gout flares, prevent gout flares, and treat FMF. The minutes indicate that named inventor Matthew Davis was present at the meeting, and that he received those minutes. In the meeting, as reflected in the minutes, FDA proposed that Takeda conduct a study to determine the magnitude of the effect of a concomitantly administered CYP3A4 and P-gp inhibitors on colchicine blood levels in order to obtain information for prescribing guidelines, such as whether recommending dosage adjustments was appropriate, and if so, what dosage adjustments to recommend. FDA instructed Takeda as to which inhibitor to use for the study (clarithromycin), and which dose of inhibitor to use (250 mg twice daily for 3–7 days). Prior to the meeting, Takeda had not intended to conduct any drug-drug interaction studies between colchicine and clarithromycin or between colchicine and ketoconazole.

98.     A person of ordinary skill would have known how to design and carry out such a study as instructed by the FDA, as well as how to interpret the results in order to make appropriate dosing recommendations, without undue experimentation. On September 5, 2007, Takeda submitted to FDA a protocol for the study as part of their investigational new drug ("IND") application for colchicine, and adopted FDA's recommendations in designing a drug interaction study between colchicine and clarithromycin.

99.     On January 14, 2009, FDA employee Margarita Tossa sent an e-mail to Takeda employee Robert Dettery, and provided FDA's comments on Takeda's June 2008 proposed colchicine package insert. Dettery then forwarded the e-mail and enclosed labeling comments to numerous individuals at Takeda and Salamandra LLC, including Matthew Davis. In its

comments, FDA provided their changes to the dosing and administration instructions for FMF patients, and changed Takeda's proposed recommendation to physicians for colchicine dosing during concomitant clarithromycin administration. FDA also expanded that recommendation beyond clarithromycin to concomitant administration of any strong CYP3A4 inhibitor, and specifically named ketoconazole, clarithromycin, and ritonavir. Takeda's scientists then claimed the FDA's recommendations as Takeda's invention in the Co-Administration Patents.

100.    On April 7, 2008, Takeda employee Suman Wason sent an e-mail to Matthew Davis with an attachment entitled "[b]rainstorming for colchicine," and Wason stated that clarithromycin causes a rise in colchicine concentration, but that there was no data on the effects of clarithromycin on steady state colchicine after twice a day dosing for chronic gout. Wason also indicated that Takeda has already consulted with Dr. Bill Barr to model and extrapolate the data.

101.    On May 5, 2008, Dr. Barr sent Wason a report of his work on determining appropriate dose adjustments for colchicine when it is co-administered with clarithromycin. In that report, Dr. Barr concluded that as a rule of thumb, when clarithromycin is co-administered with colchicine, the colchicine dose should be reduced to one third of the usual daily dose. On May 5, 2008, Wason forwarded Dr. Barr's report to Takeda's patent attorney Karen Bechtold, with a copy to Matthew Davis and two other individuals at Salamandra, LLC.

102.    Despite the contributions the FDA and Dr. Barr made to the conception of the inventions claimed in the Colcrys Patents involving co-administration, Takeda improperly resolved not to name them as inventors. That failure renders some or all of the claims in the Colcrys Patents, particularly the Co-Administration Patents, invalid for failing to name the correct inventors. Various claims in the Colcrys Patents are also invalid for failure to satisfy the

written description requirement for the reasons set forth in Exhibit 3 to the Pretrial Order in the Par Litigation.

### G.    Facing Entry by Multiple Generics, Defendants Conspire to Restrain Competition

103.    By the time of the Federal Circuit decision affirming the denial of the preliminary injunction, Takeda's lawsuits against Par, Amneal and Watson had been coordinated and set for a bench trial to start in December 2015 before Judge Robinson. Takeda was pursuing the same defective theories against Par, Amneal, and Watson that had been rejected by the court in the Mitigare Litigation.

104.    By that time, only Par, Watson and Amneal had filed ANDAs for Colcrys, but all the Defendants knew that a myriad of additional competitors could file an ANDA, since at least 21 entities were selling colchicine before the FDA's Unapproved Drug Initiative but were forced to exit the market as a result of approval of Takeda's NDA.

105.    With no basis to distinguish Takeda's infringement theory against Hikma that was rejected by the court in the Mitigare Litigation, Takeda appeared headed for a loss on the merits to Par, Watson, and Amneal on the same basis it lost its motion for a preliminary injunction against Hikma in the Mitigare Litigation.

106.    If that happened, Takeda would have assumed that Par, as the first ANDA filer, and in light of the expiration of the 30-month stay in September of 2014, could launch its product first, as soon as July 29, 2016, when Takeda's regulatory exclusivities expired. For the first 180 days following Par's launch (*i.e.*, until January 25, 2017), Par would compete with Takeda's authorized generic (or "AG"), which had been distributed by Prasco Laboratories ("Prasco") since January 2015.

107.    Takeda had launched an AG through Prasco starting in early January 2015, just after Judge Robinson denied Takeda's application for a preliminary injunction against Hikma. Seeing the writing on the wall from that decision, Takeda had licensed Prasco to sell (and deliver to Takeda the overwhelming majority of the profits from) an AG of Colcrys under an agreement that ensured that Prasco would not materially price compete with Takeda's brand Colcrys, but instead would be in place to capture generic Colcrys sales once Colcrys ANDA filers came to market following the expiration of Colcrys's final regulatory exclusivity on July 29, 2016.

108.    The presence of an AG promised to significantly devalue Par's 180-day exclusivity because it would have required Par to split the generic portion of the market with Prasco, with both Par and Prasco competing on price to gain market share.

109.    The Supreme Court and Third Circuit have recognized that AGs lower the value a first-filing generic ANDA filer can realize from the 180-day exclusivity. "[T]his 180-day period of exclusivity can prove valuable, possibly worth several hundred million dollars."[14] However, "[o]ne exception is that during the 180-day exclusivity period, the brand-name company can produce a generic version of its own drug or license a third party to do so. These 'authorized generics' can decrease the value an applicant receives from the 180-day exclusivity period to the extent they share the generic drug market and depress prices."[15]

110.    All parties would have understood that, after the expiration of Par's 180-day exclusivity, Watson and Amneal would have been free to launch their own generics, competing against Par and Prasco, as soon as their ANDAs received FDA approval. Any of the numerous other previous sellers of colchicine that sought to resume selling colchicine after reading the

---

[14] *FTC v. Actavis*, *Inc.*, 570 U.S. 136, 144 (2013) (internal quotation marks omitted).

[15] *FTC v. AbbVie Inc.*, 976 F.3d 327, 339 (3d Cir. 2020) (internal citations omitted).

decisions from the Mitigare Litigation could do so as well. In the event Par failed for launch its ANDA generic product for any reason, it would have forfeited its exclusivity, thus clearing the way for Amneal and Watson to come onto the market with their ANDA generics.

111.    The presence of Par's ANDA generic would have caused Takeda's profits to plummet. First, Takeda's AG, Par, and other generic manufacturers would have competed on price, resulting in low generic prices and prescription for Colcrys being filled almost exclusively with a generic version. Second, because Takeda's AG would have faced competition from other generics, the price of the AG would plummet, as would Takeda's share of the profits on those sales.

112.    But rather than face competition from Par, Watson, and Amneal that would drive the price of colchicine tablets down, Takeda instead engineered a market allocation scheme through anticompetitive agreements with Par, Watson, and Amneal that would stave off unrestricted competition for as long as possible.

### 1.    Takeda Enters Into Settlement, License, and Distribution Agreements With Par, Watson, and Amneal

#### (a)    Par

113.    Instead of competing against Takeda's branded Colcrys and Takeda's AG Colcrys distributed by Prasco, Par entered into an agreement with Takeda, memorialized on November 24, 2015,[16] and disguised as a license agreement and joint venture which was in fact a market allocation agreement. Under the sham joint venture Par would, after a long delay, take Prasco's place as the sole distributor of Takeda's authorized generic, and Prasco would exit the market. Par would then simply distribute the same relabeled brand Colcrys product that Takeda was

---

[16] Par License Agreement at p. 1.

previously selling through Prasco as an AG, assuring that when Par launched this AG product it would not price compete with Takeda's brand product, contrary to the contemplation of the Hatch-Waxman regulatory scheme. This market allocation agreement also ensured that Par would get 100% of the generic Colcrys market and be able to charge an elevated price as a result, instead of competing on price with Prasco.

114.    Specifically, under the conspiracy, instead of launching its ANDA generic product on July 29, 2016, Par would take over from Prasco on July 1, 2018,[17] and remit up to a percentage of its profits to Takeda.[18] This was achieved "through [a] Settlement Agreement, License Agreement, and the Distribution and Supply Agreement."[19]

115.    Pursuant to the Takeda-Par License Agreement, Par agreed not to enter the market until July 1, 2018 (2 years after it would have been reasonable to have assumed that Par would have been eligible to launch its ANDA generic version of Colcrys), and not launch its own ANDA generic version of Colcrys until the earliest of: (i) January 1, 2024; (ii) the date of a final court decision holding that Takeda's patents are invalid, cancelled, or unenforceable or not infringed, where the judgment of non-infringement is based on a label that is substantively identical to the Par label; (iii) the date a third party is licensed by Takeda to launch a generic version of Colcrys; (iv) the date on which Takeda launches a second authorized generic; or (iv) the date another ANDA filer launches a generic Colcrys at risk.[20]

---

[17] Par License Agreement §1.1.

[18] Par License Agreement, Schedule 1; *id*. §1.70. The exact percentage is redacted in publicly available information.

[19] Par Settlement Agreement at 1.

[20] Par License Agreement § 1.3.

116.    Takeda also agreed that if it launched a second AG (*i.e.*, other than through Par), Par could launch its ANDA generic product (thereby disincentivizing Takeda from ever launching another AG).[21]

### (b)    Watson and Amneal

117.    The Takeda-Par market allocation was vulnerable to being thwarted by Watson and Amneal once Par's 180-day exclusivity elapsed or was forfeited. With a bench trial looming for Watson and Amneal, and Watson and Amneal poised to defeat Takeda based on the Mitigare Litigation decisions, this was certain to occur. "[I]f a second ANDA filer obtain[s] a final judgment that the patents [are] invalid or not infringed, then the first ANDA filer would forfeit its 180-day exclusivity period if it did not market the drug within 75 days."[22] Thus, if Watson or Amneal continued with the litigation and won (as they surely would have), then under FDA regulations, Par would forfeit its 180-day exclusivity 75 days later if it did not launch its ANDA product (as opposed to the Takeda AG). Takeda and Par would thus no longer be able to use Par as a bottleneck to delay generic products from other manufacturers from coming to market. Any other prospective ANDA filer would also be able compete with Watson, Amneal, Par, and Prasco once it filed an ANDA and received FDA final approval.

118.    Therefore, Takeda and Par needed Watson and Amneal's assent and buy-in to be assured that their plan would come to fruition.

119.    Thus, in furtherance of the sham joint venture between Takeda and Par, Takeda reached agreement with Watson and Amneal to quit the patent litigation. Specifically, Takeda offered Watson and Amneal 135-days of protection from the prospective Third Wave ANDA

---

[21] Par License Agreement § 1.3(d).

[22] *Dey Pharma, LP v. Sunovion Pharm., Inc.*, 677 F.3d 1158, 1160 (Fed. Cir. 2012).

filers,[23] but only if Watson and Amneal would agree to delay their own launches of generic Colcrys until October 15, 2020, giving Par much longer than the 180-day exclusivity it could have hoped to get in a competitive market.[24]

120.    Takeda and Watson executed a binding term sheet on December 9, 2015.[25]

121.    Takeda and Amneal executed a binding term sheet the next day, December 10, 2015.[26]

122.    Takeda and Watson executed a settlement and license agreement on January 7, 2016.[27]

123.    Takeda and Amneal executed a settlement and license agreement on March 11, 2016.[28]

124.    Both the Watson License Agreement and the Watson Term Sheet provided that Watson would not launch its generic until October 15, 2020,[29] unless Takeda licensed another ANDA filer (other than Par or Amneal) to launch before then, in which case Watson's entry date would be accelerated to 135 days before that other ANDA filer would enter the market, which operated to preserve the 135 days of protection from the Third Wave ANDA filers that Takeda offered Watson to induce it to conspire.[30]

---

[23] Watson License Agreement § 1.2(b); Amneal License Agreement § 1.2(c) (a most-favored nation provision that puts Amneal on parity with Watson).

[24] Watson License Agreement ¶ 1.2(a); Amneal License Agreement ¶ 1.2(a).

[25] Watson Term Sheet at 6.

[26] Amneal Term Sheet at 5-6.

[27] Watson Settlement Agreement; *id.*, Watson License Agreement.

[28] Amneal Settlement Agreement; *id.*, Amneal License Agreement.

[29] Watson License Agreement at § 1.2(a); Watson Term Sheet at § 1.2(a).

[30] Watson License Agreement § 1.2(b); Watson Term Sheet at § 1.2(b).

125.    The Watson License Agreement and Watson Term Sheet also contained entry triggers similar to Par's with respect to a final court decision, the launch of a second AG, and an at-risk launch.[31]

126.    Both the Amneal License Agreement and the Amneal Term Sheet also provided that Amneal would not launch its generic until October 15, 2020,[32] unless Takeda licensed another ANDA filer to launch before then, in which case Amneal's entry date (like Watson's) would be accelerated to 135 days before that other ANDA filer would enter the market by virtue of a "most-favored nations" clause which would allow Amneal to launch when Watson launched.[33]

127.    The Amneal License Agreement and Watson Term Sheet also contained entry triggers similar to Par's with respect to a final court decision, the launch of a second AG, and an at-risk launch.[34]

128.    Amneal and Watson's settlement and license agreements permitted Amneal and Watson to enter the market with their generic Colcrys products before October 15, 2020, only in limited circumstances. Takeda could trigger such entry by launching a second authorized generic (which Par admitted in another litigation its joint venture agreement disincentivized Takeda from doing).[35] Or a Third Wave ANDA filer launch could trigger Amneal or Watson's entry.

---

[31] Watson License Agreement at § 1.2(d), (e), (f), (g); Watson Term Sheet at § 1.2(c), (d), (e), (f).

[32] Amneal License Agreement at § 1.2(a); Amneal Term Sheet at § 1.2(a).

[33] Amneal License Agreement § 1.2(c); Amneal Term Sheet at § 1.2(c).

[34] Amneal License Agreement at § 1.2(b), (d), (e); Amneal Term Sheet at § 1.2(b), (d), (e).

[35] Watson License Agreement § 1.2(f); Amneal License Agreement § 1.2 (d); Opening Br. in Supp. of Takeda's Mot. for a Prelim. Inj., *Takeda Pharm. U.S.A., Inc., v. Mylan Pharm. Inc.*, No. 19-cv-2216 (D. Del. Dec. 5, 2019) (ECF No. 103) at 9.

### (c)    Third Wave ANDA Filers

129.    None of the Third Wave ANDA filers had filed an ANDA until late 2016, well after the Par, Watson and Amneal settlements discussed above. However, it was likely in light of the prior state of competition before Takeda's NDA was approved, and now the decisions from the Mitigare Litigation, that Third Wave ANDA filers would emerge and file their ANDAs before Watson and Amneal's agreed delayed entry date in October of 2020, nearly five (5) years after Takeda, Par, Watson, and Amneal reached their agreements. This could potentially prematurely disrupt Takeda and Par's anticompetitive joint venture.

130.    Therefore, in furtherance of its anticompetitive joint venture with Par, and its agreements with Watson and Amneal, Takeda entered into agreements with each subsequent Third Wave ANDA filer that provided that none could come to market until 135 days after Watson and Amneal unless:

> (a)    Takeda entered into an agreement with any ANDA filer that provided a licensed entry date less than 135 days before October 15, 2020, in which case Amneal and Watson's licenses would be accelerated to ensure that they could launch 135 days before such Third Wave ANDA filer;[36] or
>
> (b)    if, in another litigation, a court determines that some or all of the patents covering Colcrys were invalid, unenforceable or not infringed;[37] or

---

[36] Opening Br. in Supp. of Takeda's Mot. for a Prelim. Inj., Takeda Pharm. U.S.A., Inc., v. Mylan Pharm. Inc., No. 19-cv-2216 (D. Del. Dec. 5, 2019) (ECF No. 103) at 8; Watson License Agreement § 1.2(b); Amneal License Agreement § 1.2(c) (a most-favored nation provision that puts Amneal on parity with Watson).

[37] Opening Br. in Supp. of Takeda's Mot. for a Prelim. Inj., Takeda Pharm. U.S.A., Inc., v. Mylan Pharm. Inc., No. 19-cv-2216 (D. Del. Dec. 5, 2019) (ECF No. 103) at 9.

(c)      if an unlicensed ANDA filer launches "at risk" (*i.e.*, a launch by an unlicensed generic competitor that has obtained final approval and without a court determination on patent issues).[38]

131.    The dates of Takeda's settlements with the Third Wave ANDA filers are listed in the below chart:

| Third Wave ANDA filer | Settlement Date |
|---|---|
| Mylan | 11/17/2017 |
| Granules | 11/7/2017 |
| Hetero | 11/28/2017 |
| Macleods | 12/11/2017 |
| Strides | 5/11/2018 |
| DRL | 4/7/2018 |
| Alkem / Ascend | 5/23/2018 |
| Zydus / Northstar | 8/20/2018 |

### 2.    Economic Benefits Flowing from the Conspiracy to Takeda, Par, Watson, and Amneal

132.    The conspiracy disguised as a joint venture benefited Takeda because it preserved Takeda's profits from the sale of brand and AG Colcrys. As shown above, generic prices drop from a nominal discount with one generic on the market to a much greater discount off brand prices with two generics on the market (as would be the case if Par's true generic product and Takeda's AG distributed by Prasco competed beginning on July 29, 2016). Those discounts increase dramatically as additional generics enter the market. And Takeda enjoyed profits from 100% of generic Colcrys sales, instead of having to split generic Colcrys sales with Par's true generic Colcrys product.

---

[38] *Id.*

133.    The sham joint venture benefited Par because Par, upon launching Takeda's AG on July 1, 2018, would not have to compete against Takeda's AG distributed by Prasco, and could therefore sell at or near branded Colcrys prices for as long as the 2-firm market could last (which was October of 2020, when Watson and Amneal would enter).

134.    Moreover, in furtherance of the sham joint venture and the conspiracy it concealed, Takeda entered into agreements with Watson and Amneal to extend Par's anticipated exclusivity from 180 days to multiple years (until October of 2020), which lengthened the duration of the sham joint venture and the profits it generated, benefiting both Par and Takeda, the latter of whom enjoyed a percent of profits from the sale of the AG.

135.    Counsel for Par has conceded that the Takeda-Par joint venture was structured to deliver these benefits to Takeda and Par, at the expense of consumers and competition, by keeping Colcrys prices at supracompetitive levels from a two-incumbent market for as long as possible and thereby supplying a "powerful incentive[]" to maintain the two-firm arrangement. Specifically:

      a.    Par admitted to Judge Andrews that Takeda and Par's "mutually beneficial arrangement with a single branded drug (Takeda's Colcrys) and a single generic version (Par's authorized generic) only functions if the market for Colcrys-equivalent colchicine is limited to those two products. Although a drug market can maintain price stability with a single generic version of a drug on the market, multiple entrants often produce a market-wide price collapse with mass renegotiation and cancellation of supply agreements. The distribution agreement between Takeda and Par . . . provides powerful incentives to ensure that the parties preserve the two-entrant market." Mem. In Supp. of

Par Pharm. Inc.'s Mot. to Intervene at 4-5, *Takeda Pharm. U.S.A., Inc., v. Mylan Pharm. Inc.*, No. 19-cv-2216 (D. Del. Dec. 23, 2019) (ECF No. 31); and

       b.      Par admitted that the goal of the conspiracy was to tie Takeda's hands and prevent generic competition when Par stated, "the Takeda-Par agreements ensure Par's exclusivity by subjecting Takeda to severe consequences if it authorizes another generic. For example, a failure by Takeda to enforce exclusivity would authorize Par to launch its own ANDA product royalty-free, effectively subjecting Takeda to the damage [unfettered competition] that Mylan threatens here and that Takeda sues to avoid." Reply in Supp. Of Par Pharm. Inc.'s Mot. to Intervene at 9, *Takeda Pharm. U.S.A., Inc. v. Mylan Pharm. Inc.*, No. 19-cv-2216 (D. Del. Jan. 1, 2020) (ECF No. 82).

136.    Takeda and Par's agreements contemplated generating millions of dollars in annual profits to Par between July 1, 2018, and October 15, 2020, even with a royalty payable back to Takeda. The agreements limited generic output in the market to a single generic and were thus worth more to Par than launching its own generic Colcrys in July of 2016 in competition with the Prasco AG and suffering the further and substantial reductions in sales and prices that would have resulted from additional generic competition starting 180 days later.

137.    Takeda's agreements with Watson and Amneal contemplated millions of dollars to both Watson and Amneal. Before the FDA's Unapproved Drug Initiative, at least 21 colchicine sellers were on the market, selling colchicine for pennies per dose. Competing against just Par and Takeda for 135 days would be more profitable to Watson and Amneal than immediately competing against up to 21 potential competitors. Generics in a 3-generic market can charge at least 20% higher prices than generics in a market with additional generics, and that price drop is compounded by the fact that each generic's share of sales shrinks with every new entrant. Thus,

to protect themselves from such generic price and market share declines, Watson and Amneal agreed to Takeda's offer, which was made in furtherance of Takeda's market allocation scheme involving Par, though Amneal also required an additional cash payment of $3.625 million.[39] This protection from price and share declines is what made Watson and Amneal's agreements with Takeda a "better deal" than subsequent ANDA filers got or could get, as Takeda's counsel admitted in another litigation. As Takeda's lawyer explained to Judge Andrews "there is a date certain that there will be full generic competition for this product. The agreement [with Mylan], though, does provide that Par, *Amneal and Watson get a better deal*."[40]

138.    Indeed, after Takeda entered into the market allocation agreements with Par, Watson, and Amneal, and after the Federal Circuit's 2015 Mitigare decision affirming Judge Robinson's denial of Takeda's preliminary injunction against Hikma, several of the Third Wave ANDA filers emerged and filed ANDAs seeking to market generic versions of Colcrys. In chronological order, the identities of the Third-Wave ANDA filers, the dates Takeda sued each, and the dates of expiry of each 30-month stay were as follows:

| Third Wave ANDA Filer | Date Takeda Sued | Expiration of 30-month stay |
|---|---|---|
| Mylan | 10/24/2016 | 3/19/2019 |
| Granules | 7/25/2017 | 12/23/2019 |
| Hetero | 7/25/2017 | 12/23/2019 |
| Macleods | 10/17/2017 | 3/8/2020 |
| Strides | 11/21/2017 | 4/18/2020 |
| DRL | 1/17/2018 | 6/11/2020 |
| Alkem | 2/1/2018 | 6/24/2020 |
| Zydus | 3/27/2018 | 8/15/2020 |

---

[39] Amneal Settlement Agreement § 5.

[40] Transcript of Jan. 21, 2020 Hearing, *Takeda Pharmaceuticals, U.S.A., Inc. v. Mylan Pharmaceuticals, Inc.*, 19-cv-2216 (D. Del. Feb. 4, 2020), ECF No. 126 at 68:5-15 (emphases added).

139.    No Third-Wave ANDA filer would need to agree for the market allocation scheme to be successful. No Third-Wave ANDA filer had a 30-month stay that expired before March of 2019. Moreover, it is unlikely a Third-Wave ANDA filer would have the economic incentive to expend the resources to take the Colcrys patent litigation to verdict when its only reward would be the entry of all other ANDA filers that had obtained FDA approval, including Amneal and Watson. In such circumstances, a Third Wave ANDA filer may not even recoup its litigation expenses by competing.

### 3.    Defendants' Written Agreements Contain Direct Evidence of Conspiracy to Restrain Trade

140.    The above-described agreements contain mutual promises comprising direct evidence of either a single market allocation among Takeda, Par, Watson, and Amneal, or separate bilateral conspiracies between Takeda and each of Par, Watson, and Amneal. In either case Takeda was seeking and reaching agreement on behalf of itself and for the benefit of its joint venture with Par, to maximize the profitability of the sham joint venture.

141.    Takeda's term sheet with Watson[41] and Takeda's agreement with Watson[42] referenced the terms of Takeda's agreements with both Amneal and Par, showing that Takeda communicated to Watson the terms of Amneal's and Par's agreements. This is additional direct evidence of conspiracy. Watson and Amneal's counsel admitted that Takeda communicated the terms of the Par and Amneal settlements to Watson in negotiating Watson's settlement agreement.[43]

---

[41] Watson Term sheet § 1.2 (b).

[42] Watson License Agreement §§ 1.2(b), (c).

[43] Dec. 12, 2021 Hr'g Tr. 50:1-51:10.

### 4.    Additional Evidence of Conspiracy

142.    There is additional evidence of conspiracy, as well. Each of the license agreements between Takeda and each of Par, Watson, and Amneal contained a "contingent" launch provision.

143.    The contingent launch provisions meant that Par, Watson, and Amneal would refrain from launching their own generic versions of Colcrys contingent on one another's agreement to refrain from doing so and Takeda's ability to induce subsequent ANDA filers to wait to launch until 135 days after Watson and Amneal's launch.

144.    The contingent launch provisions, and their necessary implication that the co-conspirators were willing to restrict their own output only for so long as Takeda could obtain agreement of other generics to stay off the market, illustrates that restricting their output was against the unilateral economic interests of each conspirator and was only in each conspirator's conspiratorial interests, and thus is evidence of conspiracy in the nature of a "plus factor." The contingent launch provisions show that each generic would otherwise want to launch as early as possible,[44] because it would not want to sit on the sidelines while its competitors launched.

145.    Takeda was acting on its market allocation agreement with Par in seeking and obtaining the contingent launch provisions. Par has admitted that the "distribution agreement between Takeda and Par . . . provides powerful incentives to ensure that the parties preserve the

---

[44] It is generally the goal of generic companies to enter the market as soon as possible. As counsel for Amneal and Watson argued in representing a generic company in reverse-payment litigation concerning the drug Dymista, requesting that the court enforce a no-AG agreement: "Ms. Allon: What the parties intended first and foremost was to agree on a date certain when [the generic] could launch. From [the brand's] perspective, it wants that date to be as late as possible; [the generic] wants that date to be as early as possible." Hearing Transcript, *Apotex Inc. et al v. Mylan Speciality LP*, et al., N20C-07-055 MMJ CCLD (Del. Super. Ct. Jan. 7, 2021) at 33:18 34:4.

two-entrant market." Mem. in Supp. of Par Pharm. Inc.'s Mot. to Intervene at 4-5, *Takeda Pharm. U.S.A., Inc., v. Mylan Pharm. Inc*., No. 19-cv-2216 (D. Del. Dec. 23, 2019) (ECF No. 31). Par has admitted "the Takeda-Par agreements ensure Par's exclusivity by subjecting Takeda to severe consequences if it authorizes another generic." Reply in Supp. of Par Pharm. Inc.'s Mot. To Intervene at 9, *Takeda Pharm. U.S.A., Inc. v. Mylan Pharm. Inc*., No. 19-cv-2216 (D. Del. Jan. 1, 2020) (ECF No. 82).

146.    Moreover, the conduct between and among Takeda, Par, Watson, and Amneal only makes economic sense if there was a single agreement among the four of them, or alternatively several bilateral agreements between Takeda, on behalf of its joint venture with Par, and each of Par, Watson, and Amneal, to restrict their respective true generic and authorized generic output and prevent the incremental reductions in price that incremental generic entrants cause. Specifically:

> a.    absent concerted assurances that Par, Watson, and Amneal would restrict their output of generic Colcrys for several years, it would not be in Takeda's unilateral economic interests to agree to stop distributing authorized generic Colcrys through Prasco;
>
> b.    absent concerted assurances that Takeda would remove Prasco as a distributor of authorized generic Colcrys and that Watson and Amneal would restrict their output until October 15, 2020, it would not be in Par's unilateral economic interests to agree to restrict its output of its generic Colcrys;
>
> c.    absent concerted assurances that they would receive 135 days of sales free from competition from subsequent ANDA filers, it would not be in Watson

and Amneal's unilateral economic interests to agree to restrict their output of generic Colcrys for years after Par's 180-day exclusivity elapsed.

147.    Furthermore, the conduct between and among Takeda, Par, Watson, and Amneal only makes economic sense if there was a conspiracy to restrain trade among the four of them, or alternatively several bilateral conspiracies to restrain trade between Takeda, on behalf of its joint venture with Par, and each of Par, Watson, and Amneal because, against each of their unilateral economic interests, Par, Watson, and Amneal each dropped a litigation they were certain to win and instead agreed to defer generic Colcrys competition until October 15, 2020. This only makes economic sense if Takeda, Par, Watson, and Amneal agreed, in a single conspiracy or several bilateral conspiracies negotiated by Takeda in furtherance of its market allocation agreement with Par, to prevent the incremental reductions in price and market share that incremental generic entrants would have caused and instead agree to delay and reduce generic Colcrys output, both their own and that of the Third Wave ANDA filers that were anticipated to emerge.

148.    Each of Takeda, Par, Watson, and Amneal was a completely involved co-conspirator. Each participated in the formation of the conspiracy, actively and even aggressively supported and furthered it, and was a necessary part and parcel of it.

### 5.    Anticompetitive Effects of the Market Allocation

149.    The single conspiracy (or, in the alternative, multiple bilateral conspiracies) had, or was intended to have, several anticompetitive effects.

150.    First, competition to Colcrys and generic Colcrys was delayed. For a long period of time, starting in July of 2016, prices were higher than they would have been. Elevated prices lasted for several years, past the time Mylan unexpectedly entered.

151.    Second, instead of Par splitting generic Colcrys sales with Prasco and price competing with it at that time, Par took over for Prasco selling Takeda's AG, keeping prices at

monopoly levels and maintaining Takeda's profits and market share by remitting to Takeda a share of the profits.

152.    Third, instead of competition from Watson and Amneal beginning 180 days after Par's entry of its true generic or with an AG, an artificial exclusivity period for Par of 837 days—4.65 times longer than its statutory 180-day exclusivity—was created for the benefit of the Takeda-Par joint venture and to consumers' detriment, preventing Watson and Amneal from entering the market until October of 2020.

153.    Fourth, instead of the Third Wave ANDA filers entering at the same time as Watson and Amneal, or whenever their respective 30-month stays elapsed and they received FDA approval, all Third Wave ANDA filers were relegated to entry only after Watson and Amneal had been on the market for 135 days.

### H.    Teva Acquired Watson and Joined the Conspiracy

154.    Through the MPA, Teva Ltd. purchased Allergan plc's worldwide generics business, including, among other of Allergan's assets, defendant Watson and Watson's generic Colcrys ANDA, in a deal valued at roughly $40 billion dollars. Teva Ltd. is the only Teva signatory to the MPA, and arranged for the MPA transaction's related financing. The MPA transaction closed in August 2016 after the parties, including Teva Ltd., conducted the required due diligence.

155.    The MPA expressly transferred Watson's liabilities. The transferred liabilities included those relating to Watson's generic Colcrys ANDA and any of Watson's actions and agreements with respect thereto.

156.    The Takeda conspiracy agreements and the related settlements involving Par, Watson, and Amneal discussed above and below were negotiated during the time Teva Ltd. was conducting its due diligence on the MPA transaction, including as pertains to the Watson transfer.

157.   Typically, an acquiring company in Teva Ltd.'s position would have known about the above-noted Takeda-Watson agreements and related settlement (and, as noted above, the related Par and Amneal agreements and settlement terms) either as a direct co-participant with Watson as those terms were being conveyed and negotiated or as a consequence of the MPA's required due diligence.

158.   After the August 2016 Watson ownership transfer, and in the absence of any output restriction conspiracy, it was in the economic self-interest of Teva Ltd. and any of its involved subsidiaries, including Teva Pharmaceuticals USA, Inc. ("Teva USA"), to launch the Watson Colcrys true generic product in the United States as soon as possible.

159.   The Watson Colcrys true generic product, for which the FDA granted tentative approval in October 2015 (meaning that but for the pending Takeda-Watson patent litigation, Takeda's exclusivities expiring in July of 2016, and Par's 180-day exclusivity, the Watson generic Colcrys true generic product otherwise met the FDA's requirements for final approval and immediate U.S. sales), was not first marketed in the United States until December 2020, and only after Mylan's unexpected disruption of the output restriction conspiracy as alleged.

160.   The Watson true generic Colcrys product sold in the United States starting in December 2020 was not manufactured, labeled, marketed, or sold by Watson. Post-acquisition, Teva maintained the FDA's approval letter for the Watson true generic Colcrys product in a "global assets" location; that product was manufactured in the Czech Republic by Teva Ltd.'s wholly-owned subsidiary Teva Czech Industries, s.r.o; labelled for U.S. sales by Teva Ltd.'s wholly-owned subsidiary Actavis Pharma, Inc.; and assigned to Teva USA for U.S. marketing and sales.

161.    The continued delay in the marketing of the Watson true generic Colcrys from January 26, 2017, through December 2020 evidences both a ratification of Watson's pre-acquisition conspiracy agreements and conduct as well as direct participation, post-acquisition, in the conspiracies alleged. Such ratification and direct conspiracy participation extend to at least Teva Ltd. and Teva USA.

**I.    The Market Allocation Comes to an Abrupt End**

162.    Ultimately, one of the Third Wave ANDA filers, Mylan, disrupted the conspiracy's aims when it suddenly launched its generic version of Colcrys on November 25, 2019. Mylan argued that the "Final Court Decision" entry date in its settlement agreement with Takeda was triggered.[45] Specifically, Mylan argued that its license was triggered on December 12, 2018, by the outcome of the aforementioned Mitigare Litigation, after Takeda failed to appeal Judge Andrews' grant of summary judgment in Hikma's favor that the same patents that were asserted against the Colcrys ANDA filers were not infringed.

163.    Takeda disagreed that Mylan's license was triggered and fought vigorously on behalf of itself and its market allocation scheme to prevent Mylan's launch. Specifically, Takeda filed for injunctive relief in the District of Delaware. Takeda argued that Judge Andrews' finding of non-infringement in the Mitigare Litigation did not trigger Mylan's license for generic Colcrys and that Mylan's launch was unlicensed.[46]

164.    Par sought to intervene to make the same argument as Takeda, and additionally argued, as reviewed in detail below, that allowing Third Wave ANDA filers to enter the market

---

[45] *See* Mylan Pharmaceuticals Inc.'s Opp'n to Takeda's Mot. for a Preliminary Injunction, *Takeda Pharmaceuticals U.S.A. Inc. v. Mylan Pharmaceuticals Inc*., 19-cv-2216-RGA (D. Del. Jan. 9, 2020) (ECF No. 70) at 7.

[46] *See Takeda Pharm. U.S.A., Inc. v. Mylan Pharm. Inc.*, 967 F.3d 1339 (Fed. Cir. 2020).

would substantially injure Par because it would be deprived of the financial benefit of the joint venture agreement with Takeda.[47]

165.    Takeda lost on its sought injunction in the district court, pursued the action to the Federal Circuit, and lost there, too, triggering the conspiracy's demise. On September 27, 2023, Judge Andrews granted summary judgment to Mylan on Takeda's breach of contract claim, effectively ruling that Mylan's November 2019 launch was authorized.[48]

166.    Nevertheless, each of the Defendants, even those that did not ultimately benefit as planned, is jointly and severally liable for the full harm that was in fact caused by the market allocation agreements (whether considered collectively or individually).

167.    Over the course of the injunctive proceedings against Mylan, counsel for Takeda and Par confirmed the nature and anticompetitive effect of the market allocation scheme, and in particular the market allocation between Takeda and Par.

168.    Specifically, Par explained that:

[A market with] a single branded drug (Takeda's Colcrys) and a single generic version (Par's authorized generic) only functions if the market for Colcrys-equivalent colchicine is limited to those two products. [] Although a drug market can maintain price stability with a single generic version of a drug on the market, multiple entrants often produce a market-wide price collapse with mass renegotiation and cancellation of supply agreements. [] The distribution agreement between Takeda and Par recognizes this dynamic and provides powerful incentives to ensure that the parties preserve the two-entrant market.[49]

---

[47] *See* Reply in Support of Par Pharmaceutical Inc.'s Motion to Intervene, *Takeda Pharmaceuticals U.S.A., Inc. v. Mylan Pharmaceuticals Inc.*, 19-cv-2216 (D. Del. Jan. 1, 2020) (ECF No. 82) at 9.

[48] *Takeda Pharmaceuticals U.S.A., Inc. v. Mylan Pharmaceuticals Inc.*, No. 19-cv-2216, 2023 WL 6295453, at *7 (D. Del. Sept. 27, 2023).

[49] Mem. in Supp. of Par Pharm. Inc.'s Mot. to Intervene, *Takeda Pharm. U.S.A., Inc., v. Mylan Pharm. Inc.*, No. 19-cv-2216 (D. Del. Dec. 23, 2019) (ECF No. 31) at 4-5.

169.    Par asserted that the entry of a single additional competitor would cause its distribution joint venture with Takeda "to lose approximately $97 million in annual revenue."[50] Par's Chief Commercial Officer explained that "[a]s additional generic versions of Colcrys enter the market, Par would be forced to swiftly reduce prices to maintain even a portion of its market share."[51]

170.    The same logic holds true from Watson and Amneal's perspective. As Takeda's lawyer explained to Judge Andrews "there is a date certain that there will be full generic competition for this product. The agreement [with Mylan], though, does provide that Par, Amneal and Watson get a better deal."[52]

171.    Specifically, the "better deal" was comprised of the price and market share protection from the Third Wave ANDA filers that Watson and Amneal received. As the FDA price chart above shows (¶ 51, *supra*), with just Par on the market, generic prices would remain nearly as high as the brand price. With just Par, Watson, and Amneal on the market, generic prices fall far lower. But with Third Wave ANDA filers entering, prices would incrementally drop lower still, to the teens and single digit percentages of the brand price. Preventing this was a purpose of the single conspiracy or multiple bilateral conspiracies.

172.    Indeed, following Mylan's launch, several more Third Wave ANDA filers launched, piggybacking on Mylan's view that the outcome of the Mitigare Litigation triggered their launches. As a result, the competition that began with Mylan's launch caused the price of

---

[50] Par's Br. in Supp. of Pl. Takeda's Mot. for Prelim. Inj., T*akeda Pharm. U.S.A., Inc. v. Mylan Pharm., Inc*., 19-cv-02216 (D. Del. Jan. 6, 2020) (ECF No. 52) at 4.

[51] Decl. of Domenico Ciarico in Supp. of Takeda's Mot. for Prelim. Inj., *Takeda Pharm. U.S.A., Inc. v. Mylan Pharm., Inc*., 19-cv-02216 (D. Del. Jan. 6, 2020) (ECF No. 54) at ¶ 13.

[52] Transcript of Jan. 21, 2020 Hearing, *Takeda Pharmaceuticals, U.S.A., Inc. v. Mylan Pharmaceuticals, Inc*., 19-cv-2216 (D. Del. Feb. 4, 2020), ECF No. 126 at 68:5-15 (emphases added).

Colcrys and generic Colcrys to quickly fall, and allowed consumers to finally benefit from prices that were about 90% lower than the price at which Takeda's branded and "authorized generic" Colcrys previously were being sold. In January 2019 the price of Colcrys was $6.73 per pill. By 2021, generic versions of Colcrys were available for $0.1475 per pill, a little more than 2% of the brand price. Preventing prices from dropping to this competitive level was the purpose of the conspiracy or conspiracies.

## V.    CLASS ACTION ALLEGATIONS

173.    Plaintiffs bring this action on behalf of themselves and all other similarly situated TPPs as a Class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure seeking damages and other monetary relief pursuant to the state antitrust, unfair competition, and consumer protection laws on behalf of the following Class:

> All entities that, for consumption by their members, employees, insureds, participants, or beneficiaries purchased, paid for and/or provided reimbursement, other than for resale, for some or all of the purchase price for Colcrys and/or generic Colcrys during the time period from August 1, 2016, through and until the anticompetitive effects of the Defendants' unlawful conduct cease in the following states and territories: Alaska, Arizona, Arkansas, California, Connecticut, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.[53]

174.    The following persons and entities are excluded from the Class:

a) Defendants and their counsel, officers, directors, management, employees, parents, subsidiaries, and affiliates;

b) All federal and state governmental entities except for cities, towns, municipalities or counties with self-funded prescription drug plans; and

---

[53] The Connecticut antitrust statute became effective July 10, 2017; the Maryland statute became effective October 1, 2017. The class period for those jurisdictions begins as of the effective date of the statutes.

c) All judges assigned to this case and any members of their immediate families.

175. Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. Plaintiffs believe that members of the Class number in the hundreds or thousands and are widely dispersed throughout the United States. Moreover, given the costs of complex antitrust litigation, it would be uneconomic for many class members to bring individual claims and join them together. The Class is readily identifiable from information and records in the possession of Class members, Defendants, and third parties.

176. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs' claims arise out of the same course of anticompetitive conduct that gives rise to the claims of the other Class members. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants—they paid supracompetitive prices for Colcrys and were deprived of the benefits of earlier and more robust competition from less expensive generic Colcrys as a result of Defendants' unlawful conduct alleged herein.

177. Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs are aligned with, and not antagonistic to, those of the other members of the Class.

178. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with class action antitrust litigation involving pharmaceutical products.

179. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entirety of the Class, thereby making overcharge damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in

Defendants' wrongful conduct. Questions of law and fact common to the Class include, but are not limited to:

a)  Whether Defendants unlawfully maintained monopoly power through all or part of their overall anticompetitive scheme;

b)  To the extent procompetitive justifications exist, whether there were less restrictive means of achieving them;

c)  Whether Defendants' scheme, in whole or in part, has substantially affected intrastate and/or interstate commerce;

d)  Whether Defendants' unlawful agreements, in whole or in part, caused antitrust injury through overcharges to the business or property of Plaintiffs and the members of the Class;

e)  Whether Defendants conspired to delay generic competition for Colcrys;

f)  Whether Defendants' unlawful conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Colcrys;

g)  Determination of a reasonable estimate of the amount of delay Defendants' unlawful conduct caused; and

h)  The quantum of overcharges paid by the Class in the aggregate.

180.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## VI.    <u>ANTICOMPETITIVE EFFECTS</u>

181.    But for the single conspiracy, or alternatively the multiple bilateral conspiracies, Par, Watson and Amneal would have entered earlier, split the available generic Colcrys sales with each other (and Prasco and other Colcrys ANDA filers) earlier, and reduced colchicine tablet prices earlier, to the benefit of consumers.

182.    Thus, Defendants' single conspiracy (or alternatively, several bilateral conspiracies) severely harmed competition in the market for Colcrys and generic Colcrys while it lasted and until prices returned to competitive levels. The conspiracy (or conspiracies) restricted output of generic Colcrys, kept Colcrys prices at supracompetitive levels, and delayed their fall to competitive levels. But for the conspiracy or conspiracies, Par would have launched generic Colcrys under its ANDA in July of 2016 following the expiration of Takeda's exclusivity,[54] followed by Watson and Amneal. Other ANDA filers, all of whom filed ANDAs only after Takeda's settlements with Par, Watson and Amneal, would launch once their ANDAs were approved. Takeda would have kept its authorized generic on the market, distributed by Prasco. The price of Colcrys would have bottomed out to pre-2006 levels far more quickly than it actually did.

183.    As a result, all payers of brand and generic Colcrys paid more than they would have because of the delay in unrestricted competition. TPPs that paid for branded Colcrys (1) were denied the option of purchasing less-expensive generic Colcrys and (2) the amounts they paid for branded Colcrys were inflated in two ways: (i) Takeda used the period of delayed

---

[54] If it wanted to, Par could have requested final approval as early as 90 days before July 29, 2016. Par had already negotiated a license to an authorized generic that would not begin until July 1, 2018. On information and belief, it did not make such a request to the FDA at that time. If it had made such a request, it may have been granted within 90 days per the FDA's practice.

competition to continue charging inflated prices for branded Colcrys and (ii) once competition began the price of branded Colcrys decreased. TPPs that paid for generic Colcrys paid more than they have had Par and Takeda's AG competed, and had full, unrestricted competition commenced sooner.

184.    The effects of Defendants' conduct can be readily seen by examining what happened when full generic competition in the market for Colcrys commenced. When only the Prasco and Par AGs were on the market, generics account for between 55 and 70% of the combined sales of brand and generic Colcrys. The remaining 30-40% of sales were for branded Colcrys. But when mutli-generic competition commenced, the share of brand Colcrys plummeted to less than three percent.[55]



Quarterly Brand and Generic Colcrys Market Shares

---

[55] Expert Merits Report of Dr. Russell Lamb, Case No. 2:21-cv-3500-MAK, ECF 742-3, at 94 (Jan. 13, 2023).

185. The same effect would have happened sooner had Defendants not delayed full generic competition. Absent the delay in competition, almost all of the branded prescriptions that TPPs paid for during the period of delay would have instead been filled with less-expensive versions of generic Colcrys. In addition, absent Defendants' conduct and delayed competition, the prices of generic Colcrys would have been lower. While the price of generic Colcrys remained relatively stable when the only generic on the market was the single Prasco or Par AG, prices dropped significantly once competition from multiple generics commenced.[56]



Brand and Generic Colcrys Prices

---

[56] Expert Merits Report of Dr. Russell Lamb, Case No. 2:21-cv-3500-MAK, ECF 742-3, at 96 (Jan. 13, 2023).

186.    Thus, TPPs that paid for brand and generic Colcrys during the class period overpaid and were injured.

187.    The effects of Defendants conduct are reflected in the Colcrys and generic Colcrys payments made by health plans providing coverage under Medicare Part D. In 2017 there were two sellers of colchicine: Takeda (selling the brand) and Prasco (selling the authorized generic). Because it was the only generic on the market, the authorized generic sold at a high price. And as a result, there was little reason for the Takeda to lower price. The result was that Part D plans spent $301,926,531.24 on 51,986,106 units of colchicine, with roughly 40% of units combined units being dispensed for branded Colcrys.

| **2017 Medicare Part D Plan Spending** | |
| --- | --- |
| Total Spending: $284,884,391.55 | |
| Brand Colcrys | Generic Colcrys |
| 20,818,254 units | 27,544,673 units |
| 43% of the market | 57% of the market |
| $141,146,162 in spending | Prasco dominates sales (100% of generic sales) |
| $6.78 average cost per unit | $ 143,738,230 in spending |
| | $5.22 average cost per unit |

188.    In 2018 and 2019 the results are similar, except that Par replaced Prasco as the dominant seller of the generic.

| **2018 Medicare Part D Plan Spending** | |
| --- | --- |
| Total Spending: $282,944,725.34 | |
| Brand Colcrys | Generic Colcrys |
| 19,538,370 units | 27,124,108 units |
| 42% of the market | 58% of the market |

| $132,342821 in spending<br>$6.77 average cost per unit | Prasco and Par dominate sales (Prasco 76%; Par 24%)<br>$150,601,905 in spending<br>$5.55 average cost per unit |
|---|---|

| **2019 Medicare Part D Plan Spending** | |
|---|---|
| Total Spending: $266,134,175 | |
| Brand Colcrys | Generic Colcrys |
| 19,943,582 units | 26,861,001 units |
| 43% of the market | 57% of the market |
| $140,555,222 in spending | Par dominates sales (95% of generic sales) |
| $7.05 average cost per unit | $125,578,953 in spending |
| | $4.67 average cost per unit |

189.    By 2021, competition had commenced, and the market radically changed: while the total amount of colchicine dispensed remained similar to prior years, in 2021:

- Generics accounted for 97% of units sold (up from 57% in 2019)
- No generic company accounted for more than 27% of generic sales (down from Par's 95% share in 2019)
- Total spending was $129,274,029 (down from $266,134,175 in 2019)
- The brand price was $6.56 per unit (down from $7.05 in 2019)
- The average generic price was $2.72 per unit (down from $4.67 in 2019)

190.    In other words: once Defendants' anticompetitive conduct ended, the market became competitive, generics sales dominated the market, prices dropped across the board, and Part D plans spent *half* of what they had spent just a few years before.

## VII.    **ANTITRUST IMPACT**

191.    During the relevant period, Plaintiffs purchased substantial amounts of Colcrys and authorized generic Colcrys from at supracompetitive prices. General economic theory

67

recognizes that any overcharge at a higher level of distribution in the chain of distribution for

Colcrys results in higher prices at every level below.[57] The institutional structure of pricing and

regulation in the pharmaceutical industry assures that overcharges at the higher level of

distribution are passed on to TPPs like Plaintiffs. In addition, benchmark prices set by

manufacturers of prescription drugs have a direct effect of the prices of the manufacturers'

branded and generic drug prices.

192.    As a result of Defendants' conduct, and as intended by Defendants, Plaintiffs were

compelled to pay and did pay artificially inflated prices for brand and generic Colcrys tablets

dispensed to their members and beneficiaries. Those prices were substantially greater than the

prices that Plaintiffs would have paid absent the conspiracy or conspiracies alleged herein,

because, but for the conspiracy or conspiracies, Plaintiffs would have paid lower prices for the

branded and generic Colcrys dispensed to their members and beneficiaries.

193.    As a consequence, Plaintiffs have sustained substantial losses and damage to their

businesses and property in the form of overcharges. The full amount of such damages will be

calculated after discovery and upon proof at trial.

## VIII.   EFFECT ON INTERSTATE AND INTRASTATE COMMERCE

194.    At all material times, Defendants, manufactured, promoted, and sold substantial

amounts of brand and generic Colcrys in a continuous and uninterrupted flow of commerce

across state and national lines and throughout the United States, including its territories,

possessions, and the Commonwealth of Puerto Rico. During the relevant time period, in

---

[57] Herbert Hovenkamp, Federal Antitrust Policy, The Law of Competition and its Practice 624 (1994). Professor Herbert Hovenkamp states that "[e]very person at every stage in the chain will be poorer as a result of the monopoly price at the top." He also acknowledges that "[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distribution level will pass on to those at the next level." *Id*

connection with the purchase and sale of brand and generic Colcrys, monies as well as contracts, bills and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

195.    During the relevant time period, Plaintiffs and Class members purchased substantial amounts of brand or generic Colcrys. As a result of Defendants' illegal conduct, Plaintiffs and Class members were compelled to pay, and did pay, artificially inflated prices for brand and generic Colcrys, and should have already been paying far less for branded and generic versions of the drug but for Defendants' conduct.

196.    During the relevant time period, various devices were used to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of Defendants as charged in this Complaint were within the flow of, and have substantially affected, interstate commerce.

197.    Defendants' conduct was within the flow of and was intended to have and did have a substantial effect on, interstate commerce of the United States, including in this district.

198.    During the Class period, each Defendant, or one or more of each Defendant's affiliates, used the instrumentalities of interstate commerce to join or effectuate the scheme. The scheme in which Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

199.    Defendants' conduct has also had substantial intrastate effects in that, among other things, consumers and third-party payers have been prevented from purchasing branded and generic versions of Colcrys in each state at lower prices. Defendants' conduct materially deprived the consuming public—including hundreds, if not thousands, of purchasers in each state—of any choice to purchase more affordable versions of Colcrys. The absence of

competition to Colcrys has, and continues to, directly and substantially affect and disrupt commerce within each state.

## IX.    **MONOPOLY POWER AND RELEVANT MARKET**

200.    At all relevant times Takeda had monopoly power in a market limited to Colcrys and generic Colcrys, because it had and exercised the power to raise and maintain the price of Colcrys and authorized generic Colcrys tablets at supracompetitive levels without losing substantial sales to other products prescribed and/or used for the same purposes, other than generic Colcrys.

201.    A small but significant, non-transitory increase in the price of Colcrys or authorized generic Colcrys would not have caused, and never did cause, a significant loss of sales to products used for the same purposes as Colcrys, other than generic Colcrys.

202.    Colcrys and authorized generic Colcrys tablets do not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than generic Colcrys. Indeed, Takeda has repeatedly increased the price of brand Colcrys without losing sales to any other non-Colcrys product.

203.    Other drugs that are not AB-rated to Colcrys do not exhibit substantial cross-price elasticity of demand with Colcrys, and thus are not economic substitutes for, nor reasonably interchangeable with, Colcrys. For instance, Par has admitted that Mitigare is not a true competitor of Colcrys, even though its active ingredient is colchicine.

204.    Products other than generic Colcrys are not economic substitutes for Colcrys or authorized generic Colcrys, and the existence of other products used to treat and/or prevent the same conditions as Colcrys did not significantly constrain Takeda's Colcrys or authorized generic Colcrys pricing. On information and belief, Takeda has never lowered the price of

70

Colcrys or lowered the price of authorized generic Colcrys in response to the pricing of other branded or generic drugs used to treat the same conditions as Colcrys.

205.    To the extent Plaintiffs are legally required to prove monopoly power circumstantially or indirectly by first defining a relevant product market, the relevant product market is limited to Colcrys and generic Colcrys.

206.    The relevant geographic market is the United States and its territories.

207.    At all relevant times, Takeda's market share in the relevant market was 100%, implying a substantial amount of monopoly power.

208.    Takeda needed to control only Colcrys and generic Colcrys, and no other products, in order to profitably maintain prices at a supracompetitive level. No product other than generic Colcrys ever rendered Takeda unable to profitably raise or maintain the price of Colcrys without losing substantial sales. Only the market entry of an AB-rated generic version of Colcrys would render Takeda unable to profitably maintain its prices of Colcrys and/or authorized generic Colcrys without losing substantial sales.

209.    At all relevant times, Takeda enjoyed high barriers to entry with respect to competition to the relevant product market due to patent and other regulatory protections and high costs of entry and expansion.

## X.    **CLAIM ACCRUAL AND/OR TOLLING**

210.    Plaintiffs' Complaint is timely as to all claims accruing within four years of the date of the filing of this Complaint.

211.    Plaintiffs' damages claims predating four years before the filing of the original complaint are also timely under the doctrines of equitable tolling, the discovery rule, and fraudulent concealment.

212.    These doctrines apply because (1) Defendants concealed from Plaintiffs the existence of this cause of action, (2) Plaintiffs could not have known about this cause of action until on or after December 2, 2019 when details about the sham joint venture between Takeda and Par began to be made public, and (3) Plaintiffs' continuing ignorance was not attributable to lack of diligence on its part.

213.    Until December 23, 2019, Defendants concealed from Plaintiffs the existence of its cause of action. Specifically, Defendants concealed from Plaintiffs the terms of the joint venture, in particular that it involved a sham joint venture to preserve Takeda's monopoly and reduce output and maintain monopoly pricing for Colcrys.

214.    The terms of the settlements between Takeda and Par, Amneal, and Watson were kept secret until at earliest December 23, 2019.

215.    On November 25, 2019, Mylan launched its generic version of Colcrys. On December 2, 2019, Takeda sued Mylan for breach of license agreement and patent infringement.[58] Although the complaint mentions Takeda's settlements with Mylan and Mylan's competitors, all of the information about the terms of the settlements is redacted in the public versions of the complaint.

216.    On December 23, 2019, Par moved to intervene in Takeda's suit against Mylan.[59] Although Par had been distributing Takeda's AG for over a year, there was no way for Plaintiffs to know that Par had become the distributor pursuant to its patent settlement agreement,

---

[58] Complaint, *Takeda Pharmaceuticals U.S.A., Inc.*, *v. Mylan Pharmaceuticals Inc.*, No. 19-2216-RGA (D. Delaware), ECF No. 20 (Dec. 11, 2019) (redacted copy of complaint filed under seal on December 2, 2019).

[59] Memorandum of Law in Support of Par Pharmaceutical Inc.'s Motion to Intervene, *Takeda Pharmaceuticals U.S.A., Inc.*, *v. Mylan Pharmaceuticals Inc.*, No. 19-2216-RGA (D. Delaware), ECF No. 31 (Dec. 23, 2019).

particularly since there was a significant time lag between the settlement and the beginning of Par's AG distribution.

217.    Par's motion to intervene publicly revealed, for the first time, that Par had an "interest in the market structure for single active ingredient colchicine established by the Par-Takeda agreements and protected by both the patents-in-suit and the agreements that resolved Takeda's litigations against Par, Mylan and other generic drug manufacturers."[60]

218.    Par's motion to intervene was also the first time Plaintiffs could have learned that "Takeda's settlement agreements with Mylan and the other generic drug manufacturers had a common provision: that the generic drug manufacturer would not enter the market with a generic ANDA product until a date that had yet to pass as of the start of this litigation. Takeda's settlement with Par, however, included additional terms. Although Par similarly agreed to not launch its own generic colchicine version of Takeda's Colcrys® product, Par instead became the exclusive distributor of an authorized generic colchicine manufactured by Takeda."[61]

219.    Par's motion to intervene was also the first time Plaintiffs could have learned that "The agreement provides for Par to purchase colchicine manufactured under Takeda's NDAs at a fixed mark-up above Takeda's cost of goods, distribute the product through Par's generic drug distribution channels, and then share the profits with Takeda according to an agreed-upon formula."[62]

220.    Par's motion to intervene was also the first time Plaintiffs could have learned that "this mutually beneficial arrangement with a single branded drug (Takeda's Colcrys®) and a single generic version (Par's authorized generic) only functions if the market for Colcrys®-

---

[60] *Id.* at 1.

[61] *Id.* at 4.

[62] *Id.*

73

equivalent colchicine is limited to those two products. Although a drug market can maintain price stability with a single generic version of a drug on the market, multiple entrants often produce a market-wide price collapse with mass renegotiation and cancellation of supply agreements. The distribution agreement between Takeda and Par recognizes this dynamic and provides powerful incentives to ensure that the parties preserve the two-entrant market."[63]

221.    Par's motion to intervene was also the first time Plaintiffs could have learned that Par had knowledge of the terms of the settlement agreements between Takeda and Amneal and Watson.

222.    Plaintiffs remained in ignorance of this cause of action until some point within four years of commencement of this action, and Plaintiffs' continuing ignorance was not attributable to a lack of diligence on its part.

223.    As a result of Defendants' fraudulent concealment, all applicable statutes of limitations for the Plaintiffs' claims have been tolled. Even absent fraudulent concealment, all applicable statutes of limitations are tolled by the doctrine of equitable estoppel.

224.    Alternatively, if the statute of limitations is not tolled, this Complaint alleges a continuing course of conduct (including conduct within the limitations period), and can recover for damages that they suffered during the limitations period, i.e., within the last four years.

## XI.    CLAIMS FOR RELIEF

### COUNT I[64]
### Single Conspiracy Among All Defendants in Restraint of Trade in Violation of State Law
### (Against All Defendants)

---

[63] *Id.* at 4–5.

[64] Concurrently with the filing of this complaint, Plaintiffs sent each Defendant a demand letter to the extent required by state law and sent notices of this action to the Attorney General for each of Alaska, Arizona, California, Connecticut, Hawaii, Illinois, Minnesota, Nevada, New York, Oregon, Rhode Island, South Carolina, and Utah.

225.    Plaintiffs hereby incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

226.    Defendants formed a single contract, combination, and conspiracy, in the nature of a concerted restriction on the output of generic Colcrys in order to keep prices from falling, that has unreasonably restrained trade or commerce in violation of the state laws listed below.

227.    The conspiracy is memorialized in written agreements signed on or about November 24, 2015, December 9, 2015, December 10, 2015, January 7, 2016, and March 11, 2016. Par agreed to restrict its output of generic Colcrys until January 1, 2024 (effectively until October 15, 2020) and to restrict output of any Colcrys product (*i.e.*, AG) from November 24, 2015, until July 1, 2018. Watson agreed to restrict its output of generic Colcrys until October 15, 2020. Amneal agreed to restrict its output of generic Colcrys until October 15, 2020. In exchange, Takeda agreed to have its AG distributor, Prasco, exit the market on July 1, 2018, and be replaced by Par as of that date and continuously until June 30, 2022. Takeda also agreed not to license any Third Wave ANDA filer to launch until 135 days after Watson and Amneal entered the market.

228.    Takeda organized this single market allocation. Takeda had the greatest financial stake in the scheme and the most to gain financially by avoiding price competition between its AG (that Par was licensed to sell beginning July 1, 2018) and entered into the aforementioned agreements that directly advanced the interests of itself and Par by extending years into the future the earliest date of generic competition that Par would face.

229.    The evidence that the nature of the conspiracy was singular, not multiple, includes:

a.        that the settlement, license, and supply agreements entered into between Takeda and each of Par, Watson, and Amneal were negotiated and executed roughly simultaneously, as shown not just by the dates of the term sheets and executed agreements, but also from the fact that Judge Robinson simultaneously cancelled the December 9, 2015 bench trials between Takeda on the one hand and Par, Watson, and Amneal on the other, following the very same status conference among all of them, and just nine days after staying the Par action in light of the Takeda-Par settlement. *See* Order, *Takeda Pharm. USA Inc. v. Par Pharm. Cos. Inc.*, No. 13-cv-01524 (D. Del. Nov. 30, 2015); Minute Entry, *Takeda Pharm. USA Inc. v. Watson Labs. Inc.*, No. 14-cv-00268 (D. Del. Dec. 9, 2015); Minute Entry, *Takeda Pharm. USA Inc. v. Amneal Pharm. LLC*, No. 13-cv-01729 (D. Del. Dec. 9, 2015);

b.        that the license agreement between Takeda and Watson specifically references Par and Amneal;

c.        that Takeda treated Par, Watson, and Amneal as a single unit that collectively received a "better deal" than the Third Wave ANDA filers;

d.        that the promises of Takeda, Par, Watson, and Amneal to delay and restrict their output of generic and authorized generic Colcrys were interdependent, inasmuch as each agreed to such delay and restriction but only for so long as the others did also;

e.        that Takeda, Par, Watson, and Amneal all shared a common goal, namely to prevent, for as long as possible, the incremental reduction of prices and profits associated with incremental generic competition to a branded drug, namely Colcrys, and to profit from the reduced generic Colcrys competition that their mutual promises to one another produced;

76

f.      that the promises of Takeda, Par, Watson, and Amneal to delay and restrict their output of generic and authorized generic Colcrys were interdependent, inasmuch as the common goal each agreed to — to reduce generic Colcrys competition and thereby increase generic Colcrys prices and increase their respective profits thereby — were furthered by the continuous cooperation of each of them to restrict their respective output and thereby keep generic Colcrys prices high.

230.    Direct evidence of conspiracy includes:

a.      the promises contained in the written settlement, license, and distribution agreements between and among Takeda and each of Par, Watson, and Amneal; and

b.      the statements of counsel for Takeda and Par in seeking to enjoin Mylan from launching generic Colcrys concerning the nature, purpose, and effect of the settlement, license, and supply agreements, which statements are more fully set forth in Count Two below and are incorporated herein by reference.

231.    Circumstantial evidence of conspiracy includes the actions each Defendant took against its independent (*i.e.*, non-conspiratorial) economic interests, but that make economic sense if there was indeed a conspiracy. This evidence includes:

a.      Par, Watson, and Amneal's agreement to settle, rather than pursuing to judgment, their invalidity and non-infringement theories against Takeda's patents purportedly covering Colcrys, when those theories were almost certain to succeed;

b.      Takeda's agreement to cause its AG distributor, Prasco, to exit the market;

c.      Par's agreement to keep its generic Colcrys off the market for several years;

d.      Par's agreement to delay selling AG Colcrys for two years (until July 1, 2018), and thereby to cede all Colcrys sales to its would-be competitor, Takeda, from July of 2016 until that time;

e.      Watson's agreement to delay selling its generic Colcrys for years after the time that Par's 180-day exclusivity would have elapsed, and thereby to cede generic sales to its would-be competitor, Par, for that time;

f.      Amneal's agreement to delay selling its generic Colcrys for years after the time that Par's 180-day exclusivity would have elapsed, and thereby to cede generic sales to its would-be competitor, Par, for that time; and

g.      each of Par, Watson, and Amneal's agreement with Takeda to withhold its respective generic Colcrys product from the market only for so long as others did so, too.

232.    Circumstantial evidence of conspiracy also includes the motive to agree that each of the Defendants had. Each additional generic entrant lowers prices and takes unit sales, lowering each incumbent firm's profitability. Therefore, under the conspiracy:

a.      Takeda avoided a catastrophic judicial determination of patent invalidity and non-infringement that would cause lowered Colcrys prices, sales, and profits immediately;

b.      Takeda avoided competing against Par, Watson, and Amneal's generic products for a period of time (from July of 2016 until October of 2020), then the conspiracy contemplated Takeda competing against just Par, Watson, and Amneal for 135 additional days, avoiding the lower prices that would have been effected by the entry of the Third Wave ANDA filers;

c.    Par avoided competing against Takeda's authorized generic (distributed by Prasco) starting in July of 2018, then the conspiracy contemplated Par avoiding competing with Watson and Amneal for a lengthy period thereafter (until October of 2020), and then competing against just the three other co-conspirators for the next 135 days and avoiding the lower prices and lower share of sales that would have been effected by the entry of the Third Wave ANDA filers; and

d.    Watson and Amneal each contemplated avoiding competing with the Third Wave ANDA filers for 135 days following their launch.

233.    Circumstantial evidence of conspiracy also includes the similarity of the terms contained in the written settlement, license, and distribution agreements between and among Takeda and each of Par, Watson, and Amneal.

234.    Upon acquiring Watson and its generic Colcrys ANDA per the 2015 MPA transaction, Teva Ltd. and Teva USA ratified the Takeda-Watson conspiracy agreements, and thereafter joined and furthered the single conspiracy (or, alternatively, the separate Takeda Watson bilateral conspiracy) by continuing to withhold the Watson true generic Colcrys product from the U.S. market, despite Teva Ltd.'s and Teva USA's economic interest to market the Watson true generic Colcrys product in the U.S. as soon as possible.

235.    The single conspiracy or multiple bilateral conspiracies substantially, unreasonably, and unduly restrained trade in the relevant market, and harmed Plaintiffs thereby.

236.    There is no legitimate, non-pretextual procompetitive justification for the conspiracy or conspiracies that outweighs its or their harmful effect. Even if there were some conceivable such justification, the conspiracy or conspiracies were broader than necessary to achieve such a purpose.

237.    Takeda and Par's agreement to replace Prasco with Par as Takeda's distributor of "authorized generic" Colcrys was a pretextual, sham joint venture that sought to conceal the conspiracy or conspiracies and did nothing to contribute to competition, as it merely substituted one distributor with another.

238.    By engaging the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a)  Arizona Rev. Stat. §§ 44-1401, et seq., with respect to Class members' purchases in Arizona and/or purchases by Arizona residents.

b)  Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to Class members' purchases in California and/or purchases by California residents.

c)  C.G.S.A. §§ 35-26 and 28, et seq., with respect to Class members' purchases in Connecticut and/or purchases by Connecticut residents.

d)  D.C. Code §§ 28-4501, et seq., with respect to Class members' purchases in the District of Columbia and/or purchases by D.C. residents.

e)  Haw. Rev. Stat. §§ 480-1, et seq., with respect to Class members' purchases in Hawaii and/or purchases by Hawaii residents.

f)  740 Ill. Comp. Stat. 10/1, et seq., with respect to Class members' purchases in Illinois and/or purchases by Illinois residents.

g)  Iowa Code § 553.1, et seq., with respect to Class members' purchases in Iowa and/or purchases by Iowa residents.

h)  Kan. Stat. Ann. § 50-101, et seq., with respect to Class members' purchases in Kansas and/or purchases by Kansas residents.

i)  MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to Class members' purchases in Maryland and/or purchases by Maryland residents.

j)  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to Class members' purchases in Michigan and/or purchases by Michigan residents.

k)  Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to Class members' purchases in Minnesota and/or by Minnesota residents.

l) Miss. Code Ann. §§ 75-21-1, et seq., with respect to Class members' purchases in Mississippi and/or purchases by Mississippi residents.

m) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to Class members' purchases in Nebraska and/or purchases by Nebraska residents.

n) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to Class members' purchases in Nevada and/or purchases by Nevada residents.

o) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to Class members' purchases in New Hampshire and/or purchases by New Hampshire residents.

p) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to Class members' purchases in New Mexico and/or purchases by New Mexico residents.

q) N.Y. Gen. Bus. Law § 340, et seq., with respect to Class members' purchases in New York and/or purchases by New York residents, and to the extent New York law so requires, Plaintiffs hereby forgoes any penalty or minimum recovery in order to preserve the right of New York class members to recover by way of a class action.

r) N.C. Gen. Stat. §§ 75-1, et seq., with respect to Class members' purchases in North Carolina and/or purchases by North Carolina residents.

s) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to Class members' purchases in North Dakota and/or purchases by North Dakota residents.

t) Or. Rev. Stat. §§ 646.705, et seq., with respect to Class members' purchases in Oregon and/or purchases by Oregon residents.

u) P.R. Laws Ann. tit. 10 §§ 258, *et seq.*, with respect to Class members' purchases in Puerto Rico and/or purchases by Puerto Rico residents.

v) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to Class members' purchases in Rhode Island and/or purchases by Rhode Island residents.

w) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to Class members' purchases in South Dakota and/or purchases by South Dakota residents.

x) Tenn. Code Ann §§ 47-25-101, et seq., with respect to Class members' purchases in Tennessee and/or purchases by Tennessee residents.

y) Utah Code Ann. §§ 76-10-3101, et seq., with respect to Class members' purchases in Utah and/or purchases by citizens or residents of Utah.

z) W.Va. Code §§ 47-18-1, et seq., with respect to Class members' purchases in West Virginia and/or purchases by West Virginia residents.

       aa) Wis. Stat. §§ 133.01, et seq., with respect to Class members' purchases in Wisconsin and/or purchases by Wisconsin residents.

239.    Plaintiffs and Class members have been injured in their business or property by reason of Defendants' violations of the laws set forth above because they paid higher prices for brand and generic Colcrys (including purchasing brand Colcrys when they otherwise would have purchased the less expensive generic) than they would have paid in the absence of these violations. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Jazz's conduct unlawful.

240.    Plaintiffs and Class members accordingly seek damages and multiple damages as permitted by law.

## COUNT II
### Conspiracy in Restraint of Trade in Violation of State Law
### (Against Takeda and Par)

241.    Plaintiffs hereby incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

242.    Takeda and Par have engaged in an unlawful contract, combination, or conspiracy in the nature of a concerted restriction on the output of generic Colcrys in order to keep prices from falling, that has unreasonably restrained trade or commerce in violation of the state laws listed below.

243.    The conspiracy is memorialized in written agreements signed on or about November 24, 2015. Par agreed to restrict its output of generic Colcrys until January 1, 2024 and to restrict output of AG from November 24, 2015 until July 1, 2018. In exchange, Takeda agreed to have its AG distributor, Prasco, exit the market on July 1, 2018 and be replaced by Par as of that date and thereafter.

244.    Direct evidence of conspiracy includes:

a.    the promises contained in the written settlement, license, and distribution agreements between Takeda and Par; and

b.    the statements of counsel for Takeda and Par in seeking to enjoin Mylan from launching generic Colcrys concerning the nature, purpose, and effect of the settlement, license, and supply agreements.

245.    Counsel for Takeda and Par made several statements concerning the nature, purpose, and effect of the settlement, license and supply agreements between Takeda and Par. These statements show that the nature, purpose, and effect of the agreements was to create and perpetuate an agreement between Takeda and Par that would create supracompetitive profits from the sale of Colcrys and AG Colcrys by restricting competition. Specifically:

a.    during Takeda's injunction action seeking to prevent a generic Colcrys Third Wave ANDA filer launch until 135 days after Watson and Amneal had entered (i.e., until March 4, 2021), Takeda admitted to Judge Andrews that the conspiracy or conspiracies challenged here forestalled "full generic competition" for the benefit of Par, Watson and Amneal, explaining that "there is a date certain that there will be full generic competition for this product. The agreement, though, does provide that Par, Amneal and Watson get a better deal." Hr'g Tr. of Jan. 21, 2020 at 68:5-15, *Takeda Pharm., U.S.A., Inc. v. Mylan Pharm., Inc*., No. 19-cv-2216 (D. Del. Feb. 4, 2020) (ECF No. 126);

b.    Takeda admitted that the "[Third Wave ANDA filer] license triggers take into account Takeda's previous settlements with Par, Watson, and Amneal (the 'Earlier Filers')" and that Third Wave ANDA filers can launch "[135 days] after the Earlier Filers are allowed to launch their generic Colcrys products." Opening Br. in Supp. of Takeda's

Mot. for a Prelim. Inj. at 8, T*akeda Pharm. U.S.A., Inc., v. Mylan Pharm. Inc*., No. 19-cv-2216 (D. Del. Dec. 5, 2019) (ECF No. 103);

c.      Par admitted that Takeda and Par's "mutually beneficial arrangement with a single branded drug (Takeda's Colcrys) and a single generic version (Par's authorized generic) only functions if the market for Colcrys-equivalent colchicine is limited to those two products. Although a drug market can maintain price stability with a single generic version of a drug on the market, multiple entrants often produce a market-wide price collapse with mass renegotiation and cancellation of supply agreements. The distribution agreement between Takeda and Par . . . provides powerful incentives to ensure that the parties preserve the two-entrant market." Mem. in Supp. of Par Pharm. Inc.'s Mot. to Intervene at 4-5, *Takeda Pharm. U.S.A., Inc., v. Mylan Pharm. Inc*., No. 19-cv-2216 (D. Del. Dec. 23, 2019) (ECF No. 31); and

d.      Par admitted that the goal of the conspiracy was to tie Takeda's hands and prevent generic competition for Par, Watson, and Amneal's benefit when Par stated, "the Takeda-Par agreements ensure Par's exclusivity by subjecting Takeda to severe consequences if it authorizes another generic. For example, a failure by Takeda to enforce exclusivity would authorize Par to launch its own ANDA product royalty-free, effectively subjecting Takeda to the damage [unfettered competition] that Mylan threatens here and that Takeda sues to avoid." Reply in Supp. of Par Pharm. Inc.'s Mot. to Intervene at 9, *Takeda Pharm. U.S.A., Inc. v. Mylan Pharm. Inc*., No. 19-cv-2216 (D. Del. Jan. 1, 2020) (ECF No. 82).

246.    These statements also show that the various agreements Takeda struck with Par, Watson, Amneal, and then the Third Wave ANDA filers were structured to support and maintain this two-firm Colcrys market and the profits is generated for as long as possible.

247.    Circumstantial evidence of conspiracy includes the actions each Defendant took against its independent (i.e., non-conspiratorial) economic interests and that make economic sense if there was indeed a conspiracy. This evidence includes:

a.    Par's agreement to settle, rather than pursuing to judgment, its invalidity and non-infringement theories against Takeda's patents purportedly covering Colcrys, when those theories were sure winners;

b.    Takeda's agreement to cause its AG distributor, Prasco, to exit the market;

c.    Par's agreement to keep its generic Colcrys off the market for several years; and

d.    Par's agreement to delay selling AG Colcrys for two years (until July 1, 2018), and thereby to cede all Colcrys sales to its competitor, Takeda, from July of 2016 until that time.

248.    Circumstantial evidence of conspiracy also includes the motive to agree that each of the Defendants had. Each additional generic entrant lowers prices and takes unit sales, lowering each incumbent firm's profitability. Therefore, under the conspiracy:

a.    Takeda avoided a catastrophic judicial determination of patent invalidity and non-infringement that would cause lowered Colcrys prices, sales, and profits immediately;

b.    Takeda avoided competing against Par's generic product for a period of time; and

c.    Par avoided competing against Takeda's authorized generic (distributed by Prasco) starting in July of 2018, then avoided competing with Watson and Amneal for a lengthy period contemplated thereafter (until October of 2020).

249.    The Takeda-Par conspiracy substantially, unreasonably, and unduly restrained trade in the relevant market, and harmed Plaintiffs thereby.

250.    Defendants Takeda and Par are per se liable for this output-restriction and market allocation conspiracy.

251.    Alternatively, Defendants Takeda and Par are liable for the conspiracy under a "quick look" and/or rule of reason standard.

252.    There is no legitimate, nonpretextual procompetitive justification for the conspiracy that outweighs its harmful effect. Even if there were some conceivable such justification, the conspiracy was broader than necessary to achieve such a purpose.

253.    Takeda and Par's agreement to replace Prasco with Par as Takeda's distributor of "authorized generic" Colcrys was a pretextual, sham joint venture that sought to conceal the conspiracy and did nothing to contribute to competition, as it merely substituted one distributor with another and ensured that the number of generic Colcrys distributors would remain at one instead of two.

254.    As a direct and proximate result of Defendants' conspiracy, as alleged herein, Plaintiffs were harmed.

255.    By engaging the foregoing conduct, Takeda and Par intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a)    Arizona Rev. Stat. §§ 44-1401, et seq., with respect to Class members' purchases in Arizona and/or purchases by Arizona residents.

b)  Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to Class members'
purchases in California and/or purchases by California residents.

c)  C.G.S.A. §§ 35-26 and 28, et seq., with respect to Class members' purchases
in Connecticut and/or purchases by Connecticut residents.

d)  D.C. Code §§ 28-4501, et seq., with respect to Class members' purchases in
the District of Columbia and/or purchases by D.C. residents.

e)  Haw. Rev. Stat. §§ 480-1, et seq., with respect to Class members' purchases in
Hawaii and/or purchases by Hawaii residents.

f)  740 Ill. Comp. Stat. 10/1, et seq., with respect to Class members' purchases in
Illinois and/or purchases by Illinois residents.

g)  Iowa Code § 553.1, et seq., with respect to Class members' purchases in Iowa
and/or purchases by Iowa residents.

h)  Kan. Stat. Ann. § 50-101, et seq., with respect to Class members' purchases in
Kansas and/or purchases by Kansas residents.

i)  MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to Class members'
purchases in Maryland and/or purchases by Maryland residents.

j)  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to Class members'
purchases in Michigan and/or purchases by Michigan residents.

k)  Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect
to Class members' purchases in Minnesota and/or by Minnesota residents.

l)  Miss. Code Ann. §§ 75-21-1, et seq., with respect to Class members'
purchases in Mississippi and/or purchases by Mississippi residents.

m) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to Class members'
purchases in Nebraska and/or purchases by Nebraska residents.

n)  Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to Class members'
purchases in Nevada and/or purchases by Nevada residents.

o)  N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to Class members'
purchases in New Hampshire and/or purchases by New Hampshire residents.

p)  N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to Class members' purchases
in New Mexico and/or purchases by New Mexico residents.

q)  N.Y. Gen. Bus. Law § 340, et seq., with respect to Class members' purchases
in New York and/or purchases by New York residents, and to the extent New
York law so requires, Plaintiff hereby forgoes any penalty or minimum

recovery in order to preserve the right of New York class members to recover by way of a class action.

r)  N.C. Gen. Stat. §§ 75-1, et seq., with respect to Class members' purchases in North Carolina and/or purchases by North Carolina residents.

s)  N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to Class members' purchases in North Dakota and/or purchases by North Dakota residents.

t)  Or. Rev. Stat. §§ 646.705, et seq., with respect to Class members' purchases in Oregon and/or purchases by Oregon residents.

u)  P.R. Laws Ann. tit. 10 §§ 258, *et seq.*, with respect to Class members' purchases in Puerto Rico and/or purchases by Puerto Rico residents.

v)  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to Class members' purchases in Rhode Island and/or purchases by Rhode Island residents.

w)  S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to Class members' purchases in South Dakota and/or purchases by South Dakota residents.

x)  Tenn. Code Ann §§ 47-25-101, et seq., with respect to Class members' purchases in Tennessee and/or purchases by Tennessee residents.

y)  Utah Code Ann. §§ 76-10-3101, et seq., with respect to Class members' purchases in Utah and/or purchases by citizens or residents of Utah.

z)  W.Va. Code §§ 47-18-1, et seq., with respect to Class members' purchases in West Virginia and/or purchases by West Virginia residents.

aa) Wis. Stat. §§ 133.01, et seq., with respect to Class members' purchases in Wisconsin and/or purchases by Wisconsin residents.

256.    Plaintiff and Class members have been injured in their business or property by reason of Takeda and Par's violations of the laws set forth above because they paid higher prices for brand and generic Colcrys (including purchasing brand Colcrys when they otherwise would have purchased the less expensive generic) than they would have paid in the absence of these violations. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Jazz's conduct unlawful.

257.    Plaintiff and Class members accordingly seek damages and multiple damages as permitted by law.

## COUNT III
### Conspiracy in Restraint of Trade in Violation of State Law
### (Against Takeda, Watson, Teva Ltd. and Teva USA)

258.    Plaintiffs hereby incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

259.    Takeda and Watson have engaged in an unlawful contract, combination, or conspiracy in the nature of a concerted restriction on the output of generic Colcrys in order to keep prices from falling, that has unreasonably restrained trade or commerce in violation of the state laws listed below.

260.    The conspiracy is memorialized in written agreements dated December 9, 2015, and January 7, 2016 that Takeda entered into with Watson. Watson agreed to restrict its output of generic Colcrys until October 15, 2020. In exchange, Takeda agreed not to license any Third Wave ANDA filer until 135 days after Watson's launch.

261.    Upon acquiring Watson and the its generic Colcrys ANDA per the 2015 MPA transaction, Teva Ltd. and Teva USA ratified the Takeda-Watson conspiracy agreements, and thereafter joined and furthered the conspiracy by continuing to withhold the Watson generic Colcrys ANDA product from the U.S. market until 2020, despite Teva Ltd.'s and Teva USA's economic interest to market that the Watson generic Colcrys ANDA product in the U.S. as soon as possible.

262.    Direct evidence of conspiracy includes:

    a.    the promises contained in the written settlement and license agreements between Takeda and Watson; and

    b.    the statements of counsel for Takeda and Par in seeking to enjoin Mylan from launching generic Colcrys concerning the nature, purpose, and effect of the

89

settlement, license, and supply agreements, which statements are more fully set forth in Count Two above and are incorporated herein by reference.

263.    Circumstantial evidence of conspiracy includes the actions each Defendant took against its independent (i.e., non-conspiratorial) economic interests, actions that only make economic sense if there was indeed a conspiracy. This evidence includes:

      a.    Watson's agreement to settle, rather than pursuing to judgment, its invalidity and non-infringement theories against Takeda's patents purportedly covering Colcrys, when those theories were sure winners;

      b.    Watson's agreement to keep its generic Colcrys off the market for several years instead of marketing it, and thereby to cede all Colcrys and generic Colcrys sales to its competitors, Takeda and Par from 2016 until October 15, 2020;

      c.    Takeda's agreement to refrain from licensing a Third Wave ANDA filer until 135 days after Watson' launch of generic Colcrys.

264.    Circumstantial evidence of conspiracy also includes the motive to agree that each of the Defendants had. Each additional generic entrant lowers prices and takes unit sales, lowering each incumbent firm's profitability. Therefore, under the conspiracy:

      a.    Takeda avoided a catastrophic judicial determination of patent invalidity and non-infringement that would cause lowered Colcrys prices, sales, and profits immediately;

      b.    Takeda contemplated avoiding competing against Watson's generic product for a period of time (2016 until October of 2020), then contemplated competed against just Par, Watson, and Amneal for 135 additional days, avoiding the lower prices that would have been effected by the entry of the Third Wave ANDA filers; and

c.      Watson contemplated avoiding competing with the Third Wave ANDA filers for 135 days following its launch.

265.    The Takeda-Watson conspiracy substantially, unreasonably, and unduly restrained trade in the relevant market, and harmed Plaintiffs.

266.    Defendants Takeda, Watson, Teva Ltd., and Teva USA are per se liable for this output-restriction conspiracy.

267.    Alternatively, Defendants Takeda, Watson, Teva Ltd., and Teva USA are liable for the conspiracy under a "quick look" and/or rule of reason standard.

268.    There is no legitimate, nonpretextual procompetitive justification for the conspiracy that outweighs its harmful effect. Even if there were some conceivable such justification, the conspiracy was broader than necessary to achieve such a purpose.

269.    As a direct and proximate result of Defendants' conspiracy, as alleged herein, Plaintiffs were harmed as aforesaid.

270.    By engaging the foregoing conduct, Takeda, Watson, and Teva intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

a)  Arizona Rev. Stat. §§ 44-1401, et seq., with respect to Class members' purchases in Arizona and/or purchases by Arizona residents.

b)  Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to Class members' purchases in California and/or purchases by California residents.

c)  C.G.S.A. §§ 35-26 and 28, et seq., with respect to Class members' purchases in Connecticut and/or purchases by Connecticut residents.

d)  D.C. Code §§ 28-4501, et seq., with respect to Class members' purchases in the District of Columbia and/or purchases by D.C. residents.

e)  Haw. Rev. Stat. §§ 480-1, et seq., with respect to Class members' purchases in Hawaii and/or purchases by Hawaii residents.

f)  740 Ill. Comp. Stat. 10/1, et seq., with respect to Class members' purchases in Illinois and/or purchases by Illinois residents.

g)  Iowa Code § 553.1, et seq., with respect to Class members' purchases in Iowa and/or purchases by Iowa residents.

h)  Kan. Stat. Ann. § 50-101, et seq., with respect to Class members' purchases in Kansas and/or purchases by Kansas residents.

i)  MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to Class members' purchases in Maryland and/or purchases by Maryland residents.

j)  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to Class members' purchases in Michigan and/or purchases by Michigan residents.

k)  Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to Class members' purchases in Minnesota and/or by Minnesota residents.

l)  Miss. Code Ann. §§ 75-21-1, et seq., with respect to Class members' purchases in Mississippi and/or purchases by Mississippi residents.

m) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to Class members' purchases in Nebraska and/or purchases by Nebraska residents.

n)  Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to Class members' purchases in Nevada and/or purchases by Nevada residents.

o)  N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to Class members' purchases in New Hampshire and/or purchases by New Hampshire residents.

p)  N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to Class members' purchases in New Mexico and/or purchases by New Mexico residents.

q)  N.Y. Gen. Bus. Law § 340, et seq., with respect to Class members' purchases in New York and/or purchases by New York residents, and to the extent New York law so requires, Plaintiff hereby forgoes any penalty or minimum recovery in order to preserve the right of New York class members to recover by way of a class action.

r)  N.C. Gen. Stat. §§ 75-1, et seq., with respect to Class members' purchases in North Carolina and/or purchases by North Carolina residents.

s)  N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to Class members' purchases in North Dakota and/or purchases by North Dakota residents.

t)  Or. Rev. Stat. §§ 646.705, et seq., with respect to Class members' purchases in Oregon and/or purchases by Oregon residents.

u) P.R. Laws Ann. tit. 10 §§ 258, *et seq.*, with respect to Class members' purchases in Puerto Rico and/or purchases by Puerto Rico residents.

v) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to Class members' purchases in Rhode Island and/or purchases by Rhode Island residents.

w) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to Class members' purchases in South Dakota and/or purchases by South Dakota residents.

x) Tenn. Code Ann §§ 47-25-101, et seq., with respect to Class members' purchases in Tennessee and/or purchases by Tennessee residents.

y) Utah Code Ann. §§ 76-10-3101, et seq., with respect to Class members' purchases in Utah and/or purchases by citizens or residents of Utah.

z) W.Va. Code §§ 47-18-1, et seq., with respect to Class members' purchases in West Virginia and/or purchases by West Virginia residents.

aa) Wis. Stat. §§ 133.01, et seq., with respect to Class members' purchases in Wisconsin and/or purchases by Wisconsin residents.

271.    Plaintiffs and Class members have been injured in their business or property by reason of Takeda, Watson, and Teva's violations of the laws set forth above because they paid higher prices for brand and generic Colcrys (including purchasing brand Colcrys when they otherwise would have purchased the less expensive generic) than they would have paid in the absence of these violations. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Jazz's conduct unlawful.

272.    Plaintiffs and Class members accordingly seek damages and multiple damages as permitted by law.

### COUNT IV
### Conspiracy in Restraint of Trade in Violation of State Law
### (Against Takeda and Amneal)

273.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

274.    Takeda and Amneal have engaged in an unlawful contract, combination, or conspiracy in the nature of a concerted restriction on the output of generic Colcrys in order to keep prices from falling, that has unreasonably restrained trade or commerce in violation of the state laws listed below.

275.    The conspiracy is memorialized in written agreements dated December 10, 2015, and March 11, 2016 that Takeda entered into with Amneal in Takeda's role as senior joint venture partner with Par in the Takeda-Par joint venture. Amneal agreed to restrict its output of generic Colcrys until October 15, 2020. In exchange, Takeda agreed not to license any Third Wave ANDA filer until 135 days after Watson's (and thus Amneal's) launch.

276.    Direct evidence of conspiracy includes:

a.    the promises contained in the written settlement and license agreements between Takeda and Amneal; and

b.    the statements of counsel for Takeda and Par in seeking to enjoin Mylan from launching generic Colcrys concerning the nature, purpose, and effect of the settlement, license, and supply agreements, which statements are more fully set forth in Count Two above and are incorporated herein by reference.

277.    Circumstantial evidence of conspiracy includes the actions each Defendant took against its independent (i.e., non-conspiratorial) economic interests, actions that only make economic sense if there was indeed a conspiracy. This evidence includes:

a.    Amneal's agreement to settle, rather than pursuing to judgment, its invalidity and non-infringement theories against Takeda's patents purportedly covering Colcrys, when those theories were sure winners;

94

b.      Amneal's agreement to keep its generic Colcrys off the market for several years instead of marketing it, and thereby to cede all Colcrys and generic Colcrys sales to its competitors, Takeda and Par from 2016 until October 15, 2020;

c.      Takeda's agreement to refrain from licensing a Third Wave ANDA filer until 135 days after Watson's (and thus Amneal's) launch of generic Colcrys.

278.    Circumstantial evidence of conspiracy also includes the motive to agree that each of the Defendants had. Each additional generic entrant lowers prices and takes unit sales, lowering each incumbent firm's profitability. Therefore, under the conspiracy:

a.      Takeda avoided a catastrophic judicial determination of patent invalidity and non-infringement that would cause lowered Colcrys prices, sales, and profits immediately;

b.      Takeda contemplated avoiding competing against Amneal's generic product for a period of time (2016 until October of 2020), then contemplated competing against just Par, Watson, and Amneal for 135 additional days, avoiding the lower prices that would have been effected by the entry of the Third Wave ANDA filers; and

c.      Amneal contemplated avoiding competing with the Third Wave ANDA filers for 135 days following its launch.

279.    The Takeda-Amneal conspiracy substantially, unreasonably, and unduly restrained trade in the relevant market, and harmed Plaintiffs.

280.    Defendants Takeda and Amneal are per se liable for this output-restriction conspiracy.

281.    Alternatively, Defendants Takeda and Amneal are liable for the conspiracy under a "quick look" and/or rule of reason standard.

282.    There is no legitimate, nonpretextual procompetitive justification for the conspiracy that outweighs its harmful effect. Even if there were some conceivable such justification, the conspiracy was broader than necessary to achieve such a purpose.

283.    As a direct and proximate result of Defendants' conspiracy, as alleged herein, Plaintiffs were harmed.

284.    By engaging the foregoing conduct, Takeda and Amneal intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

    a)  Arizona Rev. Stat. §§ 44-1401, et seq., with respect to Class members' purchases in Arizona and/or purchases by Arizona residents.

    b)  Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to Class members' purchases in California and/or purchases by California residents.

    c)  C.G.S.A. §§ 35-26 and 28, et seq., with respect to Class members' purchases in Connecticut and/or purchases by Connecticut residents.

    d)  D.C. Code §§ 28-4501, et seq., with respect to Class members' purchases in the District of Columbia and/or purchases by D.C. residents.

    e)  Haw. Rev. Stat. §§ 480-1, et seq., with respect to Class members' purchases in Hawaii and/or purchases by Hawaii residents.

    f)  740 Ill. Comp. Stat. 10/1, et seq., with respect to Class members' purchases in Illinois and/or purchases by Illinois residents.

    g)  Iowa Code § 553.1, et seq., with respect to Class members' purchases in Iowa and/or purchases by Iowa residents.

    h)  Kan. Stat. Ann. § 50-101, et seq., with respect to Class members' purchases in Kansas and/or purchases by Kansas residents.

    i)  MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to Class members' purchases in Maryland and/or purchases by Maryland residents.

    j)  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to Class members' purchases in Michigan and/or purchases by Michigan residents.

    k)  Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to Class members' purchases in Minnesota and/or by Minnesota residents.

l) Miss. Code Ann. §§ 75-21-1, et seq., with respect to Class members' purchases in Mississippi and/or purchases by Mississippi residents.

m) Neb. Rev. Stat. Ann. §§ 59-801, et seq., with respect to Class members' purchases in Nebraska and/or purchases by Nebraska residents.

n) Nev. Rev. Stat. Ann. §§ 598A.010, et seq., with respect to Class members' purchases in Nevada and/or purchases by Nevada residents.

o) N.H. Rev. Stat. Ann. §§ 356:1, et seq., with respect to Class members' purchases in New Hampshire and/or purchases by New Hampshire residents.

p) N.M. Stat. Ann. §§ 57-1-1, et seq., with respect to Class members' purchases in New Mexico and/or purchases by New Mexico residents.

q) N.Y. Gen. Bus. Law § 340, et seq., with respect to Class members' purchases in New York and/or purchases by New York residents, and to the extent New York law so requires, Plaintiffs hereby forgoes any penalty or minimum recovery in order to preserve the right of New York class members to recover by way of a class action.

r) N.C. Gen. Stat. §§ 75-1, et seq., with respect to Class members' purchases in North Carolina and/or purchases by North Carolina residents.

s) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to Class members' purchases in North Dakota and/or purchases by North Dakota residents.

t) Or. Rev. Stat. §§ 646.705, et seq., with respect to Class members' purchases in Oregon and/or purchases by Oregon residents.

u) P.R. Laws Ann. tit. 10 §§ 258, *et seq.*, with respect to Class members' purchases in Puerto Rico and/or purchases by Puerto Rico residents.

v) R.I. Gen. Laws §§ 6-36-1 et seq., with respect to Class members' purchases in Rhode Island and/or purchases by Rhode Island residents.

w) S.D. Codified Laws §§ 37-1-3.1, et seq., with respect to Class members' purchases in South Dakota and/or purchases by South Dakota residents.

x) Tenn. Code Ann §§ 47-25-101, et seq., with respect to Class members' purchases in Tennessee and/or purchases by Tennessee residents.

y) Utah Code Ann. §§ 76-10-3101, et seq., with respect to Class members' purchases in Utah and/or purchases by citizens or residents of Utah.

z) W.Va. Code §§ 47-18-1, et seq., with respect to Class members' purchases in West Virginia and/or purchases by West Virginia residents.

aa) Wis. Stat. §§ 133.01, et seq., with respect to Class members' purchases in Wisconsin and/or purchases by Wisconsin residents.

285.    Plaintiffs and Class members have been injured in their business or property by reason of Takeda and Amneal's violations of the laws set forth above because they paid higher prices for brand and generic Colcrys (including purchasing brand Colcrys when they otherwise would have purchased the less expensive generic) than they would have paid in the absence of these violations. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Jazz's conduct unlawful.

286.    Plaintifsf and Class members accordingly seek damages and multiple damages as permitted by law.

**COUNT V**
**Monopolization in Violation of State Law**
**(Against Takeda Only)**

287.    Plaintiffs hereby incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

288.    At all relevant times, Takeda and its co-conspirators possessed monopoly power in the relevant market.

289.    By its conduct as set forth above, Takeda willfully maintained monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and injured Plaintiffs thereby.

290.    It was Takeda's conscious object to further its dominance in the relevant market by and through its conduct set forth above.

291.    Takeda's conduct as set forth above constitutes an anticompetitive scheme to maintain monopoly power in the relevant market.

292.    The goal, purpose, and/or effect of Takeda's conduct was to maintain and extend Takeda's monopoly power with respect to Colcrys, and share in the unlawful profits derived therefrom. Takeda's conduct to impair generic competition allowed Takeda to continue charging supra-competitive prices for Colcrys and "authorized generic" Colcrys without a substantial loss of sales.

293.    As a direct and proximate result of Takeda's monopolistic conduct, as alleged herein, Plaintiffs were harmed.

294.    By engaging in the foregoing conduct, Takeda intentionally, willfully, and wrongfully monopolized the relevant market in violation of the following state laws:

    a)  Arizona Rev. Stat. §§ 44-1403, et seq., with respect to Class members' purchases in Arizona and/or purchases by Arizona residents.

    b)  Cal. Bus. & Prof. Code §§ 16700, with respect to Class members' purchases in California and/or purchases by California residents.

    c)  C.G.S.A. §§ 35-27, et seq., with respect to Class members' purchases in Connecticut and/or purchases by Connecticut residents.

    d)  D.C. Code §§ 28-4503, et seq., with respect to Class members' purchases in the District of Columbia and/or purchases by District Columbia residents.

    e)  Fla. Stat. §§ 501.201, et seq., with respect to Class members' purchases in Florida and/or purchases by Florida residents, and such conduct constitutes a predicate act under the Florida Deceptive Practices Act.

    f)  Haw. Rev. Stat. §§ 480-2, 480-9, et seq., with respect to Class members' purchases in Hawaii and/or purchases by Hawaii residents.

    g)  740 Ill. Comp. Stat. 10/1, et seq., with respect to Class members' purchases in Illinois and/or purchases by Illinois residents.

    h)  Iowa Code § 553.5, et seq., with respect to Class members' purchases in Iowa and/or purchases by Iowa residents.

    i)  Kan. Stat. Ann. § 50-101, et seq., with respect to Class members' purchases in Kansas and/or purchases by Kansas residents.

    j)  MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to Class members' purchases in Maryland and/or purchases by Maryland residents.

k)  Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to Class members' purchases in Michigan and/or purchases by Michigan residents.

l)  Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to Class members' purchases in Minnesota and/or purchases by Minnesota residents.

m)  Miss. Code Ann. §§ 75-21-3, et seq., with respect to Class members' purchases in Mississippi and/or purchases by Mississippi residents.

n)  Neb. Rev. Stat. Ann. §§ 59-802, et seq., with respect to Class members' purchases in Nebraska and/or purchases by Nebraska residents.

o)  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to Class members' purchases in Nevada and/or purchases by Nevada residents.

p)  N.H. Rev. Stat. Ann. §§ 356.1, et seq., with respect to Class members' purchases in New Hampshire and/or purchases by New Hampshire residents.

q)  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to Class members' purchases in New Mexico and/or purchases by New Mexico residents.

r)  N.Y. Gen. Bus. Law § 340, et seq., with respect to Class members' purchases in New York and/or purchases by New York residents, and to the extent New York law so requires, Plaintiffs hereby forgo any penalty or minimum recovery in order to preserve the right of New York class members to recover by way of a class action.

s)  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to Class members' purchases in North Carolina and/or purchases by North Carolina residents.

t)  N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to Class members' purchases in North Dakota and/or purchases by North Dakota residents.

u)  Or. Rev. Stat. §§ 646.705, et seq., with respect to Class members' purchases in Oregon and/or purchases by Oregon residents.

v)  P.R. Laws Ann. tit. 10, §§ 260, *et seq.*, with respect to Class members' purchases in Puerto Rico and/or purchases by Puerto Rico residents.

w)  R.I. Gen. Laws §§ 6-36-5 et seq., with respect to Class members' purchases in Rhode Island and/or purchases by Rhode Island residents.

x)  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to Class members' purchases in South Dakota and/or purchases by South Dakota residents.

y)  Tenn. Code Ann §§ 47-25-101, et seq., with respect to Class members' purchases in Tennessee and/or purchases by Tennessee residents.

z)  Utah Code Ann. §§ 76-10-3101, et seq., with respect to Class members' purchases in Utah and/or purchases by Arizona residents.

aa) W.Va. Code §§ 47-18-1, et seq., with respect to Class members' purchases in West Virginia and/or purchases by West Virginia residents.

bb) Wis. Stat. §§ 133.03, et seq., with respect to Class members' purchases in Wisconsin and/or purchases by Wisconsin residents.

295.    Plaintiffs and Class members have been injured in their business or property by reason of Takeda's violations of the laws set forth above because they paid higher prices for brand and generic Colcrys (including purchasing brand Colcrys when they otherwise would have purchased the less expensive generic) than they would have paid in the absence of these violations. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Jazz's conduct unlawful.

296.    Plaintiffs and Class members accordingly seek damages and multiple damages as permitted by law.

**COUNT VI**
**Conspiracy to Monopolize in Violation of State Law**
**(Against All Defendants)**

297.    Plaintiffs hereby incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

298.    Defendants conspired in either a single conspiracy or multiple bilateral conspiracies between Takeda and each of Par, Watson (and thus Teva Ltd. and Teva USA), and Amneal to unlawfully maintain Takeda's monopoly power in the relevant market by agreeing and adhering to the promises comprising the single output-restriction conspiracy or multiple bilateral output-restriction conspiracies.

299.    Defendants knowingly and intentionally entered into the output-restriction conspiracy or conspiracies.

300.    Defendants specifically intended that the conspiracy or conspiracies would maintain Takeda's monopoly power in the relevant market, and injured Plaintiffs thereby.

301.    Defendants each committed at least one overt act in furtherance of the conspiracy or bilateral conspiracies in which it was involved.

302.    As a direct and proximate result of Defendants' monopolistic conduct, as alleged herein, Plaintiffs were harmed.

303.    By engaging in the foregoing conduct, Defendants intentionally, willfully, and wrongfully conspired to monopolize the relevant market in violation of the following state laws:

    a)   Arizona Rev. Stat. §§ 44-1403, et seq., with respect to Class members' purchases in Arizona and/or purchases by Arizona residents.

    b)   Cal. Bus. & Prof. Code §§ 16700, with respect to Class members' purchases in California and/or purchases by California residents.

    c)   C.G.S.A. §§ 35-27, et seq., with respect to Class members' purchases in Connecticut and/or purchases by Connecticut residents.

    d)   D.C. Code §§ 28-4503, et seq., with respect to Class members' purchases in the District of Columbia and/or purchases by District Columbia residents.

    e)   Fla. Stat. §§ 501.201, et seq., with respect to Class members' purchases in Florida and/or purchases by Florida residents, and such conduct constitutes a predicate act under the Florida Deceptive Practices Act.

    f)   Haw. Rev. Stat. §§ 480-2, 480-9, et seq., with respect to Class members' purchases in Hawaii and/or purchases by Hawaii residents.

    g)   740 Ill. Comp. Stat. 10/1, et seq., with respect to Class members' purchases in Illinois and/or purchases by Illinois residents.

    h)   Iowa Code § 553.5, et seq., with respect to Class members' purchases in Iowa and/or purchases by Iowa residents.

    i)   Kan. Stat. Ann. § 50-101, et seq., with respect to Class members' purchases in Kansas and/or purchases by Kansas residents.

    j)   MD Code Ann., Com. Law, §§ 11-204, et seq., with respect to Class members' purchases in Maryland and/or purchases by Maryland residents.

k) Mich. Comp. Laws Ann. §§ 445.771, et seq., with respect to Class members' purchases in Michigan and/or purchases by Michigan residents.

l) Minn. Stat. §§ 325D.49, et seq., and Minn. Stat. §§ 8.31, et seq., with respect to Class members' purchases in Minnesota and/or purchases by Minnesota residents.

m) Miss. Code Ann. §§ 75-21-3, et seq., with respect to Class members' purchases in Mississippi and/or purchases by Mississippi residents.

n) Neb. Rev. Stat. Ann. §§ 59-802, et seq., with respect to Class members' purchases in Nebraska and/or purchases by Nebraska residents.

o) Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to Class members' purchases in Nevada and/or purchases by Nevada residents.

p) N.H. Rev. Stat. Ann. §§ 356.1, et seq., with respect to Class members' purchases in New Hampshire and/or purchases by New Hampshire residents.

q) N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to Class members' purchases in New Mexico and/or purchases by New Mexico residents.

r) N.Y. Gen. Bus. Law § 340, et seq., with respect to Class members' purchases in New York and/or purchases by New York residents, and to the extent New York law so requires, Plaintiffs hereby forgo any penalty or minimum recovery in order to preserve the right of New York class members to recover by way of a class action.

s) N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to Class members' purchases in North Carolina and/or purchases by North Carolina residents.

t) N.D. Cent. Code §§ 51-08.1-01, et seq., with respect to Class members' purchases in North Dakota and/or purchases by North Dakota residents.

u) Or. Rev. Stat. §§ 646.705, et seq., with respect to Class members' purchases in Oregon and/or purchases by Oregon residents.

v) P.R. Laws Ann. tit. 10, §§ 260, *et seq.*, with respect to Class members' purchases in Puerto Rico and/or purchases by Puerto Rico residents.

w) R.I. Gen. Laws §§ 6-36-5 et seq., with respect to Class members' purchases in Rhode Island and/or purchases by Rhode Island residents.

x) S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to Class members' purchases in South Dakota and/or purchases by South Dakota residents.

y) Tenn. Code Ann §§ 47-25-101, et seq., with respect to Class members' purchases in Tennessee and/or purchases by Tennessee residents.

z) Utah Code Ann. §§ 76-10-3101, et seq., with respect to Class members' purchases in Utah and/or purchases by Arizona residents.

aa) W.Va. Code §§ 47-18-1, et seq., with respect to Class members' purchases in West Virginia and/or purchases by West Virginia residents.

bb) Wis. Stat. §§ 133.03, et seq., with respect to Class members' purchases in Wisconsin and/or purchases by Wisconsin residents.

304.    Plaintiffs and Class members have been injured in their business or property by reason of Defendants' violations of the laws set forth above because they paid higher prices for brand and generic Colcrys (including purchasing brand Colcrys when they otherwise would have purchased the less expensive generic) than they would have paid in the absence of these violations. These injuries are of the type that the above laws were designed to prevent and flow from that which makes Jazz's conduct unlawful.

305.    Plaintiffs and Class members accordingly seek damages and multiple damages as permitted by law.

**COUNT VII**
**Unfair Methods of Competition and Unfair and/or Unconscionable Conduct in Violation of State Law**
**(Against All Defendants)**

306.    Plaintiffs hereby incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

307.    Defendants engaged in unfair methods of competition or unfair and/or unconscionable conduct in violation of the state consumer protection statues listed below.

308.    There was and is a gross disparity between the price that Plaintiffs and members of the Class paid for Colcrys and the value they received. Much more affordable generic Colcrys would have been more widely available, and prices for brand and generic Colcrys would have been far lower, but for Defendants' unfair competition or unfair and/or unconscionable conduct.

309.    As a direct and proximate result of Defendants' unfair competition or unfair and/or unconscionable conduct, Plaintiffs and Class members were: (i) denied of the benefits of unrestrained competition from multiple sellers of generic Colcrys; (ii) forced to pay higher prices for brand Colcrys than they would have paid but for Defendants' unlawful conduct; and (iii) forced to pay higher prices for generic Colcrys than they would have paid but for Defendants' unlawful conduct.

310.    The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiffs and Class members could not reasonably have avoided injury from Defendants' wrongful conduct.

311.    By engaging in such conduct, Defendants violated the following consumer protection laws.

    a)  Alaska Stat. Ann. §§ 45.50.471, et seq., with respect to Class members' purchases in Alaska and/or purchases by Alaska residents.

    b)  Ariz. Rev. Stat. Ann. §§ 44-1521, et seq., with respect to Class members' purchases in Arizona and/or purchases by Arizona residents.

    c)  Ark. Code Ann. §§ 4-88-101, et seq., with respect to Class members' purchases in Arkansas and/or purchases by Arkansas residents.

    d)  Cal. Bus. & Prof Code §§ 17200, et seq., with respect to Class members' purchases in California and/or purchases by California residents. Defendants engaged in business practices that are unfair in that they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to class members. There are no countervailing benefits to class members and any utility of Defendants' conduct is outweighed by the consequences to class members. Defendants' conduct also constitutes an unlawful business practice in that it violates the Sherman Act, the California Cartwright Act, and Cal. Health & Safety Code § 134002.

    e)  D.C. Code §§ 28-3901, et seq., with respect to Class members' purchases in D.C. and/or purchases by D.C. residents.

    f)  Fla. Stat. §§ 501.201, et seq., with respect to Class members' purchases in Florida and/or purchases by Florida residents.

g) Haw. Rev. Stat. §§ 481-1, et seq., with respect to Class members' purchases in Hawaii and/or purchases by Hawaii residents.

h) 815 Ill. Comp. Stat. 505/1, et seq., with respect to Class members' purchases in Illinois and/or purchases by Illinois residents.

i) Mass. Gen. Laws ch. 93A, §§ 1 et seq., with respect to Class members' purchases in Massachusetts and/or purchases by Massachusetts residents.

j) Mich. Comp. Laws §§ 445.901, et seq., with respect to Class members' purchases in Michigan and/or purchases by Michigan residents.

k) Neb. Rev. Stat. §§ 59-1601, et seq., with respect to Class members' purchases in Nebraska and/or purchases by Nebraska residents.

l) Nev. Rev. Stat. Ann. §§ 598.0903, et seq., with respect to Class members' purchases in Nevada and/or purchases by Nevada residents.

m) N.H. Rev. Stat. Ann. §§ 358-A:1, et seq., with respect to Class members' purchases in New Hampshire and/or purchases by New Hampshire residents.

n) N.M. Stat. Ann. §§ 57-12-1, et seq., with respect to Class members' purchases in New Mexico and/or purchases by New Mexico residents.

o) N.C. Gen. Stat. §§ 75-1.1, et seq., with respect to Class members' purchases in North Carolina and/or purchases by North Carolina residents.

p) R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to Class members' purchases in Rhode Island and/or purchases by Rhode Island residents, for personal, family and/or household use.

q) S.C. Code Ann. §§ 39-5-20, et seq., with respect to Class members' purchases in South Carolina and/or purchases by South Carolina residents. Defendants engaged in unfair methods of competition and/or unfair practices in the conduct of trade and commerce. Defendants' conduct is offensive to public policy and immoral, unethical, and oppressive.

r) Utah Code Ann. §§ 13-11-1, et seq., with respect to Class members' purchases in Utah and/or purchases by Utah residents for personal, family, or household purposes.

s) W. Va. Code §§ 46A-6-101, et seq., with respect to Class members' purchases in West Virginia and/or purchases by West Virginia residents.

t) Wis. Stat. § 100.20, et seq., with respect to Class members' purchases in Wisconsin and/or purchases by Wisconsin residents.

312.    Plaintiffs and Class members have been injured in their business and property by reason of Defendants' unfair competition or unfair and/or unconscionable conduct. Their injury consists of paying higher prices for brand and generic Colcrys (including purchasing brand Colcrys when they otherwise would have purchased the less expensive generic) than they would have paid in the absence of these violations. This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Defendants' unlawful conduct.

313.    On behalf of themselves and the Class, Plaintiffs seeks all appropriate relief provided for under the foregoing statutes.

## XII.    <u>DEMAND FOR JUDGMENT</u>

Plaintiffs respectfully demand that this Court:

a.    Enter joint and several judgments against the Defendants and in favor of the Plaintiffs;

b.    Award the Plaintiffs damages (*i.e.*, including multiple damages as permitted by law) in an amount to be determined at trial;

c.    Award Plaintiffs their costs of suit, including reasonable attorneys' fees as provided by law; and

d.    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## XIII.    <u>JURY DEMAND</u>

Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury on all issues so triable.

Dated: November 14, 2023                    Respectfully Submitted,

                                            **GLANCY PRONGAY & MURRAY LLP**

                                            */s/Gregory B. Linkh*_____
                                            Greg Linkh (GL 0477)
                                            Brian Brooks (BB 7442)
                                            Lee Albert (*Pro Hac Vice* forthcoming)
                                            230 Park Avenue, Suite 530
                                            New York, NY 10169
                                            Telephone: (212) 682-5340
                                            Facsimile: (212) 884-0988
                                            glinkh@glancylaw.com
                                            bbrooks@glancylaw.com
                                            lalbert@glancylaw.com

                                            Domenico Minerva
                                            **LABATON SUCHAROW LLP**
                                            140 Broadway
                                            New York, New York 10005
                                            Tel: (212) 907-0700
                                            dminerva@labaton.com

                                            Dena C. Sharp (*pro hac vice* to be filed)
                                            Scott Grzenczyk (*pro hac vice* to be filed)
                                            Tom Watts (*pro hac vice* to be filed)
                                            **GIRARD SHARP LLP**
                                            601 California Street, Suite 1400
                                            San Francisco, CA 94108
                                            Tel: (415) 981-4800
                                            dsharp@girardsharp.com
                                            scottg@girardsharp.com
                                            tomw@girardsharp.com

                                            *Counsel for Plaintiffs and the*
                                            *Proposed Class*