UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UFCW LOCAL 1500 WELFARE FUND, et al., | |
| Plaintiffs, | |
| -against- | |
| TAKEDA PHARMACEUTICALS USA, INC., et al., | |
| Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __4/28/26__

23-CV-10030 (JHR) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiffs UFCW Local 1500 Welfare Fund, Uniformed Fire Officers Association Family Protection Plan Local 854, and Uniformed Fire Officers Association for Retired Fire Officers Family Protection Plan (RFOFPP) are employee welfare benefits funds and third-party payors (TPPs) responsible for a significant portion of the cost of drugs prescribed for their members. Plaintiffs allege that defendant Takeda Pharmaceuticals U.S.A., Inc. (Takeda), which sells the name-brand gout medication Colcrys, conspired with three generic manufacturers, including defendant Amneal Pharmaceuticals LLC (Amneal), to coordinate the timing of the generic manufacturers' market entry, restrict the supply of generic alternatives, and thereby preserve the drug's high prices. As a result of this alleged anti-competitive scheme, the TPPs paid artificially inflated prices for both the name-brand drug and its generic alternatives. In this action, they seek damages from Takeda and Amneal under the antitrust laws of 32 states and the District of Columbia. Now before the Court is Takeda's motion (Dkt. 35) to transfer venue pursuant to 28 U.S.C. § 1404(a) to the Eastern District of Pennsylvania (EDPA), where a substantially similar case was litigated from 2021 through 2023. For the reasons that follow, Takeda's motion will be granted.

## I.      BACKGROUND

### A.      Factual Background

The active ingredient in Colcrys is colchicine, derived from the autumn crocus plant, which has been used to treat and prevent symptoms of gout for thousands of years. Compl. (Dkt. 1) ¶¶ 1, 38. Colchicine is also used to treat the auto-inflammatory disease familial mediterranean fever (FMF). *Id*. ¶ 38. Prior to 2009, "at least 21 companies" marketed and sold single-ingredient colchicine tablets at low prices. *See id*. ¶ 39 ("a colchicine pill cost just $0.09").

In 2006, the Food and Drug Administration (FDA) announced its Unapproved Drugs Initiative, under which sellers of "old" prescription drugs like colchicine were required, for the first time, to submit New Drug Applications (NDAs) and obtain FDA approval for their products. Compl. ¶ 40. In 2008, Takeda's predecessor Mutual Pharmaceutical Co., Inc. (Mutual) filed three NDAs for Colcrys and, in 2009, it obtained FDA approval for Colcrys for the treatment of FMF and the treatment and prophylaxis of gout. *Id*. ¶ 41. The FDA granted Takeda's branded product "a three-year exclusivity for the treatment of acute gout flares and a seven-year exclusivity for the treatment of FMF." *Id*. As a result, the 21 existing sellers of colchicine medications "were removed from the market," and Takeda, which had a temporary monopoly, raised the price of its product dramatically. *Id*. ¶ 42. By May 2014, Takeda was charging over $5.25 per tablet of Colcrys. *Id*. The price peaked at $6.73 per tablet in January 2019. *Id*.

Between 2009 and 2012, Takeda also sought and ultimately obtained 17 U.S. patents "cover[ing] several methods of administering colchicine products to treat gout." Compl. ¶¶ 43-44. However, by 2011, Takeda's "fatally weak patents started to attract challenges" from generic drug manufactures, notably Par Pharmaceutical, Inc. (Par), Watson Laboratories, Inc. (Watson), and Amneal (collectively, the Generic Manufacturers). *Id*. ¶¶ 65-66, 68, 70. Between 2011 and 2013, Par, Watson, and Amneal filed Abbreviated New Drug Applications seeking FDA approval for

their generic colchicine tablets, along with so-called "paragraph IV certifications" that Takeda's relevant patents were invalid, unenforceable, or not infringed. *Id*. ¶¶ 66, 68, 70. In response, Takeda commenced lawsuits against each of the three Generic Manufacturers for patent infringement in the District of Delaware. *Id*. ¶¶ 67, 69, 71. The assigned judge coordinated the cases and set a joint bench trial for the patent infringement lawsuits to begin in December 2015. *Id*. ¶¶ 78, 89, 103. However, on the eve of trial, Takeda settled with each of the three Generic Manufacturers. *Id.* ¶ 113. These settlements are the foundation of the state antitrust claims alleged in this action. They are also the foundation of the federal antitrust claims alleged by pharmaceutical wholesaler Value Drug Company (Value Drug) in *Value Drug. Co. v. Takeda Pharm., U.S.A. Inc.*, No 2:21-CV-03500 (E.D. Pa.) (hereafter *Value Drug*), as discussed in more detail below.

Meanwhile, between February 2015 and September 2016, the FDA tentatively approved the applications of Par, Watson, and Amneal (in that order) to launch their respective generic versions of Colcrys. Compl. ¶¶ 73-75. As the first generic filer, Par was entitled to launch its generic product as early as July 2016 (when the last of Takeda's regulatory exclusivities expired), *id.* ¶ 73, and would thereafter be entitled to an 180-day period of generic exclusivity, "during which the FDA would not approve other generic manufacturers to sell a generic version of Colcrys." *Id*. ¶ 66. During that 180-day period, "Par would compete with Takeda's authorized generic . . . , which had been distributed by Prasco Laboratories (Prasco) since January 2015." *Id*. ¶ 106. Assuming that they too received final FDA approval, subsequent generic filers, including Watson and Amneal, would be free to launch their competing generic colchicine products after the expiration of Par's 180-day exclusivity period. *Id*. ¶¶ 74-75, 110.

Plaintiffs allege that, in order to avoid the inevitable price drop that would result from the market entry of multiple generics, "Takeda instead engineered a market allocation scheme through

3

anticompetitive agreements with Par, Watson, and Amneal that would stave off unrestricted competition for as long as possible." Compl. ¶ 112. In relevant part, pursuant to those agreements, Takeda and Par entered a "sham joint venture" whereby "Par would . . . take Prasco's place as the sole distributor of Takeda's authorized generic, and Prasco would exit the market," ensuring that "Par would get 100% of the generic Colcrys market and be able to charge an elevated price as a result, instead of competing on price with Prasco." *Id*. ¶¶ 113, 132-33. However, Par agreed to refrain from entering the market for two and a half years, in order to "delay . . . other manufacturers from coming to market" and lengthen the time Takeda enjoyed a market free of competition. *Id*. ¶¶ 114-115, 117. For their part, Watson and Amneal agreed to delay their entry into the generic colchicine market for nearly five years, thereby artificially extending Takeda and Par's "two-firm arrangement," in exchange for protection from other prospective competitors. *Id*. ¶¶ 119, 124, 126, 129-30, 134-36, 169. To that end, Takeda entered into licensing agreements with other non-conspiring generic companies to delay their entry until 135 days after Watson and Amneal entered the market. *Id*. ¶¶ 130, 137-38. Because companies can charge "at least 20% higher" in a generic market limited to three competitors (compared to a market with additional competitors), this agreement ensured that Amneal and Watson got "a 'better deal' than subsequent [] filers got or could get." *Id*. ¶¶ 137-38, 170-71.

Ultimately, by 2021, multiple non-conspiring competitors were able to enter the market, causing the price of a colchicine pill to drop to $0.1475 (approximately 2% of the January 2019 peak price for name-brand Colcrys tablets). Compl. ¶ 172.

### B.    The EDPA Litigation

On August 5, 2021, Value Drug – a drug wholesaler that directly purchased Colcrys and its generic counterparts from Takeda, Prasco, and Par – filed a putative class action complaint, alleging conspiracy in restraint of trade and monopolization in violation of §§ 1 and 2 of the

Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, against Takeda, Par, Watson, Amneal, Teva Pharmaceutical Industries Ltd. (Teva Ltd.), Teva Pharmaceuticals USA, Inc. (Teva USA), and other alleged co-conspirators.[1] The case was assigned to the Hon. Mark A. Kearney, United States District Judge, who determined two motions to dismiss, *see Value Drug Co. v. Takeda Pharm., U.S.A. Inc.*, 2021 WL 6200907, at *8- 9 (E.D. Pa. Dec. 29, 2021); *Value Drug Co. v. Takeda Pharm., U.S.A. Inc.*, 2022 WL 952896, at *3-7 (E.D. Pa. Mar. 30, 2022); oversaw a substantial discovery period and two rounds of class certification motions, *see Value Drug Co. v. Takeda Pharm., U.S.A. Inc.*, 2022 WL 17177267, at *1 (E.D. Pa. Nov. 23, 2022); *Value Drug Co. v. Takeda Pharm., U.S.A. Inc.*, 2023 WL 2314911, at *2 (E.D. Pa. Feb. 28, 2023); heard and resolved numerous *Daubert* motions and other pretrial disputes; and ultimately presided over a nine-day jury trial beginning on September 5, 2023, during the course of which the defendants all entered into confidential settlement agreements. The last defendant to settle was Takeda, which did so on September 19, 2023 (the final day of trial), by which time Judge Kearney had heard testimony from 36 witnesses, including nine experts. (*See* Dkt. 1178 in *Value Drug*, at 63-64.)

### C.     This Action

Approximately two months later, on November 14, 2023, plaintiffs commenced the instant action in this District against Takeda, Amneal, Watson, Teva Ltd., and Teva USA. Compl. at 1. Aside from asserting state rather than federal causes of action, plaintiffs make substantially the same factual allegations made in *Value Drug* and raise substantially the same claims, including claims for conspiracy in restraint of trade, monopolization, and unfair competition. *Id*. ¶¶ 225-313.

---

[1] Teva Ltd. is the successor-in-interest to Watson, which it acquired in August 2016. Compl. ¶¶ 11, 13. Teva USA is a wholly-owned subsidiary of Teva Ltd. *Id*. ¶ 12.

On February 28, 2024, Takeda filed a pre-answer motion to transfer this case to the EDPA, accompanied by a memorandum of law (Takeda Mem.) (Dkt. 36) in which Takeda argues principally that "considerations of judicial efficiency and the interest of justice overwhelmingly favor the Eastern District of Pennsylvania where the case can be heard by Judge Kearney, who is already steeped in the facts and the core legal issues that will need to be addressed in this case." *Id*. at 2.

On March 6, 2024, the Honorable Jennifer H. Rearden, United States District Judge, granted the parties' joint letter-motion to extend defendants' deadline to answer or otherwise respond to the Complaint until 45 days after the resolution of Takeda's motion to transfer. (Dkt. 41.) On March 14, 2024, plaintiffs voluntarily dismissed Watson, Teva Ltd., and Teva USA from the case (Dkt. 46), leaving only their claims against Takeda and Amneal.

On March 13, 2024, plaintiffs responded to Takeda's motion to transfer, stating that while they believe this District is an appropriate venue, they do not oppose a transfer "to Judge Kearney" in the EDPA, and "are prepared to proceed in whichever venue the Court deems most appropriate." Pl. Resp. (Dkt. 44) at 1. However, plaintiffs "would oppose transfer" if the case is transferred "to a different judge in the Eastern District of Pennsylvania." *Id*.

That same day, defendant Amneal filed a letter-brief asserting that if this action were transferred to the EDPA, it would contest personal jurisdiction there. Amneal Opp. (Dkt. 43) at 1. Amneal noted that it is incorporated in Delaware, with its principal place of business in New Jersey, and pointed out that plaintiffs fail to allege that they purchased any product from Amneal in Pennsylvania or that they suffered any injury in that state. *Id*. at 1-2.

On March 20, 2024, Takeda filed a reply memorandum, arguing that Pennsylvania has a consent-by-registration statute which provides for general personal jurisdiction over out-of-state

6

companies that – like Takeda – have registered to do business in Pennsylvania. *See* Takeda Reply (Dkt. 47) at 1 (citing 42 Pa. Cons. Stat. § 5301(a)(2)(i), (b)). Takeda further noted that in *Mallory v. Norfolk S. Railway Co.*, 600 U.S. 122, 134-36 (2023), the Supreme Court held that Pennsylvania's consent-by-registration statute comports with due process. *Id*.

That same day, plaintiffs filed their own reply, agreeing that "a motion by Amneal to challenge personal jurisdiction in the Eastern District of Pennsylvania would likely be unsuccessful," Pl. Reply (Dkt. 48) at 2, because "[c]onsent by registration is sufficient to establish personal jurisdiction regardless of whether the court would otherwise have general or specific personal jurisdiction over the defendant." *Id*. at 3 (citing *Camber Spine Tech. v. Intermed Resources, LLC*, 2023 WL 5182597, at *4 (E.D. Pa. Aug. 11, 2023)). As Exhibit A to their reply, plaintiffs attach a copy of Amneal's Certificate of Registration from the Pennsylvania Department of State. *Id.* at 3 & Ex. A (Dkt. 48-1) (Cert. of Reg.).

On March 27, 2024, with permission of the Court (Dkt. 52), Amneal filed a sur-reply brief arguing that "Plaintiffs have not and cannot establish that Amneal has substantial business operations in Pennsylvania, which distinguishes this case from *Mallory* and compels the conclusion that any consent-by-registration rule would be unconstitutional as applied to Amneal." Amneal Sur-Reply (Dkt. 55) at 2. In Amneal's view, Pennsylvania's consent-by-registration statute, as applied to it, would violate the Dormant Commerce Clause. *Id*. at 3.

On November 6, 2025, Judge Reardon referred the venue motion to me for decision. (Dkt. 56.)[2] On November 17, 2025, I issued an order granting the parties an opportunity to submit any

---

[2] A motion to transfer venue pursuant to 28 U.S.C. § 1404(a) is a non-dispositive motion that can be determined by a magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a), "because it can result only in the transfer of the case to another federal district, not in a decision on the merits or even a determination of federal jurisdiction." *Salzman v. Travelers Home & Marine Ins. Co.,* 2016 WL 3951206, at *1 (S.D.N.Y. July 20, 2016) (quoting *Adams v. Key*

updates to the Court. (Dkt. 57.) Amneal's update letter, submitted on November 21, 2025, argues that the passage of "more than 2 years since Judge Kearney has had any involvement with the previously adjudicated action . . . has likely lessened substantially any efficiencies that might have been gained from transferring this action to the Eastern District of Pennsylvania." Amneal Update Ltr. (Dkt. 58) at 1. Amneal adds that there is no guarantee that the case would be assigned to Judge Kearney. *Id*.

Takeda's update letter, filed on the same date, notes that since the parties' last submissions, "additional decisions from the Eastern District of Pennsylvania have been issued providing further guidance . . . that jurisdiction over an out-of-state company [is] appropriate based on registration alone, without assessing the defendant's business operations in Pennsylvania." (Dkt. 60 at 1-2.) Plaintiffs advised that they had no further relevant updates. (Dkt. 61.) Finally, on December 1, 2025, Amneal filed a reply letter (Amneal Reply Ltr.) (Dkt. 62), attempting to distinguish the recent EDPA cases cited by Takeda.

## II.    STANDARDS

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought[.]" 28 U.S.C. § 1404(a). When deciding a motion to transfer venue, a district court must conduct a two-part inquiry: "First, the court must determine whether the action could have been brought in the proposed transferee forum" – here, the EDPA. *Burgos v. United States*, 2017 WL 2799172, at *2 (S.D.N.Y. June 27, 2017) (quoting *Freeplay Music, LLC v. Gibson Brands, Inc.*, 195 F. Supp. 3d 613, 616 (S.D.N.Y. 2016)). "Second, the court must . . . determine whether transfer is

---

*Tronic Corp.,* 1997 WL 1864, at *1 (S.D.N.Y. Jan. 2, 1997)); *accord Atari Interactive, Inc. v. Target Corp.*, 2019 WL 6728860, at *2 (S.D.N.Y. Dec. 10, 2019); *Philpot v. Kos Media LLC*, 2017 WL 2271540, at *1 n.1 (S.D.N.Y. May 3, 2017).

appropriate." *Id.* (internal quotations omitted) (alteration in original). The federal district courts have "broad discretion in making determinations of convenience under Section 1404(a)." *Corley v. United States*, 11 F.4th 79, 89 (2d Cir. 2021) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006)). In exercising that discretion, the courts commonly consider the following nine factors:

> (1) the locus of the operative facts; (2) convenience of the parties; (3) the convenience of the witnesses; (4) the location of relevant documents and relative ease of proof; (5) the relative means of the parties; (6) the availability of process to compel attendance of unwilling witnesses; (7) a forum's familiarity with the governing law; (8) the weight accorded to plaintiff's choice of forum; and (9) trial efficiency and the interests of justice based on the totality of the circumstances.

*Schuyler v. Sun Life Assurance Co. of Canada*, 2021 WL 5853991, at *3 (S.D.N.Y. Dec. 9, 2021); *accord Burgos*, 2017 WL 2799172, at *2; *Am. Eagle Outfitters, Inc. v. Tala Bros. Corp.*, 457 F. Supp. 2d 474, 477 (S.D.N.Y. 2006). "The factors do not comprise an exclusive list, and they should not be applied mechanically or formulaically but rather to guide the Court's exercise of discretion." *Matthews v. Cuomo*, 2017 WL 2266979, at *2 (S.D.N.Y. May 1, 2017). The moving party bears the burden of establishing the propriety of the transfer by "clear and convincing evidence." *Schuyler,* 2021 WL 5853991, at *2 (citing *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010)).

## III.    DISCUSSION

### A.    This Action Could Have Been Brought in the Transferee Forum

For purposes of § 1404(a), "an action might have been brought in another forum if, at the time the action was originally filed, the transferee court would have had subject matter jurisdiction and personal jurisdiction over the defendants, and if venue would have been proper in the transferee court." *Guardian Life Ins. Co. of Am. v. Coe*, 724 F. Supp. 3d 206, 213 (S.D.N.Y. 2024) (quoting *Posven, C.A. v. Liberty Mut. Ins. Co.*, 303 F. Supp. 2d 391, 401 (S.D.N.Y. 2004)). Here,

the parties do not dispute that the EDPA would have subject matter jurisdiction in this action. They disagree, however, as to whether defendant Amneal would be subject to personal jurisdiction in the EDPA.

Pennsylvania state law provides that an out-of-state corporation "may not do business in this Commonwealth until it registers with" the Pennsylvania Department of State. 15 Pa. Cons. Stat. § 411(a). As part of the registration process, the out-of-state corporation is required to identify an "office" that it will "continuously maintain" in Pennsylvania. *Id*. § 411(f); *see also id.* § 412(a)(5). Once these requirements are met, the out-of-state corporation "shall enjoy the same rights and privileges as a domestic entity and shall be subject to the same liabilities, restrictions, duties and penalties . . . imposed on domestic entities[.]" *Id*. § 402(d). Another provision expressly states that "qualification as a foreign corporation under the laws of this Commonwealth" enables "the tribunals of this Commonwealth to exercise general personal jurisdiction" over the registered foreign corporation to the same extent as domestic corporations. 42 Pa. Cons. Stat. § 5301(a)(2)(i); *see also id.* § 5301(b) (providing that "any cause of action may be asserted" against a registered foreign corporation, "whether or not arising from acts enumerated in this section"). Thus, "Pennsylvania law expressly provides that a foreign corporation's registration to do business constitutes consent to general jurisdiction." *Jasinski v. Kia Am., Inc.*, 2025 WL 3047883, at *6 (E.D. Pa. Oct. 31, 2025).

In *Mallory*, the Supreme Court upheld the constitutionality of Pennsylvania's consent-by-registration statutory scheme, finding that suits against foreign corporations in Pennsylvania "premised on these grounds do not deny a defendant the due process of law." *Mallory*, 600 U.S. at 135. In reaching this holding, the Court expressly declined to overturn *Pennsylvania Fire Ins. Co. of Philadelphia v. Gold Issue Min. & Mill. Co.*, 243 U.S. 93 (1917),

10

which upheld a similar Missouri law under which out-of-state insurance companies were required to consent to service of process on the state insurance superintendent in order to receive a license to conduct business in state. *Mallory*, 600 U.S. at 134.

### 1.    Amneal's Due Process Challenge

Amneal attempts to distinguish *Mallory* on two different grounds. First, Amneal argues that *Mallory* only applies where the foreign corporation has "substantial business operations in the state." Amneal Sur-Reply at 2-4. In *Mallory*, the defendant, Norfolk Southern, undeniably had "substantial business operations" in Pennsylvania, where it "manage[d] over 2,000 miles of track, operate[d] 11 rail yards, and [ran] 3 locomotive repair shops in Pennsylvania." *Mallory*, 600 U.S. at 127; *see also id.* at 153 (Alito, J., concurring in part and concurring in judgment) (discussing Norfolk Southern's "extensive operations" in Pennsylvania). Here, in contrast, Amneal argues, plaintiffs have failed to show that it "has substantial business operations in Pennsylvania," such that "*Mallory's* Due Process holding does not apply." *Id*. at 3.

At the time Amneal submitted its sur-reply, no court in the Third Circuit had squarely addressed this argument. However, on March 5, 2026, Judge Kearney (the same judge who presided over the *Value Drug* litigation) expressly rejected the precise distinction that Amneal hopes to draw. *See Blade v. Sig Sauer, Inc.*, 2026 WL 625093, at *4-7 (E.D. Pa. Mar. 5, 2026). In *Blade*, a New Hampshire-based firearms manufacturer, Sig Sauer, was sued in the EDPA by 51 plaintiffs, including two Pennsylvania residents, who alleged that they were injured by its products. Sig Sauer moved to dismiss for lack of personal jurisdiction, arguing – as Amneal argues here – that Pennsylvania's consent-by-registration statute violates the Due Process Clause, as applied to it, because it did not have extensive or substantial operations in Pennsylvania. 2026 WL 625093, at *6. Indeed, Sig Sauer swore that it "has no operations in Pennsylvania," "does not have a

11

physical presence," "owns no property, leases no property, maintains no corporate offices," "does not engage in systematic corporate or business activity," and "does not have a history of affirmatively filing lawsuits in Pennsylvania [c]ourts." *Id.* at *4 (alteration in original) (internal citations omitted). However, "guided by colleagues [in other Districts] addressing similar consent-by-registration statutes after *Mallory*," Judge Kearney expressly rejected Sig Sauer's "attempts to distinguish the Court's *Mallory* guidance," *id.*, explaining that:

> The Court in *Pennsylvania Fire* makes no mention of the amount of business the out-of-state corporation conducted in Missouri. Nor do we read the Court in *Mallory* conditioning a holding on an operational scale. The Court's *Pennsylvania Fire* guidance remains controlling precedent and we are bound to follow it . . . The statute is clear registration carries the consequence of general personal jurisdiction. Like Norfolk Southern, Sig Sauer has "complied with this law for many years" and has "agreed to be found in Pennsylvania and answer any suit [] here for more than 20 years." *Pennsylvania Fire* requires no further analysis.

*Id.* at *6 (second alteration in original) (quoting *Mallory*, 600 U.S. at 134-35).

As Takeda notes, other federal courts in Pennsylvania have also applied *Mallory* to find general personal jurisdiction over foreign corporations based solely on their registration to do business in Pennsylvania. *See Jasinski*, 2025 WL 3047883, at *6 (applying *Mallory* to hold that "Defendant's registration to do business in Pennsylvania, coupled with its appointment of a registered agent, satisfies § 5301 and independently establishes personal jurisdiction. Under *Mallory* . . . , no further 'minimum contacts' analysis is necessary."); *Thurlow v. Nat'l Inspection Servs., LLC*, 2025 WL 408352, at *4 (W.D. Pa. Feb. 6, 2025) (applying *Mallory* to hold that "general personal jurisdiction exists over NIS because it is registered as a foreign corporation in Pennsylvania, and therefore has consented to general personal jurisdiction"); *Fry v. American Honda Motor Co.*, 2026 WL 801428, at *10 (M.D. Pa. Mar. 23, 2026) (applying *Mallory* to hold that "[b]ecause Honda has registered to do business and has a registered agent in Pennsylvania, it has consented to personal jurisdiction"); *see also Robinson v. Home Goods, Inc.*, 2023 WL

12

5401630, at *1 (E.D. Pa. Aug. 22, 2023) (applying *Mallory* to find that venue was proper in the EDPA where "the defendant corporations consented to jurisdiction when they registered to do business in Pennsylvania").

Here, plaintiffs have submitted a copy of Amneal's certificate of registration to do business in Pennsylvania, showing that, since 2015,[3] it has "chose[n] to register in Pennsylvania as an out-of-state corporation," *Blade*, 2026 WL 625093, at *1, "apparently believing," when it registered, that it "did business" in Pennsylvania, and enjoying the benefits attendant upon such registration, including the privilege of suing in the Pennsylvania state courts. *Id*. Since neither *Mallory* nor *Pennsylvania Fire* requires further analysis, I conclude – as did judge Kearney in *Blade* – that "[e]xercising general personal jurisdiction over [Amneal] does not violate the Due Process Clause." *Id*. at *7. It follows that a motion by Amneal to challenge personal jurisdiction in the EDPA on due process grounds would likely be unsuccessful.[4]

### 2.    Amneal's Dormant Commerce Clause Challenge

Next, invoking *dicta* in Justice Alito's concurrence in *Mallory*, Amneal argues that applying Pennsylvania's consent-by-registration statute to it would violate the Dormant Commerce

---

[3] *See* Cert. of Reg. (showing a registration date of February 19, 2015).

[4] Amneal also appears to challenge specific personal jurisdiction, contending that plaintiffs allege no facts to suggest that it has sufficient "contacts" with Pennsylvania. Amneal Opp. at 1 (citing *Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. 255 (2017)). Given my finding that the EDPA may exercise general jurisdiction over Amneal, I need not address specific jurisdiction. *See Blade*, 2026 WL 625093, at *2 n.17 ("Sig Sauer also challenges specific personal jurisdiction . . . We need not address specific jurisdiction as we find general personal jurisdiction."); *Sloan v. Burist*, 2023 WL 7309476, at *6 (S.D. Ga. Nov. 6, 2023) ("[A] determination that [defendant] Mayflower is subject to general personal jurisdiction in Georgia is dispositive of Mayflower's motion to dismiss."); *see also Thurlow*, 2025 WL 408352, at *6 (denying NIS's motion to add an affirmative defense regarding its lack of "minimum contacts" with Pennsylvania as futile because, having already found that it could exercise general personal jurisdiction over NIS based on its Pennsylvania registration, the court "does not need to exercise specific personal jurisdiction over NIS").

Clause. In *Mallory*, Justice Alito agreed that the statute did not violate the Due Process Clause, but posed the question whether "a State's assertion of jurisdiction over lawsuits with no real connection to the State may violate fundamental principles that are protected by one or more constitutional provisions or by the very structure of the federal system that the Constitution created." *Mallory*, 600 U.S. at 150 (Alito, J., concurring in part and concurring in the judgment). As Amneal notes, "[w]hile the four-justice dissent found a home for this principle in the Due Process Clause," Amneal Sur-Reply at 3, Justice Alito believed that "the most appropriate home for these principles is the so-called dormant Commerce Clause." *Mallory*, 600 U.S. at 150. In Justice Alito's view, "there is a good prospect that Pennsylvania's assertion of jurisdiction [based on its consent-by-registration statute] . . . violates the Commerce Clause," *id*. at 160, because that statute "discriminates against out-of-state companies," or, "at the very least," imposes a "'significant burden' on interstate commerce by '[r]equiring a foreign corporation . . . to defend itself with reference to all transactions,' including those with no forum connection." *Id*. (alterations in original) (quoting *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888, 893 (1988)).

Since *Mallory,* however*,* judges in the Eastern and Middle Districts of Pennsylvania have rejected the argument that Pennsylvania's consent-by-registration statute violates the Dormant Commerce Clause. *See Jasinski*, 2025 WL 3047883, at *6 (finding no Dormant Commerce Clause violation even though the plaintiff purchased his allegedly defective Kia Soul in Florida and the case had no discernable connection to the forum other than defendant's registration to do business in Pennsylvania); *Fry*, 2026 WL 801428, at *11 (rejecting defendant's Dormant Commerce Clause argument and noting that Justice Alito's concurrence does "not constitute binding precedent"); *Blade*, 2026 WL 625093, at *7 (finding no Dormant Commerce Clause violation "in a case brought

14

by at least two Pennsylvanians").[5] Other District Courts have likewise rejected this argument. *See, e.g.*, *Am. Food & Vending Corp. v. Goodyear Tire & Rubber Co.*, 2025 WL 2770651, at *5 (D. Kan. Sept. 29, 2025) (finding no Dormant Commerce Clause violation where the consent-by-registration statute "does not discriminate against out-of-state entities but merely places them in the same footing as in-state entities," and collecting cases).

As Judge Kearney pointed out in *Blade*, Amneal's Dormant Commerce Clause argument "rests on non-binding dicta" by a single justice. 2026 WL 625093, at *7. Since *Mallory*, moreover, neither the Third Circuit nor any District Court within that Circuit has relied on that *dicta* to hold that Pennsylvania's consent-by-registration statute violates the Dormant Commerce Clause. Consequently, for purposes of § 1404(a), I find that this action could have been brought in the EDPA. *Coe*, 724 F. Supp. 3d at 213.

### B.    Whether Transfer is Appropriate in the Interest of Justice

Next, I turn to the nine customary factors considered in determining whether convenience and fairness favor transfer under § 1404(a) and conclude that transfer to the EDPA is appropriate.

#### 1.    Trial Efficiency and the Interests of Justice

Takeda argues that "considerations of judicial efficiency and the interest of justice overwhelmingly favor transferring this case to the Eastern District of Pennsylvania," where it is likely to be heard by Judge Kearney, who presided over a substantially similar action for approximately two years, including through a nine-week trial. Takeda Mem. at 7. While Takeda concedes that there is no guarantee that this case, if transferred, would be assigned to Judge

---

[5] In the case at bar, none of the plaintiffs is "a Pennsylvanian." However, plaintiff RFOFPP has members in Pennsylvania, and alleges that it "paid for some or all of its members' purchases of brand and/or generic Colcrys in . . . Pennsylvania." Compl. ¶ 9.

Kearney, the EDPA's local rules appear to create a strong presumption in favor of that assignment. *See* E.D. Pa. Local Civ. R. 40.1.

In *Berger v. Cushman & Wakefield of Pennsylvania, Inc.*, 2013 WL 4565256, at *13 (S.D.N.Y. Aug. 28, 2013), Judge Oetkin considered a similar pre-answer motion to transfer a case to the EDPA. In that case, defendants contended that the transfer would serve trial efficiency and the interests of justice because the transferee court had presided over a related but no longer pending case. *Id.* However, pursuant to the EDPA's local civil rules – as in effect in 2013 – Judge Oetkin concluded that the action before him would not qualify as a "related case" upon transfer, since the earlier-filed case had been "resolved more than one year [prior]." *Id.* (quoting E.D. Pa. Local Civ. R. 40.1(b)(3), as in effect in 2013, which provided: "[a]t the time of filing any civil action or proceeding, counsel shall indicate on the appropriate form whether the case is related to any other pending or within one (1) year previously terminated action of this court."). Accordingly, Judge Oetkin found that this factor was neutral, since the case "would not automatically be assigned to [the judge] who presided over the prior litigation," but "there still might be some efficiency given the relatively recent adjudication of closely related litigation in Pennsylvania." *Id.*

Since then, the EDPA has amended Rule 40.1 and removed the language quoted above. Rule 40.1 now states that any "newly filed case[]" will be deemed "related to a prior filed civil case if," among other things, it "involve[s] a transaction or occurrence which was the subject of an earlier numbered suit." E.D. Pa. Local Civ. R. 40.1(IV)(a). The current rule further provides that if the case relationship is appropriately indicated at the time of filing, "the assignment clerk *shall assign* the case to the same judge to whom the earlier numbered related case is assigned." *Id.* at 40.1(V)(a) (emphasis added). The assigned judge may decline to accept the case only if he or she

16

is "of the opinion that the relationship does not exist." *Id.*[6] Thus, the plain language of Rule 40.1 – in its present form – supports Takeda's contention that "the Eastern District of Pennsylvania has procedures to ensure that related cases are transferred to the appropriate judge." Takeda Mem. at 7. Given the likelihood of assignment to Judge Kearney, this factor weights in favor of transfer. *See Pictometry Int'l Corp. v. Geospan Corp.*, 2011 WL 13213624, at *2 (W.D.N.Y. May 12, 2011) (finding that this factor weighed in favor of transfer under similar local rules, where the earlier-filed action was no longer pending, but that the judge who presided over the earlier case for two and a half years "is by now quite familiar with the relevant patents and the general nature of the dispute in this case") (collecting cases).

Moreover, this case remains at the "earliest stages" of litigation. *Frame v. Whole Foods Mkt., Inc.*, 2007 WL 2815613, at *7 (S.D.N.Y. Sept. 24, 2007). No discovery has been conducted or even scheduled, such that "there [will] be little loss in judicial economy by transferring the case." *Id.*

### 2.     Locus of the Operative Facts

The locus of the operative facts also weighs in favor of transfer. Here, while plaintiffs are New York-based health and welfare benefit plans, none of the operative facts took place in this District. Instead, plaintiffs allege a nationwide conspiracy pertaining to the sale of Colcrys in more than 12 states, including both New York and Pennsylvania. *See* Compl. ¶¶ 7-9 (alleging that between 2017 and 2020, plaintiffs paid for some or all of their members' purchases of brand and/or generic Coclrys in California, Connecticut, Delaware, Florida, Georgia, New Jersey, New York,

---

[6] The rule does not permit the judge to reject the later-filed case based on any other concerns. However, if that judge has caseload concerns, he or she may call the matter to the attention of the Chief Judge and "request leave to reassign *a case of like category and approximately similar age*," to ensure "equal distribution of the workload." E.D. Pa. Local Civ. P. 40.1(V)(c) (emphasis added).

North Carolina, Pennsylvania, Virginia, Wyoming, and Utah). Plaintiffs have not alleged that the underlying conspiracy, achieved through settlement agreements arising out of the Delaware litigation, has any specific nexus to New York.

In support of transfer, Takeda further points out that the Complaint contains substantial allegations regarding "certain . . . foundational events [that] occurred in the Eastern District of Pennsylvania." Takeda Mem. at 10. Specifically, as described above, plaintiffs have made detailed allegations regarding actions taken by Takeda's predecessor Mutual, which was headquartered in Philadelphia, including, "for example, filing the NDAs for Colcrys, obtaining the patents covering Colcrys that Plaintiffs contend were invalid, and initiating the patent infringement lawsuit against Par that Plaintiffs claim was the first step in the overarching conspiracy." Takeda Mem. at 11 (citing Compl. ¶¶ 24, 41, 97-102). Given that neither plaintiffs nor Amneal offers any arguments to the contrary, I agree with Takeda that "between the two venues, the Eastern District of Pennsylvania" has a closer nexus to the operative facts of this case. *Id*.

### 3.    Familiarity with Governing Law

Plaintiffs allege violations of the antitrust laws of 32 states and the District of Columbia, including New York (but not Pennsylvania). While judges in this District may be "more familiar" with New York's antitrust law – and potentially, for that reason, more efficient in resolving those particular claims, *see Jones v. United States*, 2002 WL 2003191, at *4 (E.D.N.Y. Aug. 26, 2002) – judges in both Districts are of course equally capable of applying the antitrust laws of the remaining 31 states and the District of Columbia. Moreover, as Takeda notes, most state antitrust statutes are interpreted through "federal case law applying the Sherman Act," as to which all federal courts are "presumed to possess equal skill" and knowledge. Takeda Mem. at 11. Accordingly, this factor does not meaningfully favor either forum and is therefore neutral.

18

### 4.   Convenience of the Witnesses and Availability of Process to Compel Attendance of Unwilling Witnesses

"Courts typically regard the convenience of witnesses as the most important factor in considering a § 1404(a) motion to transfer." *Berger*, 2013 WL 4565256, at *5 (collecting cases). "In evaluating this factor, the court should look beyond the quantity of witnesses and assess the quality of the testimony offered." *Id.* (citation omitted). In order to do so, the movant must "identify the material witnesses and supply a general description of what their testimony will cover." *Id.* (quotations and citations omitted). "The convenience of non-party witnesses is accorded more weight than that of party witnesses." *Indian Harbor Ins. Co. v. Factory Mut. Ins. Co.*, 419 F. Supp. 2d 395, 402 (S.D.N.Y. 2005). Here, Takeda argues that the convenience of several non-party witnesses – and the parties' ability to compel their appearance if necessary – favors transfer to the EDPA. *See* Takeda Mem. at 9.

Specifically, Takeda identifies a "significant nonparty witness," Dr. Matthew Davis, upon whom it relied in the *Value Drug* trial, and who resides in a suburb "just outside of Philadelphia." Takeda Mem. at 9-10. Dr. Davis was "the inventor of the patented innovations covering Colcrys." *Id.* at 10. Takeda also lists several additional non-party witnesses whom it previously called at trial and who reside in Delaware, which is "roughly 30 miles from the Eastern District of Pennsylvania." *Id.* at 10. Conversely, neither plaintiffs nor Amneal have identified any non-party witnesses who could be subpoenaed to appear at trial in this District, but not in the EDPA, and who would be unwilling to travel to Pennsylvania voluntarily. Accordingly, these factors weigh in favor of transfer. *See, e.g., Wyndham Assocs. v. Bintliff*, 398 F.2d 614, 619 (2d Cir. 1968) (saving witnesses time and expense weighs in favor of transfer); *CCM Pathfinder Pompano Bay, LLC v. Compass Fin. Partners LLC*, 396 B.R. 602, 608 (S.D.N.Y. 2008) (same).

19

### 5.   Convenience of the Parties

It would be more convenient for defendant Takeda to litigate this case in the Eastern District of Pennsylvania. *See* Takeda Mem. at 9-12. It would be more convenient for defendant Amneal to litigate in the Southern District of New York. *See* Amneal Update Ltr. at 1. The plaintiffs do not discuss which forum is more convenient for them. Instead, they state that they "are prepared to proceed in whichever venue the Court deems most appropriate." Pl. Resp. at 2. This factor therefore does not tip the scales in either direction.

### 6.   Location of Relevant Documents and Relative Ease of Proof

Takeda asserts that the location of relevant documents is neutral given the "ease of access to sources of proof" through electronic discovery. Takeda Mem. at 12 n.10. I agree. *See Am. S.S. Owners Mut. Prot. & Indemn. Association v. Lafarge N. Am., Inc.,* 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007) ("The location of relevant documents is largely a neutral factor in today's world of faxing, scanning, and emailing documents."); *accord Mastr Asset Backed Sec. Tr. 2007-WMC1, ex rel. U.S. Bank Nat. Ass'n v. WMC Mortg. LLC*, 880 F. Supp. 2d 418, 422-23 (S.D.N.Y. 2012). Moreover, none of the other parties provides any argument concerning this factor. Accordingly, I conclude that the location of relevant documents is neutral.

### 7.   Relative Means of the Parties

Takeda asserts that there is no "significant financial disparity" that would impact the parties' ability to litigate in either forum. Takeda Mem. at 12 n.10. Plaintiffs and Amneal are silent as to this factor, thereby conceding that it is also neutral.

### 8.   Plaintiffs' Choice of Forum

While a plaintiff's choice of forum is "presumptively entitled to substantial deference," *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 698 (S.D.N.Y. 2009), this factor is

far less compelling where, as here, plaintiffs do not oppose transfer. *See* Pl. Resp. at 2 (noting that plaintiffs "take no position on Takeda's motion and are prepared to proceed in whichever venue the Court deems most appropriate"). I therefore conclude that this factor weighs neither for nor against the requested transfer.

### 9.    Weighing the Factors

I have found that four factors weigh in favor of transfer to the EDPA – trial efficiency; the locus of the operative facts; the convenience of witnesses; and the availability of process to compel unwilling witnesses – while all of the other factors are neutral. On balance, therefore, I conclude that "transfer is appropriate." *Burgos*, 2017 WL 2799172, at *2.

## IV.    Conclusion

For the foregoing reasons, Takeda's motion (Dkt. 35) is GRANTED. The Clerk of Court is respectfully directed to TRANSFER this case to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a).

Dated: New York, New York        **SO ORDERED**.
      April 28, 2026

_____
**BARBARA MOSES**
**United States Magistrate Judge**